IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*2:15 pm, Jun 23, 2026*
**JEFFREY P. COLWELL, CLERK**

Civil Action No. _____

ALEC S. COSTERUS, and

DENISE M. COSTERUS,

   *Plaintiffs*,

v.

JACOB JENKINS, individually;

GRACE MANCUSO, individually;

BLAKE REESE DAVIS, individually;

KEVIN CROMWELL, individually;

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF DOUGLAS;

DARREN WEEKLY, in his official capacity as Sheriff of Douglas County, Colorado, to the extent necessary for official-capacity, municipal, policy, custom, sheriff-policy, final-policymaker, jail, training, supervision, discipline, ratification, indemnification, and prospective relief;

ELIZABETH WILCOX, individually and, alternatively, as a private actor acting under color of law;

JOHN AND JANE DOE, their respective official capacity as DCSO Supervisors, Watch Commanders, Report Reviewers, Probable Cause Reviewers, Arrest Review Officers, Records Personnel, Trainers, Policymakers, Detention Officers, Medical Providers, and Intake Personnel, 1–30, individually,

   *Defendants.*

---

## COMPLAINT AND JURY DEMAND

---

**TABLE OF CONTENTS**

I.      Nature of Action ........................................................................................... Page   4

II.     Jurisdiction and Venue ................................................................................ Page   8

III.    Parties............................................................................................................ Page   9

IV.     Notice, Conditions Precedent, and Preservation of Claims ................................ Page 13

V.      Pleading Clarifications Concerning Anticipated Defenses.................................. Page 15

VI.     Exhibit Placeholders.................................................................................... Page 19

VII.    Common Factual Background ...................................................................... Page 21

VIII.   Factual Allegations — Denise Costerus October 9–10, 2025 Incident........... Page 28

IX.     Factual Allegations — Alec Costerus June 6, 2026 Incident ............................. Page 53

X.      Common Municipal-Liability Facts ............................................................... Page 63

XI.     Claims for Relief .......................................................................................... Page 68

        Claim One — 42 U.S.C. § 1983, Fourth Amendment False Arrest /
        Unlawful Seizure — Denise............................................................................. Page 68

        Claim Two — 42 U.S.C. § 1983 — Fourth Amendment Judicial
        Deception / Material Falsehoods and Omissions — Denise .............................. Page 70

        Claim Three — 42 U.S.C. § 1983 — Fourth Amendment Malicious
        Prosecution / Wrongful Legal Process — Denise.............................................. Page 73

        Claim Four — 42 U.S.C. § 1983 — Fourth and Fourteenth Amendment
        Unreasonable Restraint, Transport, Detention Conditions, and
        Custodial Medical Treatment — Denise ......................................................... Page 74

        Claim Five — 42 U.S.C. § 1983 — Failure to Intervene — Denise ................... Page 75

        Claim Six — 42 U.S.C. § 1983 — Fourth Amendment Warrantless
        Home-Threshold Seizure / Constructive Home Arrest — Alec.......................... Page 76

        Claim Seven — 42 U.S.C. § 1983 — Fourth Amendment False Arrest /
        Unlawful Seizure — Alec ............................................................................... Page 77

Claim Eight — 42 U.S.C. § 1983 — Failure to Intervene — Alec ......................Page 78

Claim Nine — 42 U.S.C. § 1983 — Municipal / Official-Capacity
Liability—Plaintiffs.............................................................................................Page 79

Claim Ten — Alternative Joint-Action Liability Under 42 U.S.C.
§ 1983 — Wilcox.................................................................................................Page 82

Claim Eleven — C.R.S. § 13-21-131 — Colorado Constitutional
Unreasonable Seizure / Deprivation of Rights — Denise ...................................Page 84

Claim Twelve — C.R.S. § 13-21-131 — Colorado Constitutional
Unreasonable Seizure / Home-Threshold Violation — Alec..............................Page 86

Claim Thirteen — Colorado State Tort — Malicious
Prosecution — Denise .........................................................................................Page 88

Claim Fourteen — Colorado State Tort — False Arrest /
False Imprisonment — Denise ...........................................................................Page 89

Claim Fifteen — Colorado State Tort — Defamation /
Defamation *Per Se* — Plaintiffs........................................................................Page 90

Claim Sixteen — Colorado State Tort — Negligence /
Negligence *Per Se* Relating to Unrestrained Dog — Denise ...............................Page 92

Claim Seventeen — Colorado State Tort — Intentional Infliction
of Emotional Distress / Outrageous Conduct — Plaintiffs ..................................Page 93

Claim Eighteen — Colorado State Tort — Abuse of Process — Alec...............Page 94

XII.      Damages ..............................................................................................Page 96
XIII.     Prayer for Relief..................................................................................Page 97
XIV.      Jury Demand .......................................................................................Page 98

Exhibits    ............................................................................................................Page 99

Plaintiffs Alec Costerus and Denise Costerus allege as follows:

## I.    NATURE OF ACTION

1.    This is a civil-rights and tort action arising from two related but distinct arrests generated from the same neighborhood protection-order conflict, the same recurring private complainant, the same recurring law-enforcement officer, and the same recurring constitutional defect: protection-order enforcement without constitutionally adequate investigation into knowledge, intent, complainant-created proximity, exculpatory evidence, and the protection order's express limitations.

2.    Plaintiff Denise Costerus brings claims arising from her October 9–10, 2025 arrest, detention, prosecution, and custodial mistreatment after Defendant Elizabeth Wilcox reported an alleged protection-order violation involving Wilcox's loose dog, Moose.

3.    Plaintiff Alec Costerus brings claims arising from his June 6, 2026 warrantless home-threshold arrest after Wilcox again acted as the reporting party and allegedly created, contributed to, or staged the apparent proximity she then reported as a protection-order violation.

4.    Plaintiffs plead the incidents together because they are not disconnected events. Both arose from the same neighborhood conflict, the same protection-order

context, the same household, the same private complainant, the same law-enforcement agency, and the same principal officer, Defendant Jacob Jenkins.

5.  In both incidents, the operative protection order expressly permitted ingress and egress to Plaintiffs' own home and incidental contact. Those limitations were not incidental to probable cause; they were central to it.

6.  In both incidents, the central criminal issue was knowledge and intent. For Denise, the question was whether she intentionally called, lured, took, controlled, or used Moose, or whether Moose ran loose while Denise was lawfully outside. For Alec, the question was whether he knowingly approached Wilcox, or whether Wilcox created or contributed to apparent proximity by positioning herself beside a white Jeep adjacent to Plaintiffs' property and then reporting Alec as having approached her when Alec did not know she was present.

7.  At the November 25, 2025 permanent-protection-order hearing, the magistrate expressly allowed incidental contact and admonished Wilcox and Ellen Graham that the protection order was not to be used "as a sword," for "baiting," for "trying to trap" Alec, or "as something to be weaponized." Ex. B, PPO Tr. 132:23–133:13.

8.  Plaintiffs allege that Wilcox later did precisely what the magistrate warned against. She used the protection-order framework not merely as protection, but as a mechanism to create, frame, or report alleged violations for law-enforcement action.

9. Defendant Jenkins was the recurring state actor in both seizures. In October 2025, Jenkins allegedly accepted or incorporated Wilcox's materially shifting account of the loose-dog incident without interviewing the obvious material witness, Jeremiah Miller. In June 2026, Jenkins again acted on a Wilcox-generated or Wilcox-reported protection-order allegation and coerced Alec out of his own home without an arrest warrant.

10. Defendant Blake Reese Davis approved Jenkins's October 10, 2025 DCSO offense/incident report and case narrative concerning Denise. Plaintiffs allege that Davis approved or ratified a materially deficient probable-cause narrative that depended on disputed intent, an interested complainant, a derivative witness account, and a protection order that expressly permitted ingress, egress, and incidental contact.

11. Upon information and belief, Jenkins was serving as a field-training officer during the October 9–10, 2025 incident involving Denise and was later promoted to corporal before the June 6, 2026 incident involving Alec. Plaintiffs allege this is material because Jenkins was entrusted with training, modeling, or reinforcing Douglas County law-enforcement practices at the time he allegedly failed to investigate the central intent issue, failed to interview Jeremiah Miller, failed to account for the protection order's express exceptions, and used or adopted a materially misleading arrest narrative.

12. Plaintiffs allege, subject to discovery, that the Board, Sheriff Weekly in his official capacity, DCSO policymakers, and/or Douglas County's sheriff-controlled practices did not meaningfully discipline, retrain, counsel, supervise, correct, or remove Jenkins from positions of authority after the October 2025 incident. Instead, Jenkins remained in or advanced to a position of greater authority and later participated in another protection-order enforcement incident involving the same household, the same private complainant, and related Fourth Amendment concerns.

13. Defendant Mancuso participated in the October 2025 incident involving Denise. Mancuso heard material exculpatory facts, heard that the officers lacked a clear protection-order violation, heard Plaintiffs identify the loose-dog explanation and Jeremiah Miller as a material witness, heard Denise deny the alleged intent sequence, participated in or observed the arrest and custodial handling, and failed to intervene.

14. Plaintiffs also allege, as limited contextual and pattern evidence, that Wilcox's conduct was not confined to two isolated reports. Plaintiffs allege that Wilcox repeatedly acted as a source, catalyst, coordinator, amplifier, or beneficiary of allegations, recordings, confrontations, HOA restrictions, and protection-order activity involving Graham, Nichole Bach, Garrett Ditus, and others. Plaintiffs do not plead those background events as independent federal claim tracks in this Complaint. They plead them to show motive, notice, intent, absence of mistake,

private-complainant reliability concerns, foreseeability, and the recurring structure of the events that culminated in Plaintiffs' arrests.

15. This case is not about requiring perfect police work. It is about repeated protection-order enforcement without constitutionally adequate investigation into intent, knowledge, express exceptions, complainant-created proximity, and material exculpatory facts.

16. Plaintiffs bring claims under 42 U.S.C. § 1983, C.R.S. § 13-21-131, and Colorado common law for unreasonable seizure, false arrest, judicial deception, wrongful legal process, malicious prosecution where ripe, unreasonable restraint and custodial mistreatment, failure to intervene, municipal liability, abuse of process, and related state torts.

## II.    JURISDICTION AND VENUE

17. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related Colorado constitutional, statutory, and common-law claims arising from the same case or controversy.

19. Venue is proper in the District of Colorado under 28 U.S.C. § 1391 because the events occurred in Douglas County, Colorado, and Defendants reside in or perform official duties in Colorado.

20. Plaintiffs demand a jury trial on all issues so triable.

## III. PARTIES

21. Plaintiff Alec Costerus is a resident of Douglas County, Colorado.

22. Plaintiff Denise Costerus is a resident of Douglas County, Colorado.

23. Defendant Jacob Jenkins was, at all relevant times, a sworn Douglas County deputy sheriff, field-training officer, corporal, or law-enforcement officer acting under color of state law. He is sued individually.

24. Upon information and belief, Jenkins was serving as a field-training officer during the October 9–10, 2025 incident involving Denise and was later promoted to corporal before the June 6, 2026 incident involving Alec. Plaintiffs will seek discovery concerning Jenkins's rank, field-training role, supervisory responsibilities, promotion history, personnel file, internal-affairs history, discipline, counseling, retraining, remedial supervision, performance evaluations, and Douglas County's knowledge of and response to the October 2025 incident.

25. Defendant Grace Mancuso was, at all relevant times, a sworn Douglas County deputy sheriff or law-enforcement officer acting under color of state law. She is

sued individually for her participation in, continuation of, failure to intervene in, and/or failure to prevent the October 9–10, 2025 arrest, seizure, restraint, transport, detention-transfer, and custodial mistreatment of Denise Costerus.

26. Defendant Blake Reese Davis was, at all relevant times, a Douglas County Sheriff's Office supervisor, approving supervisor, report reviewer, probable-cause reviewer, arrest-review officer, and/or supervisory peace officer acting under color of state law. Plaintiffs sue Davis individually for personally reviewing, approving, ratifying, processing, or causing the use of Jenkins's October 10, 2025 DCSO offense/incident report, case narrative, probable-cause narrative, summons, criminal complaint, booking materials, or prosecution referral concerning Denise Costerus.

27. Plaintiffs do not allege liability against Davis merely because of supervisory rank. Plaintiffs allege liability because Davis, acting under color of law as a peace officer, approved Jenkins's October 10, 2025 report and case narrative despite material omissions, unsupported assertions, and facts on the face of the report showing that probable cause depended on disputed intent, an interested complainant, a derivative witness account, and a protection order that expressly permitted ingress, egress, and incidental contact.

28. Defendant Kevin Cromwell was, at all relevant times, a sworn Douglas County deputy sheriff or law-enforcement officer acting under color of state law. He is sued individually for his role in the June 6, 2026 incident involving Alec.

29. Defendant The Board of County Commissioners of the County of Douglas is the statutory entity through which Douglas County is sued. Plaintiffs name the Board as the county/entity defendant for claims against Douglas County, including claims under 42 U.S.C. § 1983, Monell, and related official-capacity, policy, custom, training, supervision, discipline, report-review, probable-cause-review, ratification, indemnification, and prospective-relief allegations.

30. Defendant Darren Weekly is the Sheriff of Douglas County, Colorado. Plaintiffs sue Sheriff Weekly in his official capacity only to the extent necessary for official-capacity, municipal, sheriff-policy, final-policymaker, jail, law-enforcement, training, supervision, discipline, ratification, indemnification, and prospective relief. Plaintiffs do not presently sue Sheriff Weekly in his individual capacity.

31. Plaintiffs plead Sheriff Weekly in official capacity because Douglas County Sheriff's Office law-enforcement operations, patrol practices, protection-order enforcement, arrest practices, report-review practices, jail/detention operations, training, supervision, discipline, and deputy conduct may involve sheriff-controlled policies, customs, practices, or final policymaking authority distinct from or overlapping with the Board's county/entity responsibilities.

32. Plaintiffs do not name the Douglas County Sheriff's Office as a separate defendant. Plaintiffs allege that the proper governmental defendants for municipal/entity and official-capacity relief are the Board of County Commissioners of the County of Douglas and Sheriff Weekly in his official capacity, to the extent necessary.

33. Defendant Elizabeth Wilcox is a Colorado resident and private individual. Upon information and belief, Wilcox was also a licensed physician and served as a designated or contracted occupational-injury provider for Douglas County, including the Douglas County Sheriff's Office and Douglas County courts.

34. Wilcox is sued individually for state-law claims. Plaintiffs also plead, in the alternative, that Wilcox acted under color of law for purposes of 42 U.S.C. § 1983 because she invoked her professional identity and institutional relationship with Douglas County personnel, supplied materially misleading protection-order violation narratives, and willfully participated in official action that caused Plaintiffs' seizures.

35. John and Jane Doe DCSO Supervisors, Watch Commanders, Report Reviewers, Probable-Cause Reviewers, Arrest-Review Officers, Records Personnel, Trainers, Policymakers, Detention Officers, Medical Providers, and Intake Personnel 1–30 are presently unidentified Douglas County actors who participated in, approved, reviewed, ratified, processed, transmitted, supervised, trained, failed to intervene in, or failed to correct the arrests, reports, probable-cause statements, charging

materials, detention decisions, custodial handling, medical-risk handling, training decisions, disciplinary decisions, promotion decisions, or supervisory decisions alleged herein.

36. This Doe category includes, without limitation, any peace-officer supervisor, watch commander, sergeant, lieutenant, corporal, report reviewer, probable-cause reviewer, arrest-review officer, or approving official who reviewed, approved, processed, transmitted, or ratified the June 6, 2026 arrest narrative, probable-cause determination, report, summons, complaint, booking materials, or prosecution referral concerning Alec Costerus.

37. Plaintiffs do not allege Doe supervisory liability based on rank, title, respondeat superior, or passive employment status. Plaintiffs allege Doe liability only to the extent discovery establishes personal participation, approval, ratification, knowing failure to correct, deliberate indifference, or an affirmative link between each Doe Defendant's own conduct and Plaintiffs' constitutional injuries.

## IV.  NOTICE, CONDITIONS PRECEDENT, AND PRESERVATION OF CLAIMS

38. Denise Costerus served a Notice of Claim pursuant to C.R.S. § 24-10-109 on or about March 24, 2026 concerning the October 9–10, 2025 incident, identifying Jenkins, Deputy Grace Mancuso, Wilcox, the dog/protection-order incident, the alleged false report, exculpatory evidence, custodial injury, and damages.

39. Alec and Denise Costerus served a Supplemental Notice of Claim dated June 10, 2026 concerning additional facts, including the June 6, 2026 incident involving Alec, Jenkins, Cromwell, the warrantless home-threshold encounter, lack of an arrest warrant, alleged coerced surrender, and related damages.

40. Federal claims under 42 U.S.C. § 1983 are not subject to the Colorado Governmental Immunity Act notice requirement.

41. Claims under C.R.S. § 13-21-131 are not barred by the Colorado Governmental Immunity Act, statutory immunities, statutory damages limitations, or qualified immunity.

42. Alec does not presently assert Colorado common-law tort claims against Jenkins, Cromwell, the Board, Sheriff Weekly in his official capacity, or any other public employee or public entity arising from the June 6, 2026 incident, including common-law false arrest, false imprisonment, battery, negligence, abuse of process, or malicious prosecution. Alec expressly reserves those state-law tort claims until satisfaction of all applicable Colorado Governmental Immunity Act conditions, denial of the Supplemental Notice of Claim, expiration of the statutory waiting period, favorable termination where required, or amendment by leave of Court.

43. Alec's reservation of June 6 public-employee state tort claims does not reserve or limit his federal § 1983 claims, his C.R.S. § 13-21-131 claim, or his state-law abuse-

of-process claim against Wilcox arising from the June 6, 2026 staged-proximity transaction.

44. Plaintiffs plead all claims in the alternative and reserve the right to amend after production of body-worn camera footage, CAD records, dispatch audio, arrest affidavits, jail records, medical records, prosecutor records, internal-affairs records, policy materials, training materials, supervisory communications, communications with private complainants, and other evidence.

## V.   PLEADING CLARIFICATIONS CONCERNING ANTICIPATED DEFENSES

45. Plaintiffs do not allege liability based on hindsight, negligence, or a failure to conduct a perfect investigation. Plaintiffs allege that Defendants acted without reasonably trustworthy probable cause after disregarding or omitting material facts concerning intent, knowledge, the protection order's express exceptions, complainant-created proximity, Wilcox's interest and professional familiarity, and the availability of material witnesses.

46. Plaintiffs do not seek to interfere with any pending state criminal proceeding. Alec does not seek dismissal of charges, suppression relief, an injunction against prosecution, or any order directing the state criminal court how to proceed. Alec reserves malicious-prosecution and wrongful-legal-process claims arising from the June 6, 2026 prosecution until favorable termination or other proper ripeness.

47. Plaintiffs do not allege that Wilcox became a state actor merely by reporting alleged misconduct. Plaintiffs plead Wilcox's § 1983 liability in the alternative based on joint action, nexus, and willful participation, including her alleged professional affiliation with Douglas County, invocation of that relationship to Jenkins, personal familiarity with Jenkins's household, expressed punitive purpose, materially misleading reports, and Jenkins's adoption and operationalization of those reports.

48. Plaintiffs do not base their claims merely on protected petitioning activity, privileged testimony, or ordinary reporting. Plaintiffs seek relief for materially false or misleading factual reports, complainant-created proximity, malicious procurement of seizure, nonprivileged or overpublished defamatory statements, abuse of process, and conduct alleged to defeat any qualified privilege through knowing falsity, reckless disregard, malice, excessive publication, or improper purpose.

49. Plaintiffs do not name Alex Bisgard or the unidentified adult male passenger as defendants in this Complaint. Plaintiffs plead their alleged June 6, 2026 conduct only as factual context supporting Wilcox's alleged staged proximity, improper purpose, malice, abuse of process, and use of the protection-order process as a criminal-enforcement trigger. Plaintiffs reserve the right to seek leave to amend if discovery establishes that any non-party private actor knowingly participated in

tortious conduct, materially facilitated the staged-proximity report, coordinated with Wilcox or law enforcement, or otherwise caused Plaintiffs' injuries.

50. Plaintiffs do not ask this Court to hold Wilcox or any Defendant in contempt of the County Court protection order. Any contempt remedy for violation or defiance of a County Court protection order, including relief under C.R.C.P. 107 or C.R.C.C.P. 407, belongs in the court and proceeding with authority to enforce that order. Plaintiffs plead the magistrate's admonition against using the protection order as a sword, bait, trap, or weaponized instrument as evidence supporting abuse of process, improper purpose, malice, knowledge, and willful misuse of process.

51. Plaintiffs do not assert independent claims in this Complaint based on the Ditus, Graham, or Bach background incidents. Those facts are pleaded only for context, motive, notice, intent, absence of mistake, private-complainant reliability, foreseeability, and the recurring structure of the October 2025 and June 2026 seizures.

52. Plaintiffs do not allege municipal liability under respondeat superior. Plaintiffs allege municipal and official-capacity liability based on policies, customs, failures to train, failures to supervise, failures to discipline, ratification, and deliberate indifference concerning recurring operational issues in protection-order enforcement, home-threshold seizures, material-witness investigation, report review, probable-cause review, and medically vulnerable arrestees.

53. Plaintiffs do not treat the November 25, 2025 PPO hearing as an adjudication of criminal liability, probable cause, Jenkins's truthfulness, or the materiality of omitted exculpatory evidence. Plaintiffs rely on that hearing for specific testimony, admissions, judicial warnings, and the denial of Wilcox's requested permanent protection order against Denise.

54. Plaintiffs do not presently allege that Mancuso authored, approved, submitted, or materially contributed to Jenkins's affidavit or probable-cause statement. Plaintiffs allege that Mancuso participated in, continued, assisted, and/or failed to intervene in Denise's seizure and custodial handling after hearing facts showing the absence of reasonably trustworthy probable cause and Denise's medical vulnerability.

55. Plaintiffs do not allege that Jenkins's status as a field-training officer or later promotion to corporal conclusively proves municipal liability. Plaintiffs allege that those facts are relevant to municipal liability because they support a reasonable inference, subject to discovery, that the Board, Sheriff Weekly in official capacity, DCSO policymakers, and/or Douglas County's sheriff-controlled practices did not meaningfully discipline, retrain, counsel, supervise, correct, or remove Jenkins from positions of authority after the October 2025 incident, and instead permitted him to remain in or advance to a greater position of law-enforcement authority before the June 2026 incident.

56. Plaintiffs do not allege liability against Davis merely because he was a supervisor. Plaintiffs allege liability against Davis because he approved or ratified Jenkins's materially deficient October 10, 2025 report and probable-cause narrative, which caused or contributed to Denise's continued seizure if approval preceded discharge, and in all events caused or contributed to wrongful legal process, prosecution, reputational injury, legal expense, emotional distress, and related damages.

57. Plaintiffs do not yet know the exact time on October 10, 2025 when Davis approved Jenkins's report because the produced report identifies the approval date but not the approval time. The exact approval time, RMS audit trail, report-routing metadata, report-submission metadata, booking records, probable-cause review records, and discharge records are within Defendants' possession, custody, or control.

## VI.   EXHIBIT PLACEHOLDERS

58. Plaintiffs anticipate relying on the following exhibits, subject to amendment, supplementation, authentication, and production:

Ex. A — Operative temporary and/or permanent protection order containing the "ingress/egress" and "incidental contact" language.

Ex. B — Relevant excerpts of the November 25, 2025 PPO hearing transcript.

Ex. C — Jenkins body-worn camera transcript from October 9–10, 2025.

Ex. D — Jenkins October 10, 2025 DCSO offense/incident report and case narrative concerning Denise, approved by Blake Reese Davis on October 10, 2025.

Ex. E — Animal Control records, including Jeremiah Miller statement and related dog-control records.

Ex. F — Criminal dismissal order or docket reflecting dismissal of charges against Denise on December 16, 2025.

Ex. G — June 6, 2026 arrest records, CAD, dispatch audio, body-worn camera, incident report, and arrest affidavit concerning Alec, to be supplemented upon production.

Ex. H — Medical, injury, restraint, jail, intake, and booking records concerning Denise and Alec, to be supplemented upon production.

Ex. I — Relevant text messages, photographs, screenshots, and communications, including Wilcox/Jeremiah communications, to be supplemented upon authentication.

Ex. J — Records concerning the October, 24, 2024 Garrett Ditus incident, including criminal case records, dismissal or disposition records, police reports, witness statements, and communications, to be supplemented upon production.

Ex. K — Records, recordings, transcripts, or pleadings concerning related Graham and Bach incidents, offered only for limited contextual purposes unless later amended, to be supplemented as per Court's upload directions.

Ex. L — Grace Mancuso body-worn camera footage and/or transcript from October 9–10, 2025.

Ex. M — Douglas County personnel, training, discipline, counseling, promotion, supervisory, internal-affairs, remedial-action, RMS audit, report-approval, and report-routing records concerning Jenkins, Mancuso, Davis, Cromwell, and relevant supervisors, to be requested in discovery.

Ex. N — Denise Costerus cell-phone video, photographs, screenshots, or related metadata from the June 6, 2026 incident showing the white Jeep, Alex Bisgard, the unidentified adult male passenger, Wilcox's position relative to the vehicle and Plaintiffs' property, and any waving or other conduct captured while Denise recorded, to be supplemented as per Court's upload directions.

Ex. O — Douglas County Resolution No. R-025-019, Resolution for the Control and Licensing of Household Pets, including the provisions defining "Control," "Running at Large," impoundment authority, and owner responsibility.

## VII.  COMMON FACTUAL BACKGROUND

A.    The Protection Order Expressly Permitted Ingress/Egress and Incidental Contact

59. Plaintiffs and Wilcox lived in close residential proximity in the same cul-de-sac or immediate neighborhood area.

60. The operative protection order did not prohibit all proximity, all visual contact, or all unavoidable neighborhood interaction.

61. The order expressly permitted ingress and egress to Plaintiffs' own home. Ex. A.

62. The order expressly permitted incidental contact. Ex. A.

63. These provisions were central. Plaintiffs and Wilcox necessarily used nearby homes, vehicles, sidewalks, driveways, streets, mailboxes, lawns, and ordinary neighborhood access routes.

64. The order required law enforcement to distinguish intentional prohibited contact from lawful ingress/egress, incidental contact, unavoidable proximity, and complainant-created proximity.

65. The order did not permit Wilcox to manufacture or create a violation by moving toward Plaintiffs, concealing her presence, allowing an animal to run loose, positioning herself behind or beside a vehicle, or otherwise creating proximity and then reporting the resulting encounter as criminal conduct.

66. The order did not permit law enforcement to treat every claimed proximity event as probable cause without investigating knowledge, intent, location, causation, context, exculpatory facts, and the order's express exceptions.

B.    The November 25, 2025 PPO Hearing

67.    On November 25, 2025, the County Court held a permanent-protection-order hearing involving Wilcox, Graham, Alec, and Denise.

68.    During that hearing, Wilcox testified under oath concerning her relationship with Douglas County personnel.

69.    Wilcox testified that she had served as a designated provider for Douglas County occupational injuries, including for the Sheriff's Office and courts, and that over approximately 25 years she had treated or interacted professionally with numerous Sheriff's Office personnel. Ex. B, PPO Tr. 52:13–53:14.

70.    Wilcox further acknowledged that when Jenkins arrived at her home on October 9, 2025, she identified herself by the professional name by which Jenkins would have known her, "Dr. Bisgard," and admitted that she wanted Jenkins to know she was associated with his or his wife's prior medical-care context. Ex. B, PPO Tr. 53:15–54:10.

71.    Wilcox also acknowledged asking about Jenkins's wife while Jenkins was investigating the October 9, 2025 incident. Ex. B, PPO Tr. 54:11–17.

72.    Plaintiffs do not allege that professional familiarity alone creates liability. Plaintiffs allege that this familiarity was material because Jenkins appeared to credit

Wilcox's accusations without independently verifying the central facts despite Wilcox's personal stake in the dispute.

73. Wilcox admitted at the PPO hearing that she told Jenkins she wanted Denise punished for the October 9, 2025 incident. Ex. B, PPO Tr. 54:20–25.

74. Plaintiffs allege this admission is material because it confirms that Wilcox's report was accompanied by an expressed desire for punitive law-enforcement action, not merely neutral reporting.

75. The PPO hearing also addressed Moose. Wilcox admitted that on October 9, 2025, Moose was not on a leash. Ex. B, PPO Tr. 70:19–25.

76. Although Wilcox described Moose as wearing an electronic collar, she admitted that she had left the control device on the porch. Ex. B, PPO Tr. 71:1–4.

77. The sequence discussed at the hearing concerning Jeremiah Miller's statement was that Jeremiah waved at Denise, Moose ran toward Denise, and only afterward did Jeremiah allegedly hear Denise call out. Ex. B, PPO Tr. 71:12–72:4.

78. Plaintiffs allege that sequence materially undermined probable cause because it suggested that Moose's movement toward Denise preceded any alleged statement by Denise.

79. The magistrate denied Wilcox's request for a permanent protection order against Denise. Ex. B, PPO Tr. 124:10–125:8.

80. The PPO court's limited credibility observation concerning Wilcox's testimony about Denise allegedly calling Moose was made on an incomplete civil-protection-order record. Denise did not testify; Jeremiah Miller did not testify live; the Animal Services report was not accepted for the truth of Jeremiah's observations; and the PPO court did not adjudicate whether Jenkins had probable cause at the time of arrest, whether Jenkins omitted material exculpatory facts, or whether Jenkins's affidavit contained material falsehoods or omissions.

81. The magistrate granted permanent protection orders involving Alec but expressly allowed incidental contact. Ex. B, PPO Tr. 132:23.

82. The magistrate further admonished Wilcox and Graham that the order was not to be used "as a sword," not to be used for "baiting" or "trying to trap" Alec, and was meant as protection, "not as something to be weaponized." Ex. B, PPO Tr. 132:23–133:13.

83. The magistrate's admonition was not ambiguous. The court expressly warned Wilcox and Graham that the protection order was not to be used "as a sword," for "baiting," for "trying to trap" Alec, or "as something to be weaponized." Ex. B, PPO Tr. 132:23–133:13.

84. Plaintiffs allege that Wilcox knew of that admonition, understood it, and later acted contrary to it.

85. The warning is material to the June 6, 2026 incident because Plaintiffs allege Wilcox later created or contributed to the very kind of trap-like proximity the magistrate warned against.

C.   Limited Pattern Facts Involving Graham, Bach, and Ditus

86. Plaintiffs do not plead all facts concerning Ellen Graham, Nichole Bach, Garrett Ditus, Kurt Ditus, or related third parties as separate claims for relief in this Complaint.

87. Plaintiffs plead limited pattern facts concerning those persons because the facts are relevant to Wilcox's knowledge, motive, intent, absence of mistake, use of third-party amplification, Douglas County's need to evaluate private-complainant reliability, foreseeability of escalation, and the recurring misuse of official systems or third-party actors in the neighborhood dispute.

88. On or about October 24, 2024, Garrett Ditus confronted, harassed, or otherwise acted against Alec after, upon information and belief, Elizabeth Wilcox communicated with or influenced Garrett's father, Kurt Ditus, concerning Plaintiffs or the ongoing neighborhood dispute.

89. Garrett Ditus was later criminally charged in connection with that confrontation or harassment, and the matter was dismissed or resolved without a conviction due to first-offense, diversionary, deferred, or similar considerations. Ex. J.

90. Plaintiffs do not plead the Ditus incident to prove character or propensity. Plaintiffs plead it for the limited purposes of showing notice, motive, absence of mistake, foreseeable escalation, and the recurring pattern by which Wilcox-originated or Wilcox-amplified narratives allegedly caused third parties or officials to act against Plaintiffs.

91. Plaintiffs further allege that Graham and Bach were involved in related incidents or proceedings in which Wilcox-originated or Wilcox-amplified allegations were repeated, operationalized, recorded, or used in official settings.

92. Plaintiffs allege that Wilcox repeatedly appeared as a source, catalyst, coordinator, recorder, beneficiary, or amplifier of allegations used in neighborhood, law-enforcement, HOA, and civil-protection-order settings against Plaintiffs.

93. Plaintiffs will seek discovery concerning communications between Wilcox, Garrett Ditus, Kurt Ditus, Graham, Bach, and others only to the extent relevant to motive, knowledge, notice, absence of mistake, causation, credibility, private-complainant reliability, and the recurring structure of the October 2025 and June 2026 seizures.

94. Plaintiffs plead these pattern facts cautiously and do not ask this Court to adjudicate criminal liability or impose civil liability for every background incident. The allegations are included only to explain context, motive, notice, intent, absence of mistake, and the recurring structure of the incidents involving Denise and Alec.

## VIII. FACTUAL ALLEGATIONS — DENISE COSTERUS OCTOBER 9–10, 2025 INCIDENT

A. Jenkins Initially Recognized the Protection-Order Violation Was Unclear

95. On or about October 9, 2025, Wilcox contacted law enforcement concerning an alleged protection-order violation involving Moose.

96. When Jenkins first arrived at Wilcox's home, the body-worn camera transcript reflects that Jenkins had already reviewed or seen the protection order and was "confused" how there was a violation. Ex. C, Jenkins BWC Tr. 90.455–125.895.

97. Jenkins further noted that Wilcox had received the dog back from a different neighbor, "not the person that's on the protection order." Ex. C, Jenkins BWC Tr. 113.705–125.895.

98. Jenkins therefore did not initially perceive a clear protection-order violation from dispatch information, the order, or the preliminary facts.

99. The lack of clarity mattered because the protection order expressly permitted incidental contact and ingress/egress to Plaintiffs' own home. Ex. A.

100. Mancuso's body-worn camera likewise captured officers acknowledging that dispatch notes were unclear, that the officers were confused about the alleged violation, and that they needed to review the protection order and speak with Plaintiffs. Ex. L, Mancuso BWC Tr. 153.695–174.475.

101. Plaintiffs allege that Mancuso therefore knew or had reason to know that the officers did not arrive with clear probable cause and understood that further investigation was necessary.

B.    Wilcox Invoked Her Professional Identity and Personal Familiarity With Jenkins

102. During the active investigation, Wilcox invoked her professional identity, stating in substance, "Don't know if you remember me. I'm Dr. Bisgard." Ex. C, Jenkins BWC Tr. 122.385–125.895.

103. Plaintiffs allege that the BWC transcript's spelling or transcription of "Bisgard" may be imperfect, but the statement corresponds to Wilcox's later sworn testimony that she used the professional name by which Jenkins knew her. Ex. B, PPO Tr. 53:15–54:10.

104. Wilcox's professional and personal familiarity with Jenkins was not abstract.

105. During the investigation, Wilcox and Jenkins discussed Jenkins's household, baby/family circumstances, and baby pictures. The transcript reflects Jenkins stating in substance that the baby was big, Wilcox asking to see a picture, and Jenkins stating he had the phone in the car and would show her. Ex. C, Jenkins BWC Tr. 324.125–331.685.

106. Later, Wilcox provided her phone number, referenced sending baby pictures, asked that Kelsey text her, and Jenkins discussed Kelsey's work status. Ex. C, Jenkins BWC Tr. 1059.015–1127.785.

107. Plaintiffs allege this interaction is material because it shows that Jenkins was not interacting with Wilcox as an unknown neutral complainant, but as a professionally and personally familiar person whose accusations he then credited without adequate independent verification.

108. Wilcox also told Jenkins that before calling law enforcement, she had spoken with her attorney and "one of my buddies that's on the force," who allegedly told her that Denise "absolutely" violated the protection order. Ex. C, Jenkins BWC Tr. 220.545–259.155.

109. Plaintiffs allege that this statement shows Wilcox's report was not neutral or spontaneous but was made after pre-call consultation and with a pre-formed enforcement theory.

C.   Wilcox's Enforcement Narrative, Danger Escalation, and Punitive Purpose

110. Wilcox told Jenkins that Denise was required to retreat, was not supposed to be within one hundred yards, and had deliberately violated the order. Ex. C, Jenkins BWC Tr. 128.135–174.375; 220.545–260.585.

111. Wilcox also stated that Denise knew Wilcox was present, came out anyway, called Moose, encouraged him, took him inside, and shut the door. Ex. C, Jenkins BWC Tr. 134.815–203.035; 260.585–278.435.

112. Wilcox's account supplied the missing intent element. A dog running loose would not establish a knowing violation; a claim that Denise intentionally called or lured the dog could.

113. Wilcox's report also included broader grievance material concerning years of neighborhood disputes, alleged frivolous complaints, HOA reports, parking complaints, litigation, and prior calls for service. Ex. C, Jenkins BWC Tr. 290.985–429.675; 787.235–919.605.

114. Wilcox also injected inflammatory danger-character assertions into the investigation that had no direct relationship to the alleged Moose incident. According to Jenkins's body-worn camera transcript, Wilcox stated: "She's, she's just so you know, she's unhinged. Okay. ." Ex. C, Jenkins BWC Tr. 1308.335.

115. Later, immediately after stating, "I'm just hoping if you take her, this will end," Wilcox stated: "The fact that they have guns really scares me. Yeah." Ex. C, Jenkins BWC Tr. 1531.105–1540.745; Ex. L, Mancuso BWC Tr. 205.525–215.665.

116. The Jenkins and Mancuso transcripts also reflect, substantially in part, Wilcox characterizing Alec as violent or aggressive. Ex. C, Jenkins BWC Tr. 1558.465–1560.945; Ex. L, Mancuso BWC Tr. 230.655–245.835.

117. No firearm was involved in the Moose incident. Denise did not display a firearm, threaten a firearm, possess a firearm during the alleged contact, or use any weapon. The alleged protection-order violation turned on whether Denise intentionally called, lured, took, controlled, or used Moose, not on generalized firearm ownership, character accusations, mental-state labels, or speculative dangerousness.

118. Plaintiffs allege that Wilcox's statements that Denise was "unhinged," that Plaintiffs "have guns," and that Alec was violent or aggressive were materially prejudicial and were offered to make Plaintiffs appear dangerous, unstable, armed, and criminally blameworthy, thereby escalating the encounter and increasing the likelihood of arrest despite the absence of reasonably trustworthy evidence that Denise knowingly violated the protection order.

119. Wilcox admitted at the PPO hearing that she told Jenkins she wanted Denise punished. Ex. B, PPO Tr. 54:20–25.

120. During the BWC encounter, Wilcox stated in substance that "tonight is the night that it needs to stop." Ex. C, Jenkins BWC Tr. 420.995–429.675.

121. Mancuso's body-worn camera captured Wilcox stating in substance that she was hoping that if officers "take" Denise, "this will end." Ex. L, Mancuso BWC Tr. 205.525–209.685.

122. Plaintiffs allege that Wilcox's statements were enforcement-oriented, danger-escalating, and punitive, not merely neutral reporting of a discrete event.

123. Jenkins did not respond by maintaining investigative neutrality. Instead, Jenkins told Wilcox that she should "call every time," that reports would create documentation, and that such documentation would be "more ammunition" for Wilcox to bring to the judge. Ex. C, Jenkins BWC Tr. 408.915–429.675; 941.435–1013.735.

124. Plaintiffs allege that Jenkins's statements encouraged Wilcox to use law enforcement as a documentation and enforcement mechanism in the protection-order litigation.

125. Plaintiffs further allege that Mancuso heard enough of Wilcox's arrest-oriented motive and danger-escalating character assertions to know or reasonably suspect that Wilcox was an interested complainant seeking punitive or coercive law-enforcement action.

D.    The Loose-Dog Incident

126. On October 9, 2025, Denise was lawfully outside retrieving mail or otherwise using Plaintiffs' property.

127. Moose, a large dog associated with Wilcox or Wilcox's household, was loose, unrestrained, or not under effective physical control.

128. Douglas County Resolution No. R-025-019 defines "Control" to require that, when a dog is off the owner's property, it is maintained on a leash, cord, or chain not more than ten feet in length and held by a person physically able to restrain it. Ex. O.

129. Douglas County Resolution No. R-025-019 defines "Running at Large" as being off the premises of the dog owner and not under the real and immediate physical control of an owner able to control the dog. Ex. O.

130. Douglas County Resolution No. R-025-019 authorizes animal-control action concerning household pets found running at large. Ex. O.

131. Wilcox admitted at the PPO hearing that Moose was not on a leash on October 9, 2025. Ex. B, PPO Tr. 70:19–25.

132. Wilcox admitted that although Moose had an electronic collar, she had left the control device on the porch. Ex. B, PPO Tr. 71:1–4.

133. Plaintiffs allege that Moose was therefore not under effective physical control within the meaning and policy of Douglas County Resolution No. R-025-019.

134. Denise did not intentionally call, lure, steal, conceal, restrain, or exercise unlawful control over Moose.

135. Denise did not cross onto Wilcox's property to obtain Moose.

136. Denise did not pursue Wilcox.

137. Denise did not threaten Wilcox.

138. Denise did not intentionally initiate direct communication with Wilcox.

139. Jenkins asked whether there had been any direct conversation, statement, or comment to Wilcox. Wilcox identified no direct contact other than the alleged attraction of Moose. Ex. C, Jenkins BWC Tr. 535.665–606.905.

140. Thus, the alleged violation turned entirely on the disputed dog-related intent issue.

141. Moose was familiar with Plaintiffs' home and had naturally gone to the Costerus home in the past. Ex. B, PPO Tr. 69:6–19; Ex. C, Jenkins BWC Tr. 646.775–671.785.

142. Mancuso heard Plaintiffs explain that Moose had gotten out repeatedly, was not leashed or collared, liked Plaintiffs and their dogs, ran toward or into Plaintiffs'

home, and was later retrieved by Jeremiah Miller. Ex. L, Mancuso BWC Tr. 748.865–860.675.

143. Mancuso heard Denise read or describe her contemporaneous written account stating that she went to the mailbox, Moose saw her, Moose came running past her to the front door, Denise opened the door, and Moose ran inside. Ex. L, Mancuso BWC Tr. 864.945–925.665.

144. The noncriminal explanation was straightforward: Moose was loose, saw or reacted to Denise or the surrounding circumstances, and moved toward or near Plaintiffs' property of his own volition.

145. That explanation did not establish criminal tampering, theft, obstruction, or a knowing violation of a protection order.

146. The incident became criminal only if Denise intentionally called, lured, took, controlled, or used Moose to violate the protection order.

147. Thus, the central factual issue was intent.

E.    The Jeremiah Miller Issue

148. Jeremiah Miller was a nearby witness with material information concerning Moose's movement and the sequence of events.

149. Jeremiah was not a peripheral witness.

150. Jeremiah's direct account was necessary to determine whether Moose ran loose of his own volition or whether Denise intentionally called, lured, took, controlled, or used Moose.

151. Wilcox showed or described to Jenkins text messages or statements she attributed to Jeremiah. Ex. C, Jenkins BWC Tr. 543.385–572.145.

152. Wilcox told Jenkins that Jeremiah was available and "would be happy to talk" to deputies. Ex. C, Jenkins BWC Tr. 724.205–737.125.

153. Jenkins did not interview Jeremiah before arresting Denise.

154. Rather than obtaining Jeremiah's direct account, Jenkins stated in substance that he had Jeremiah's statement from Wilcox and that was sufficient. Ex. C, Jenkins BWC Tr. 724.205–737.125.

155. Jenkins therefore relied on a derivative version of what Jeremiah supposedly observed or confirmed, rather than Jeremiah's own direct account.

156. Mancuso heard Plaintiffs identify Jeremiah Miller as the neighbor who came to retrieve Moose. Ex. L, Mancuso BWC Tr. 781.000–828.725.

157. Mancuso further heard Denise state that officers could speak with Jeremiah. Ex. L, Mancuso BWC Tr. 1058.525–1060.515.

158. Because the alleged offenses depended on intentional conduct, Jenkins's failure to interview Jeremiah went directly to probable cause.

159. Mancuso knew or had reason to know that Jeremiah was a material witness whose direct account should have been obtained before Denise was arrested.

160. The officers' omission was especially unreasonable because the account Jenkins accepted depended materially on an interested complainant's characterization of another witness' supposed observations.

F.    Denise Denied Intent and the Officers Arrested Her Anyway

161. Later that night, Jenkins and Mancuso went to Plaintiffs' home.

162. Plaintiffs told Jenkins and Mancuso that Moose had run toward or into their home, that they had contacted Animal Control, and that they wanted an official record because they expected Wilcox would call law enforcement. Ex. C, Jenkins BWC Tr. 2073.675–2303.475; Ex. L, Mancuso BWC Tr. 748.865–981.445.

163. Denise provided a contemporaneous written or oral account stating in substance that she went to the mailbox, Moose saw her, Moose came running past her to the front door, she opened the door, and Moose ran inside. Ex. C, Jenkins BWC Tr. 2190.265–2249.705; Ex. L, Mancuso BWC Tr. 864.945–925.665.

164. Denise stated that Moose came running and that she did not remember calling Moose over. Ex. C, Jenkins BWC Tr. 2347.675–2375.785; Ex. L, Mancuso BWC Tr. 1016.145–1058.525.

165. Denise suggested Jenkins and Mancuso could talk to Jeremiah. Ex. C, Jenkins BWC Tr. 2383.325–2385.475; Ex. L, Mancuso BWC Tr. 1058.525–1060.515.

166. Jenkins and Mancuso did not interview Jeremiah before arresting Denise.

167. Jenkins then told Denise she was under arrest for violation of a protection order. Ex. C, Jenkins BWC Tr. 2740.345–2766.515; Ex. L, Mancuso BWC Tr. 1415.265–1446.475.

168. Jenkins stated that any contact outside incidental contact would be a violation. Ex. C, Jenkins BWC Tr. 2771.585–2781.895; Ex. L, Mancuso BWC Tr. 1456.325–1483.195.

169. Jenkins then stated that he had a "third party witness" who said Denise went to the mailbox, gathered her mail, returned to her house, saw the dog, returned, called the dog into the house, and then closed or refused the door. Ex. C, Jenkins BWC Tr. 2781.895–2808.835; Ex. L, Mancuso BWC Tr. 1456.325–1483.195.

170. That statement was materially misleading because Jenkins had not interviewed the third-party witness. Jenkins had obtained the supposed account through Wilcox.

171. Jenkins's assertion transformed Wilcox's derivative characterization of Jeremiah's supposed account into a law-enforcement claim that Jenkins had a "third party witness."

172. Denise contemporaneously disputed the arrest theory. She stated that she went outside to get her mail, did not know Wilcox was outside, Moose was running toward her, Moose ran inside, and the judge had told her she was allowed to be in her yard and retrieve mail. Ex. C, Jenkins BWC Tr. 2821.615–2885.635; Ex. L, Mancuso BWC Tr. 1496.295–1560.515.

173. Jenkins responded that he did not disagree that Denise could be in her yard and retrieve mail. Ex. C, Jenkins BWC Tr. 2885.635–2923.795; Ex. L, Mancuso BWC Tr. 1560.515–1593.885.

174. Jenkins nevertheless asserted that Denise returned outside after completing her lawful purpose, returned to coax Moose, and refused to release him. Ex. C, Jenkins BWC Tr. 2923.795–2949.275; Ex. L, Mancuso BWC Tr. 1598.685–1624.505.

175. Denise denied that sequence, stating that she did not go back outside. Ex. C, Jenkins BWC Tr. 2923.795–2949.275; Ex. L, Mancuso BWC Tr. 1598.685–1624.505.

176. The unsupported re-entry/re-exit/coaxing sequence supplied the missing intent element necessary to arrest Denise.

177. Jenkins lacked reasonably trustworthy information supporting that sequence because he did not interview Jeremiah directly.

178. Mancuso heard the exculpatory loose-dog explanation, heard that Jeremiah was a material witness, heard Denise deny the intent sequence, heard the lawful mail/yard-access explanation, and nevertheless did not intervene to stop, delay, correct, or mitigate the arrest.

179. Jenkins and Mancuso failed to fairly account for the noncriminal loose-dog explanation.

180. Jenkins and Mancuso failed to fairly account for the protection-order language allowing incidental contact and lawful ingress and egress.

181. Jenkins and Mancuso failed to distinguish intentional prohibited conduct from incidental neighborhood proximity caused by a loose animal.

182. At most, the facts available to Jenkins and Mancuso supported further investigation.

183. Those facts did not support immediate arrest unless the officers possessed reasonably trustworthy evidence that Denise intentionally called, lured, took, controlled, or used Moose, or intentionally violated the protection order.

184. Jenkins and Mancuso did not possess such reasonably trustworthy evidence.

185. The officers did not merely fail to perform a perfect investigation. They failed to interview the obvious material witness whose direct account would have tested the only fact necessary to establish probable cause.

186. Jenkins made or led the arrest decision. Mancuso participated in, assisted, continued, and failed to intervene in Denise's seizure after hearing facts showing the absence of reasonably trustworthy probable cause.

G.    Later Animal-Control Evidence Confirmed Materiality

187. Several days after Denise's arrest, on or about October 14, 2025, Animal Control interviewed Jeremiah directly. Ex. E.

188. Jeremiah stated in substance that Moose ran immediately when Moose saw Denise. Ex. E.

189. Jeremiah's direct statement contradicted or materially undermined the re-entry/re-exit/calling sequence attributed to the incident through Wilcox's portrayal or Jenkins's report.

190. Jeremiah's statement corroborated the noncriminal explanation that Moose was loose, unrestrained, and moved of his own volition.

191. Jeremiah's later Animal Control statement is not pleaded to establish what Jenkins, Mancuso, or Davis knew at the precise moment of arrest.

192. It is pleaded to show why the officers' failure to interview Jeremiah before arresting Denise was material and why Davis's later approval of the deficient report and probable-cause narrative was material.

193. If Jenkins or Mancuso had interviewed Jeremiah before arresting Denise, they would have learned or likely would have learned facts undermining the intentional-conduct narrative.

194. A reasonable officer would have understood that the direct account of the witness supposedly used to corroborate intent was necessary before arresting Denise.

H.     Material Falsehoods, Omissions, and Jenkins's Approved Report

195. Jenkins's affidavit, probable-cause statement, summons, report, or official criminal justice record was materially misleading. Ex. D.

196. Jenkins's October 10, 2025 DCSO offense/incident report identifies Jenkins as the reporting officer and Blake Reese Davis as the approving supervisor. Ex. D.

197. The report lists two offenses: violation of a civil protection order and second-degree criminal tampering. Ex. D.

198. The report expressly recites the protection order's special terms, including that Denise was permitted ingress and egress to her own property and that incidental contact was permitted. Ex. D.

199. The report therefore placed Jenkins and Davis on notice that probable cause could not be based merely on proximity, neighborhood contact, mail retrieval, ordinary use of Plaintiffs' property, or incidental contact.

200. The report adopted Wilcox's allegation that Denise checked the mail, returned home, exited again, called "Moose" numerous times, and walked Moose into the house. Ex. D.

201. The report further stated that Denise was approximately 30 yards from Wilcox. Ex. D.

202. The report stated that Wilcox showed Jenkins a text message from Jeremiah that "confirmed" Wilcox's statement. Ex. D.

203. The report did not state that Jenkins interviewed Jeremiah directly before arresting Denise.

204. The report did not disclose that Jenkins relied on Wilcox's characterization of Jeremiah's supposed account rather than a direct interview of Jeremiah, the material witness whose account was necessary to evaluate intent.

205. The report did not fairly account for the protection order's incidental-contact and ingress/egress exceptions as applied to Denise retrieving mail and using her own property.

206. The report did not fairly account for Denise's contemporaneous denial of the re-entry/re-exit/coaxing sequence.

207. The report did not fairly account for the noncriminal loose-dog explanation: Moose was outside with Wilcox, was not under effective physical control, had previously gone to Plaintiffs' home, ran toward or into Plaintiffs' home, and was later retrieved.

208. The report did not fairly account for Douglas County Resolution No. R-025-019, the loose-dog / running-at-large context, or Wilcox's own duty to control Moose.

209. The report did not fairly account for Wilcox's role as an interested complainant who had professional and personal familiarity with Jenkins and who expressed a punitive objective.

210. The report did not fairly disclose or account for Wilcox's inflammatory danger-character assertions, including that Denise was "unhinged," that Plaintiffs "have guns," and that Alec was characterized as violent or aggressive, nor did it explain that no firearm, weapon, threat, assault, or act of violence was involved in the alleged Moose incident.

211. The report included Wilcox's broader grievance narrative concerning years of prior calls, parking complaints, animal complaints, noise complaints, neighbor disputes, and alleged conduct by Denise and Alec. Ex. D.

212. The report also stated that Wilcox was encouraged to contact law enforcement to document continuing issues. Ex. D.

213. The report acknowledged that Jenkins's body-worn camera was recording and "may contain details and/or statements that were not reflected" in the report. Ex. D.

214. Plaintiffs allege that this acknowledgment is material because the body-worn camera evidence contains or may contain exculpatory facts, context, omissions, contradictions, and statements not included in Jenkins's approved report.

215. The report adopted or incorporated an inculpatory sequence that supplied intent without reasonably trustworthy evidentiary support.

216. The report failed to disclose that Jenkins had not obtained Jeremiah's direct statement before relying on a version attributed through Wilcox.

217. The report failed to disclose or fairly account for the noncriminal explanation that Moose was loose, unrestrained, and running of his own volition.

218. The report failed to disclose or fairly account for the protection-order language allowing incidental contact and lawful ingress and egress.

219. The report failed to distinguish between intentional prohibited conduct and incidental proximity caused by a loose animal.

220. The report failed to disclose that Jenkins initially questioned whether there was a protection-order violation.

221. The report failed to disclose the professional and personal familiarity between Jenkins and Wilcox during the investigation.

222. The report failed to disclose that Wilcox had expressed a desire for punitive law-enforcement action.

223. The omissions and misleading framing were material because, without the unsupported intent sequence, probable cause did not exist.

224. A corrected affidavit, report, or probable-cause narrative that removed unsupported inculpatory assertions and included the omitted exculpatory context would not support probable cause.

225. Plaintiffs do not presently allege that Mancuso authored, approved, submitted, or materially contributed to Jenkins's affidavit, probable-cause statement, or official report. Plaintiffs reserve the right to amend if discovery establishes Mancuso's participation in any materially misleading official record.

I.    Supervisory Approval by Blake Reese Davis and Timing of Continued Seizure

226. Davis approved Jenkins's October 10, 2025 report and case narrative on October 10, 2025. Ex. D.

227. Denise remained confined from her October 9, 2025 arrest until her discharge from custody on the afternoon of October 10, 2025.

228. Plaintiffs do not yet know the exact time on October 10, 2025 when Davis approved Jenkins's report because the report produced to Plaintiffs identifies the approval date but not the approval time.

229. The exact approval time, RMS audit trail, report-routing metadata, report-submission metadata, booking records, probable-cause review records, and discharge records are within Defendants' possession, custody, or control.

230. Davis approved or ratified an arrest narrative that depended on the unsupported re-entry/re-exit/coaxing sequence — the only fact that supplied the intent element necessary to convert a loose-dog incident into a criminal protection-order violation.

231. Davis approved or ratified a narrative that failed to disclose that Jenkins had not interviewed Jeremiah Miller directly before relying on a version of Jeremiah's supposed account supplied through Wilcox, the interested complainant.

232. Davis approved or ratified a narrative that failed to fairly account for the protection order's express incidental-contact and ingress/egress exceptions.

233. Davis approved or ratified a narrative that failed to fairly account for Denise's contemporaneous denial of the re-entry/re-exit/coaxing sequence.

234. Davis approved or ratified a narrative that failed to fairly account for the noncriminal loose-dog explanation: Moose was unrestrained or not under effective control, ran toward or into Plaintiffs' home, and had naturally gone to Plaintiffs' home before.

235. Davis approved or ratified a narrative that failed to fairly account for Douglas County Resolution No. R-025-019, the loose-dog / running-at-large context, and Wilcox's duty to control Moose.

236. Davis approved or ratified a narrative that failed to fairly account for Wilcox's status as an interested complainant who had professional and personal familiarity with Jenkins and expressed a desire for punitive law-enforcement action.

237. Davis approved or ratified a narrative that failed to fairly account for Wilcox's inflammatory danger-character assertions, including that Denise was "unhinged," that Plaintiffs "have guns," and that Alec was characterized as violent or aggressive, despite the absence of any firearm, weapon, threat, assault, or act of violence connected to the alleged Moose incident.

238. Plaintiffs allege that Davis either knew or recklessly disregarded that the approved report and probable-cause narrative were materially incomplete, misleading, unsupported by reasonably trustworthy information, or insufficient to establish probable cause when corrected to include omitted facts.

239. If Davis approved the report before Denise's discharge from custody, Plaintiffs allege that Davis's approval, ratification, processing, or use of the materially deficient probable-cause narrative caused or contributed to Denise's continued seizure, confinement, booking, detention, criminal process, and related damages.

240. If Davis approved the report after Denise's discharge from custody, Plaintiffs allege in the alternative that Davis's approval, ratification, processing, or use of the materially deficient probable-cause narrative caused or contributed to Denise's wrongful legal process, prosecution, reputational injury, legal expense, emotional distress, and related damages.

241. By approving, ratifying, processing, or causing the use of that deficient report and probable-cause narrative, Davis personally participated in or caused Denise's unlawful seizure, continued seizure if approval preceded discharge, wrongful legal process, prosecution, reputational injury, legal expense, emotional distress, and other damages.

J.    Denise's Arrest, Medical Vulnerability, Transport, and Detention

242. As a result of Defendants' conduct, Denise was arrested and deprived of liberty.

243. Denise was medically vulnerable at the time of arrest and detention.

244. Denise had medical conditions, symptoms, or vulnerabilities including cancer-related issues, chemotherapy-induced neuropathy, dehydration risk, pain, medication needs, and/or an implanted medical device.

245. Before being removed from the home, Denise asked for water. Jenkins refused. Alec stated that Denise was sick, and Denise herself stated that she was sick. Ex. C, Jenkins BWC Tr. 2957.675–3032.925; Ex. L, Mancuso BWC Tr. 1632.825–1649.205.

246. Mancuso participated in or observed the custodial handling of Denise after Denise requested water and after Alec and Denise stated that Denise was sick. Ex. L, Mancuso BWC Tr. 1632.825–1649.205.

247. During the arrest and transport sequence, Denise stated that she had a spinal-cord stimulator or similar implanted device in her back, that she took medications, that she had cancer, that she was going to pass out, that she became dehydrated, and that she needed water. Ex. C, Jenkins BWC Tr. 3143.685–3479.455; Ex. L, Mancuso BWC Tr. 1818.485–1906.735.

248. Mancuso participated in or observed the refusal to allow Denise water before transport, including the refusal to allow Alec to provide a bottle of water despite Alec stating Denise was getting through cancer. Ex. L, Mancuso BWC Tr. 1705.435–1753.855.

249. Mancuso participated in or observed Denise's pat-down and custodial handling after Denise disclosed that she had a spinal-cord stimulator implanted under her skin. Ex. L, Mancuso BWC Tr. 1777.055–1840.795.

250. Mancuso heard Denise state that she was going to pass out and that she had cancer. Ex. L, Mancuso BWC Tr. 1876.355–1906.735.

251. Jenkins did not obtain water for Denise before transport and stated that jail personnel would ask about her medical condition when she arrived. Ex. C, Jenkins BWC Tr. 3471.415–3479.455; 4552.235–4554.955.

252. At or near the jail, Denise complained that the restraint or seatbelt was in her neck and demanded that the condition be photographed. Jenkins responded that the camera showed Denise pushing her neck into it. Ex. C, Jenkins BWC Tr. 4343.865–4355.125.

253. After Denise allegedly slipped one cuff, Jenkins stated that he had been leaving the handcuffs loose but would now put them on "a lot tighter." Ex. C, Jenkins BWC Tr. 4705.955–4794.385.

254. Plaintiffs allege that Jenkins and Mancuso had a realistic opportunity to mitigate Denise's medical-risk and custodial-treatment issues, including water denial, restraint, pat-down, transport, and injury-documentation concerns, but failed to do so.

255. Denise suffered physical injury, pain, medical exacerbation, emotional distress, humiliation, reputational harm, loss of liberty, legal expense, and other damages.

256. Criminal proceedings were initiated against Denise.

257. The criminal charges arising from the October 9–10, 2025 incident were dismissed in Denise's favor on December 16, 2025. Ex. F.

258. The dismissal, combined with the protection-order language, loose-dog evidence, failure to interview Jeremiah, lack of direct threats or pursuit, and materially unsupported intent narrative, confirms the absence of constitutionally adequate probable cause.

## IX.  FACTUAL ALLEGATIONS — ALEC COSTERUS JUNE 6, 2026 INCIDENT

A. Wilcox's June 6 Report, White Jeep Placement, and Complainant-Created Proximity

259. On June 6, 2026, Wilcox was again the reporting party whose allegations caused or materially contributed to the law-enforcement response to Plaintiffs' home.

260. Before deputies arrived, a white Jeep was positioned near Plaintiffs' residence.

261. Upon information and belief, Alex Bisgard drove the white Jeep.

262. Upon information and belief, an unidentified adult male occupied the passenger seat of the white Jeep.

263. Plaintiffs do not presently name Alex Bisgard or the unidentified adult male passenger as defendants. Plaintiffs plead their presence and conduct as factual context supporting Wilcox's alleged staged proximity, improper purpose, malice, and abuse of process.

264. Wilcox was standing beside the white Jeep on the driver's side, away from Plaintiffs' property but immediately adjacent to it, on the far side of the vehicle from Plaintiffs' residence.

265. The positioning of the white Jeep and Wilcox's location beside it are material because Wilcox's position allowed her to be near Plaintiffs' home while obscured from Alec's view.

266. Alec did not know Wilcox was present beside or near the white Jeep.

267. Alec did not knowingly approach Wilcox.

268. Alec did not pursue Wilcox.

269. Alec did not speak to Wilcox.

270. Alec did not threaten Wilcox.

271. Alec did not intentionally initiate contact with Wilcox.

272. To the extent Wilcox reported that Alec "approached" her or violated the protection order by proximity, that report was materially misleading because

Wilcox's own positioning beside the white Jeep, adjacent to Plaintiffs' property but away from Alec's view, created or contributed to the apparent proximity and Alec lacked knowledge of her presence.

273. The magistrate had previously warned Wilcox and Graham that the protection order was not to be used "as a sword," for "baiting," for "trying to trap" Alec, or "as something to be weaponized." Ex. B, PPO Tr. 132:23–133:13.

274. Wilcox's alleged conduct on June 6, 2026 was consistent with the kind of baiting, trapping, or weaponized use the magistrate warned against.

275. On June 6, 2026, Wilcox did not merely report accidental or unavoidable proximity. Plaintiffs allege that Wilcox affirmatively participated in conduct that created, staged, or facilitated the very kind of proximity trap the magistrate had warned against: Wilcox positioned herself beside the white Jeep, away from Plaintiffs' property but adjacent to it, on the far side of the vehicle from Plaintiffs' residence, while Alec did not know she was present.

276. Plaintiffs allege that Wilcox then used or caused the use of the protection-order and criminal-enforcement process to characterize the resulting apparent proximity as a violation by Alec, even though the protection order expressly permitted ingress and egress to Plaintiffs' home and incidental contact.

277. Plaintiffs further allege that Wilcox's conduct was contempt-like and in defiance of the magistrate's express admonition. Plaintiffs do not ask this Court to hold

Wilcox in contempt of the County Court protection order in this action. Rather, Plaintiffs plead the magistrate's admonition and Wilcox's alleged defiance of it as evidence of Wilcox's knowledge, improper purpose, willful misuse of process, malice, and intent to weaponize the protection-order process.

278. Denise observed and recorded part of the incident on her cell phone. Ex. N.  Full video to be supplemented as per Court's video upload directions.

279. While Denise was recording, Wilcox, Alex Bisgard, the unidentified adult male passenger, or some combination of them waved toward Denise.

280. Plaintiffs do not allege that waving, standing near a vehicle, driving a vehicle, sitting in a vehicle, or being present near a residence is independently tortious. Plaintiffs allege that the vehicle placement, Wilcox's positioning, and the recorded conduct are circumstantial evidence that Wilcox's proximity to Alec was created or facilitated by Wilcox's own conduct rather than by any knowing approach by Alec.

281. A reasonable officer investigating an alleged protection-order violation under those circumstances was required to determine whether Alec knowingly violated the order, or whether Wilcox's own positioning, the white Jeep, and the surrounding circumstances created the apparent encounter.

282. Wilcox's report was not neutral background information. It was the factual trigger for the June 6 enforcement action and was central to probable cause.

B.    The June 6 Law-Enforcement Response

283. On Saturday, June 6, 2026, at approximately 2:00 p.m., Jenkins and Cromwell responded to Plaintiffs' residence at 16261 Laurelhill Court, Parker, Colorado 80134.

284. The incident is associated with Douglas County Court Case No. C0182026M001323 and Arrest / DCSO No. 26002681. Ex. G.

285. Jenkins and Cromwell approached the home.

286. Alec remained inside the residence behind a locked storm-glass door.

287. At various points, the main interior door was opened, but Alec remained behind the locked storm-glass door and did not consent to entry or exit.

288. Cromwell stated in substance that he wanted to speak with Alec.

289. Alec responded in substance that they could speak while Alec remained inside behind the locked storm-glass door.

290. Cromwell asked Alec to come outside.

291. Alec refused.

292. When asked why he would not come outside, Alec stated in substance, "I don't have to."

293. Alec did not threaten the officers.

294. Alec did not use force.

295. Alec did not attempt to flee.

296. Alec did not create exigent circumstances.

297. Alec remained inside his home behind a locked barrier and expressly declined to exit.

C.     Officers Had No Arrest Warrant

298. Alec asked whether the officers had an arrest warrant.

299. The officers admitted they did not have an arrest warrant.

300. Jenkins asserted in substance that they had probable cause and did not need an arrest warrant.

301. That assertion was legally misleading under the circumstances.

302. Probable cause alone does not authorize a warrantless, nonconsensual home arrest absent a warrant, valid consent, or exigent circumstances.

303. Alec did not provide valid consent to enter the home.

304. Alec did not voluntarily agree to exit the home.

305. No exigent circumstances justified entering the home or coercing Alec to surrender the protection of the home threshold.

D.    Attempted Entry and Coercive Surrender

306. Jenkins and Cromwell repeatedly knocked, rang the doorbell, pounded on the glass, and attempted to open the locked storm-glass door.

307. The locked storm-glass door was the physical barrier preventing completed entry.

308. Had the storm-glass door not been locked, Plaintiffs reasonably believe the officers would have crossed the threshold and entered the residence without a warrant, consent, or exigent circumstances.

309. The encounter was not merely a consensual knock-and-talk.

310. The officers exceeded any implied license to approach the front door by refusing to accept Alec's decision to remain inside, attempting to open the locked storm-glass door, asserting warrantless authority they did not possess, and pressuring Alec to exit.

311. Jenkins escalated the encounter by warning Alec in substance not to "make this worse" and by referencing additional criminal charges, including resisting arrest.

312. Alec understood the officers' statements and conduct as a coercive threat that if he remained inside his home and insisted on a warrant, he would face additional criminal accusations, property damage, forced entry, or escalation.

313. Alec exited only because he reasonably believed, based on the officers' words, actions, attempted opening of the storm door, physical positioning, assertion of authority, and threat of additional charges, that officers would enter the home, damage the property, escalate the encounter, or add charges if he did not submit.

314. Alec did not exit voluntarily.

315. Alec's exit was coerced by asserted police authority and threat of criminal escalation.

316. Once Alec exited, officers handcuffed him.

317. The handcuffing constituted physical restraint, intentional physical contact, and a seizure.

318. The seizure was unlawful because it followed a warrantless constructive home arrest, attempted entry, and coerced surrender obtained without valid consent, without an arrest warrant, without a search warrant, and without exigent circumstances.

E.     June 6 Supervisory Review Placeholder

319.  Upon information and belief, one or more DCSO supervisors, watch commanders, report reviewers, probable-cause reviewers, arrest-review officers, or approving peace officers reviewed, approved, processed, transmitted, or ratified the June 6, 2026 arrest narrative, probable-cause statement, report, summons, criminal complaint, booking materials, or prosecution referral concerning Alec Costerus.

320.  Plaintiffs do not yet know the identity of the June 6 approving supervisor, report reviewer, or probable-cause reviewer because Plaintiffs have not yet received the June 6 body-worn camera footage, arrest affidavit, probable-cause statement, incident report, supervisor approval metadata, RMS approval records, CAD materials, or related records.

321.  Upon information and belief, the June 6 arrest narrative, probable-cause statement, report, or prosecution referral omitted or failed to fairly account for material facts, including that officers had no arrest warrant; Alec remained inside his home behind a locked storm-glass door; Alec asked whether officers had a warrant; officers admitted they did not; no valid consent or exigent circumstances existed; officers attempted to open the locked storm-glass door; officers used threats of escalation or additional charges to coerce Alec's exit; and Wilcox's alleged report arose from complainant-created or third-party-facilitated

proximity involving the white Jeep, Alex Bisgard, the unidentified adult male passenger, and Wilcox's obscured position.

322. If discovery establishes that any June 6 supervisor, report reviewer, probable-cause reviewer, arrest-review officer, or approving peace officer knew or recklessly disregarded those facts and nevertheless approved, processed, transmitted, or ratified a materially deficient arrest narrative, probable-cause statement, report, summons, complaint, booking decision, or prosecution referral, that person personally participated in or caused Alec's unlawful seizure, continued seizure, wrongful legal process, reputational injury, legal expense, emotional distress, and other damages.

323. Plaintiffs will amend to substitute the true name of the June 6 approving supervisor, report reviewer, probable-cause reviewer, arrest-review officer, or approving peace officer after production of the June 6 body-worn camera footage, arrest affidavit, probable-cause statement, incident report, RMS approval records, supervisor approval metadata, CAD records, dispatch audio, booking records, and related discovery.

F.    Alec's Damages and Reservation of Malicious-Prosecution Claim

324. Alec suffered deprivation of liberty, public humiliation, reputational harm, emotional distress, household distress, business interruption, lost time, legal expense, and other damages.

325. Alec's arrest occurred in view of or in a manner observable by neighbors or others, causing reputational and emotional harm.

326. To the extent the June 6, 2026 criminal case remains pending, Alec does not presently assert malicious prosecution arising from that incident.

327. Alec reserves the right to amend to add malicious prosecution, wrongful legal process, fabrication, and related claims after favorable termination or after discovery reveals facts making such claims ripe and proper.

## X. COMMON MUNICIPAL-LIABILITY FACTS

328. The Board, Sheriff Weekly in his official capacity, DCSO policymakers, and/or Douglas County's sheriff-controlled practices are responsible for training, supervising, disciplining, and controlling deputies regarding arrests, probable cause, protection-order enforcement, witness interviews, exculpatory evidence, truthful reporting, official criminal justice records, report review, probable-cause review, home-threshold rules, warrantless arrest limits, knock-and-talk limits, constructive entry, coercion, handcuffing, transport, detention, medical vulnerability, and failure to intervene.

329. Protection-order enforcement in close residential settings is a recurring law-enforcement scenario in Douglas County.

330. Deputies predictably encounter protection orders containing exceptions for incidental contact, ingress and egress, shared residences, neighborhood proximity, lawful home access, or other lawful contact.

331. Deputies require training to distinguish intentional prohibited contact from unavoidable incidental contact.

332. Deputies require training to evaluate probable cause where a complaining witness has a personal dispute, pending civil litigation, neighborhood conflict, institutional familiarity, or motive to misuse legal process.

333. Deputies require training not to ignore readily available exculpatory evidence before making a custodial arrest.

334. Deputies require training to independently interview material witnesses when the arrest theory depends on disputed intent and third-party observations.

335. Deputies require training to distinguish civil, neighborhood, animal-control, and property disputes from criminal conduct.

336. Deputies require training on the constitutional limits of arresting persons for ambiguous conduct under protection orders that expressly allow incidental contact and ingress/egress.

337. Deputies require training on the distinction between probable cause and the separate arrest-warrant requirement for entry into or coercive seizure from the home.

338. Deputies require training on the limits of knock-and-talk encounters and on the principle that refusal to exit a home or insistence on a warrant does not itself create resisting arrest.

339. Deputies require training not to threaten additional charges to coerce surrender across the home threshold where officers lack a warrant, consent, or exigent circumstances.

340. Deputies require training on medically vulnerable arrestees, proper restraint, handcuffing, transport, water, medication access, injury documentation, intake screening, and custodial medical care.

341. Deputies require training concerning officers' duties to intervene when fellow officers conduct unlawful arrests, continue unlawful seizures, disregard material exculpatory evidence, or subject medically vulnerable arrestees to unreasonable custodial handling.

342. Report-review, probable-cause-review, supervisory-approval, and arrest-review practices are independently material to municipal and official-capacity liability. If supervisors, watch commanders, report reviewers, or probable-cause reviewers approved reports or prosecution referrals containing material omissions,

derivative witness assertions, unsupported intent narratives, inflammatory danger-character assertions, or warrantless home-threshold arrest defects, those approvals support Plaintiffs' claims that deficient practices existed concerning supervision, report review, probable-cause review, corrective action, discipline, and training.

343. Upon information and belief, Jenkins was serving as a field-training officer during the October 9–10, 2025 incident involving Denise. As a field-training officer, Jenkins was allegedly entrusted not merely to enforce law, but to model, teach, or reinforce Douglas County law-enforcement practices.

344. Jenkins's alleged conduct as a field-training officer was therefore especially significant. He allegedly failed to investigate the central intent issue, failed to interview Jeremiah Miller, failed to account for the protection order's express exceptions, accepted an interested complainant's derivative account, and used or adopted a materially misleading arrest narrative.

345. Davis's approval of Jenkins's report and probable-cause narrative is material to municipal and official-capacity liability because it supports a plausible inference that supervisory review did not correct obvious omissions, did not require direct interview of the material witness, did not enforce the protection order's express exceptions, did not account for Douglas County Resolution No. R-025-019, did not

account for prejudicial danger-escalation assertions, and did not prevent complainant-driven enforcement.

346. Upon information and belief, despite the constitutional warning signs from the October 2025 incident, the Board, Sheriff Weekly in official capacity, DCSO policymakers, and/or Douglas County's sheriff-controlled practices did not meaningfully discipline, retrain, counsel, supervise, correct, or remove Jenkins from positions of authority.

347. Instead, Jenkins remained in or advanced to a position of greater authority and was later promoted to corporal before the June 6, 2026 incident involving Alec.

348. Jenkins's continued authority and later promotion are material to municipal and official-capacity liability because they support a reasonable inference, subject to discovery, that the responsible policymaking entities or officials failed to correct, ratified, tolerated, or remained deliberately indifferent to recurring unconstitutional protection-order enforcement practices.

349. The Board, Sheriff Weekly in official capacity, DCSO policymakers, and/or Douglas County's sheriff-controlled practices failed to provide adequate training and supervision in the areas alleged herein.

350. The Board, Sheriff Weekly in official capacity, DCSO policymakers, and/or Douglas County's sheriff-controlled practices failed to adequately discipline, retrain, supervise, counsel, or correct deputies who engaged in deficient investigations,

misleading arrest narratives, coercive threshold tactics, complainant-driven enforcement, failures to intervene, inadequate report review, inadequate probable-cause review, or inadequate custodial treatment.

351. Upon information and belief, after Denise's October 2025 arrest, the Board, Sheriff Weekly in official capacity, DCSO policymakers, and/or Douglas County's sheriff-controlled practices did not meaningfully investigate, discipline, retrain, counsel, supervise, correct, or remove Jenkins, Mancuso, or Davis despite notice of the constitutional concerns.

352. Instead, Jenkins remained in a position of authority, advanced to corporal, and later participated in Alec's June 2026 arrest, which raised additional Fourth Amendment issues concerning civil-protection-order enforcement, complainant-created proximity, probable cause, warrant requirements, home-threshold protections, and coercive police tactics.

353. The Board's policies or customs, Sheriff Weekly's official-capacity policies or customs, DCSO policymaker decisions, and/or Douglas County's sheriff-controlled practices were moving forces behind Plaintiffs' injuries.

## XI.  CLAIMS FOR RELIEF

CLAIM ONE:  42 U.S.C. § 1983 — Fourth Amendment False Arrest / Unlawful Seizure
*Denise Costerus against Defendants Jenkins and Mancuso*

354. Denise incorporates all preceding paragraphs.

355. Denise had a clearly established Fourth Amendment right to be free from arrest without probable cause.

356. Jenkins made or led the arrest decision and arrested Denise.

357. Mancuso participated in, assisted, continued, or failed to prevent Denise's seizure and arrest.

358. Jenkins and Mancuso lacked reasonably trustworthy information establishing that Denise intentionally called, lured, took, controlled, or used Moose, or intentionally engaged in prohibited contact beyond incidental contact and lawful ingress/egress permitted by the protection order.

359. Jenkins relied on Wilcox's materially shifting and interested account.

360. Jenkins and Mancuso knew or had reason to know that Wilcox had a personal stake in the dispute and an expressed desire for punitive law-enforcement action.

361. Jenkins knew or had reason to know that Wilcox had professional and personal familiarity with him and other Douglas County Sheriff's Office personnel.

362. Mancuso knew or had reason to know that the officers lacked a clear protection-order violation, that the alleged violation depended on disputed intent, that Jeremiah Miller was an available material witness, and that Denise denied the alleged intent sequence.

363. Jenkins and Mancuso failed to interview Jeremiah Miller, the obvious material witness whose direct account was necessary to test the only fact that could transform a loose-dog incident into criminal conduct.

364. At most, the facts supported further investigation, not immediate arrest.

365. Jenkins's arrest of Denise and Mancuso's participation in or failure to prevent the seizure were objectively unreasonable and violated the Fourth Amendment.

366. Denise suffered damages.

CLAIM TWO:    42 U.S.C. § 1983 — Fourth Amendment Judicial Deception / Material Falsehoods and Omissions

*Denise Costerus against Defendants Jenkins and Blake Reese Davis*

367. Denise incorporates all preceding paragraphs.

368. The Fourth Amendment prohibits officers from causing seizure or legal process through material false statements, misleading assertions, or material omissions made knowingly, intentionally, or with reckless disregard for the truth.

369. Jenkins prepared or caused to be prepared an arrest affidavit, probable-cause statement, report, summons, or official criminal justice record that was materially misleading.

370. Davis reviewed, approved, ratified, processed, or caused the use of Jenkins's October 10, 2025 report and materially misleading probable-cause narrative despite material omissions and unsupported assertions.

371. The record adopted or incorporated an inculpatory sequence in which Denise allegedly re-entered, re-exited, and called or lured Moose.

372. That sequence supplied the missing intent element necessary to support criminal charges.

373. Jenkins did not have reasonably trustworthy support for that sequence.

374. Jenkins and Davis omitted or failed to disclose that Jenkins had not interviewed Jeremiah directly.

375. Jenkins and Davis omitted or failed to fairly account for the loose-dog explanation.

376. Jenkins and Davis omitted or failed to fairly account for the protection-order language permitting incidental contact and lawful ingress and egress.

377. Jenkins and Davis omitted or failed to fairly account for Douglas County Resolution No. R-025-019, Moose's lack of effective control, and the running-at-large context.

378. Jenkins and Davis omitted or failed to fairly account for Wilcox's professional and personal familiarity with Jenkins, expressed punitive purpose, and role as an interested complainant.

379. Jenkins and Davis omitted or failed to fairly account for the fact that Wilcox injected inflammatory danger-character assertions into a loose-dog / alleged protection-order investigation, including statements that Denise was "unhinged," that Plaintiffs "have guns," and that Alec was characterized as violent or aggressive, despite the absence of any firearm, weapon, threat, assault, or act of violence connected to the alleged conduct.

380. Davis knew or recklessly disregarded that the report or probable-cause statement omitted facts necessary to a fair probable-cause determination, including Jenkins's failure to interview Jeremiah Miller, the protection order's incidental-contact and ingress/egress language, Denise's contemporaneous denial of intent, the noncriminal loose-dog explanation, Douglas County Resolution No. R-025-019, Wilcox's interested and punitive posture, and Wilcox's danger-escalation assertions.

381. These statements and omissions were material because a corrected affidavit, report, or probable-cause narrative would not establish probable cause.

382. Jenkins and Davis violated Denise's Fourth Amendment rights.

383. Denise suffered damages.

CLAIM THREE:  42 U.S.C. § 1983 — Fourth Amendment Malicious Prosecution / Wrongful Legal Process

*Denise Costerus against Defendants Jenkins and Blake Reese Davis*

384.  Denise incorporates all preceding paragraphs.

385.  Jenkins caused or substantially contributed to criminal process against Denise.

386.  Davis caused, approved, ratified, or materially contributed to criminal process against Denise by approving or causing the use of the materially deficient October 10, 2025 report and probable-cause narrative.

387.  The criminal process depended on an unsupported intent narrative.

388.  Jenkins and Davis caused or contributed to that process through materially misleading statements, omissions, official records, report approval, and prosecution materials.

389.  The proceedings lacked probable cause.

390.  The criminal proceedings terminated in Denise's favor on December 16, 2025.

391.  Denise suffered liberty deprivation, court obligations, reputational harm, legal expense, emotional distress, and other damages.

392.  Jenkins and Davis violated Denise's Fourth Amendment right to be free from wrongful legal process unsupported by probable cause.

CLAIM FOUR:   42 U.S.C. § 1983 — Fourth and Fourteenth Amendment Unreasonable Restraint, Transport, Detention Conditions, and Custodial Medical Treatment

*Denise Costerus against Defendants Jenkins, Mancuso, and Doe Defendants*

393. Denise incorporates all preceding paragraphs.

394. Denise was arrested, restrained, transported, booked, and detained.

395. Denise had medical vulnerabilities and communicated medical concerns, pain, dehydration risk, medication needs, implanted-device concerns, or injury complaints.

396. Jenkins, Mancuso, Doe deputies, detention officers, intake personnel, or medical personnel unreasonably disregarded, delayed, denied, or minimized those needs.

397. Denise was subjected to unreasonable restraint, transport, detention conditions, denial or delay of water, denial or delay of medication or medical evaluation, injury aggravation, or failure to document injury.

398. Mancuso participated in, observed, assisted, continued, or failed to intervene in Denise's restraint, transport, custodial handling, water denial, medical-risk handling, and detention transfer despite known medical vulnerability.

399. The conduct was objectively unreasonable under the Fourth Amendment during seizure, restraint, and transport, and objectively unreasonable, punitive, deliberately indifferent, or not reasonably related to any legitimate governmental

objective under the Fourteenth Amendment during pretrial detention or custodial processing.

400. Denise suffered physical injury, pain, medical exacerbation, emotional distress, humiliation, and other damages.

CLAIM FIVE:  42 U.S.C. § 1983 — Failure to Intervene
*Denise Costerus against Defendant Mancuso and Doe Defendants*

401. Denise incorporates all preceding paragraphs.

402. Mancuso and Doe Defendants were present for, participated in, observed, or had reason to know of Denise's arrest, seizure, restraint, transport, and custodial handling.

403. Mancuso and Doe Defendants knew or had reason to know that Denise's arrest was based on a disputed protection-order violation involving a loose dog, an interested complainant, an unverified third-party-witness account, and a protection order that expressly permitted incidental contact and ingress/egress.

404. Mancuso and Doe Defendants knew or had reason to know that Denise disputed the alleged intent sequence and that Jenkins had not interviewed Jeremiah Miller before arresting Denise.

405. Mancuso and Doe Defendants knew or had reason to know that Denise requested water, stated or demonstrated medical vulnerability, disclosed an implanted

spinal-cord stimulator or similar device, referenced cancer, medication, dehydration risk, and feeling faint or likely to pass out.

406. Mancuso and Doe Defendants had a realistic opportunity to intervene to prevent or stop the unlawful seizure, arrest, unreasonable restraint, denial or delay of water, or unreasonable custodial treatment.

407. Mancuso and Doe Defendants failed to intervene.

408. Denise suffered damages.

CLAIM SIX:  42 U.S.C. § 1983 — Fourth Amendment Warrantless Home-Threshold Seizure / Constructive Home Arrest

*Alec Costerus against Defendants Jenkins and Cromwell*

409. Alec incorporates all preceding paragraphs.

410. Alec had a clearly established Fourth Amendment right to be secure in his home from warrantless, nonconsensual seizure absent a warrant, consent, or exigent circumstances.

411. Jenkins and Cromwell came to Alec's residence without an arrest warrant.

412. Alec remained inside the home behind a locked storm-glass door.

413. Alec asked whether officers had an arrest warrant.

414. Officers admitted they did not.

415. Jenkins asserted in substance that probable cause was sufficient and that an arrest warrant was not required.

416. Officers attempted to open the locked storm-glass door, continued pressuring Alec to exit, and threatened escalation or additional charges.

417. Alec exited only because he reasonably believed he would otherwise face forced entry, property damage, escalation, or additional criminal charges.

418. Alec's exit was not voluntary consent.

419. Jenkins and Cromwell thereby accomplished a warrantless constructive home arrest or home-threshold seizure without a warrant, consent, or exigent circumstances.

420. Alec's seizure violated the Fourth Amendment.

421. Alec suffered damages.

CLAIM SEVEN:  42 U.S.C. § 1983 — Fourth Amendment False Arrest / Unlawful Seizure
*Alec Costerus against Defendants Jenkins and Cromwell*

422. Alec incorporates all preceding paragraphs.

423. Jenkins and Cromwell seized and arrested Alec.

424. Jenkins and Cromwell lacked reasonably trustworthy information that Alec knowingly violated the protection order because Wilcox allegedly created or

contributed to the apparent proximity by standing beside the white Jeep, on the far side from Plaintiffs' property, and then reporting Alec as having approached her when Alec did not know she was present.

425. The protection order expressly allowed ingress/egress to Plaintiffs' home and incidental contact.

426. The seizure was independently unlawful because it followed a warrantless constructive home arrest and coerced surrender from inside the home.

427. Probable cause alone did not authorize the officers to coerce Alec across the home threshold for arrest.

428. Alec did not consent, no arrest warrant existed, and no exigent circumstances justified the seizure.

429. Jenkins and Cromwell acted intentionally, knowingly, recklessly, or with deliberate indifference to Alec's rights.

430. Alec suffered damages.

CLAIM EIGHT: 42 U.S.C. § 1983 — Failure to Intervene
*Alec Costerus against Defendants Jenkins, Cromwell, and Doe Defendants*

431. Alec incorporates all preceding paragraphs.

432. Each law-enforcement Defendant present at the June 6, 2026 incident had a realistic opportunity to prevent or stop the unconstitutional conduct.

433. Jenkins and Cromwell each knew or should have known that officers lacked an arrest warrant and that Alec remained inside the home behind a locked barrier.

434. Each officer knew or should have known that threatening escalation, attempting to open the storm-glass door, and coercing Alec to exit without a warrant, consent, or exigent circumstances violated the Fourth Amendment.

435. Each officer failed to intervene to prevent or stop the violation.

436. Alec suffered damages.

CLAIM NINE:  42 U.S.C. § 1983 — Municipal / Official-Capacity Liability

*Plaintiffs against The Board of County Commissioners of the County of Douglas and Sheriff Darren Weekly in His Official Capacity*

437. Plaintiffs incorporate all preceding paragraphs.

438. The Board of County Commissioners of the County of Douglas and Sheriff Weekly in his official capacity are sued for municipal and official-capacity liability under 42 U.S.C. § 1983 and Monell.

439. Plaintiffs do not seek municipal or official-capacity liability under respondeat superior. Plaintiffs allege that the Board, Sheriff Weekly in official capacity, or both, through official policy, custom, practice, failure to train, failure to supervise, failure

to discipline, failure to counsel, failure to correct, failure to remove officers from positions of authority, deficient report review, deficient probable-cause review, and/or ratification, caused the constitutional violations alleged herein.

440. To the extent Douglas County's sheriff-controlled law-enforcement, patrol, arrest, protection-order enforcement, report-review, probable-cause-review, detention, jail, training, discipline, or supervision practices are attributable to Sheriff Weekly as an official-capacity policymaker, Plaintiffs seek relief against Sheriff Weekly in his official capacity.

441. To the extent Douglas County's entity-level funding, indemnification, training infrastructure, jail facilities, personnel systems, records systems, report-review infrastructure, policy implementation, or county-level obligations are attributable to the Board of County Commissioners of the County of Douglas, Plaintiffs seek relief against the Board.

442. The County failed to adequately train and supervise deputies concerning protection-order enforcement, incidental-contact exceptions, ingress/egress exceptions, probable cause in ambiguous neighbor disputes, complainant bias, institutional familiarity, exculpatory evidence, material witness interviews, arrest-first/investigate-later practices, truthful affidavits, report review, probable-cause review, home-threshold protections, warrantless home arrests, knock-and-talk limitations, constructive entry, coercive surrender, resisting-arrest

threats, handcuffing, transport, failure to intervene, and medically vulnerable detainees.

443. The need for such training was obvious because deputies regularly enforce protection orders, make arrests at residences, interact with complainants in neighbor disputes, review reports and probable-cause narratives, and detain medically vulnerable persons.

444. Jenkins's status as a field-training officer during the October 2025 incident is material because he allegedly modeled, reinforced, or operationalized deficient protection-order enforcement practices while occupying a training role.

445. Davis's approval of Jenkins's October 10, 2025 report and probable-cause narrative is material because it allegedly ratified or failed to correct the same deficient investigation and materially incomplete narrative.

446. The failure to account for Douglas County Resolution No. R-025-019, the loose-dog / running-at-large context, and Wilcox's duty to control Moose is material to municipal and official-capacity liability because it reflects a failure to distinguish criminal protection-order enforcement from noncriminal animal-control and neighborhood-dispute facts.

447. Douglas County's alleged failure to discipline, retrain, counsel, supervise, correct, or remove Jenkins from positions of authority after the October 2025 incident, followed by Jenkins's later promotion or advancement to corporal before the June

2026 incident, supports a plausible inference of deliberate indifference, ratification, and failure to correct recurring unconstitutional protection-order enforcement practices.

448. The Board's, Sheriff Weekly's official-capacity policies or customs, DCSO policymaker decisions, and/or Douglas County's sheriff-controlled practices reflected deliberate indifference to the known or obvious risk of constitutional violations.

449. The Board's, Sheriff Weekly's official-capacity policies or customs, DCSO policymaker decisions, and/or Douglas County's sheriff-controlled practices caused Denise's October 2025 arrest, prosecution, detention, and injury.

450. The Board's, Sheriff Weekly's official-capacity policies or customs, DCSO policymaker decisions, and/or Douglas County's sheriff-controlled practices caused Alec's June 2026 warrantless home-threshold seizure and arrest.

451. The Board's, Sheriff Weekly's official-capacity policies or customs, DCSO policymaker decisions, and/or Douglas County's sheriff-controlled practices were moving forces behind Plaintiffs' damages.

CLAIM TEN:  Alternative Joint-Action Liability Under 42 U.S.C. § 1983
*Plaintiffs against Defendant Wilcox*

452. Plaintiffs incorporate all preceding paragraphs.

453. Plaintiffs plead this claim in the alternative.

454. Wilcox acted under color of law because, on the facts alleged and to be developed through discovery, her conduct was fairly attributable to the State under the joint-action and nexus tests.

455. Wilcox was not merely an ordinary private complainant.

456. Upon information and belief, Wilcox served as a contracted or professionally affiliated Douglas County medical provider, had long-term professional relationships with DCSO personnel, invoked that professional identity to Jenkins during an active investigation, discussed Jenkins's wife and baby/family circumstances during that investigation, expressed that she wanted Denise punished, supplied or promoted materially misleading violation narratives, and Jenkins accepted, adopted, and operationalized those narratives without adequate independent verification.

457. In October 2025, Wilcox's misleading account supplied the intent element necessary to convert a loose-dog incident into Denise's arrest.

458. In June 2026, Wilcox again acted as reporting party and allegedly supplied the factual trigger for Alec's arrest by creating or contributing to complainant-created proximity and then reporting that proximity as a violation.

459. Plaintiffs allege that Wilcox's repeated conduct, institutional relationship, invocation of professional status, preferential credibility with Jenkins, and law-enforcement reliance support a plausible inference of willful joint participation in official action.

460. If discovery shows no sufficient state action, Plaintiffs' claims against Wilcox remain independently actionable under Colorado law.

CLAIM ELEVEN:  C.R.S. § 13-21-131 — Colorado Constitutional Unreasonable Seizure / Deprivation of Rights

*Denise Costerus against Defendants Jenkins, Mancuso, and Blake Reese Davis*

461. Denise incorporates all preceding paragraphs.

462. Jenkins, Mancuso, and Davis are peace officers within the meaning of C.R.S. § 13-21-131.

463. Jenkins, Mancuso, and Davis acted under color of law.

464. Article II, § 7 of the Colorado Constitution protects Denise from unreasonable seizure, arrest, detention, and state action unsupported by reasonably trustworthy probable cause.

465. Jenkins deprived Denise of rights secured by Article II, § 7 by arresting her without reasonably trustworthy probable cause and by using or causing a materially misleading probable-cause narrative to support her seizure and criminal process.

466. Mancuso deprived Denise of rights secured by Article II, § 7 by participating in, continuing, assisting, or failing to intervene in Denise's unreasonable seizure after hearing facts showing that the arrest lacked reasonably trustworthy probable cause.

467. Davis deprived Denise of rights secured by Article II, § 7 by reviewing, approving, ratifying, processing, or causing the use of the materially deficient arrest affidavit, probable-cause statement, report, summons, criminal complaint, booking materials, or prosecution referral concerning Denise.

468. Davis approved or ratified a probable-cause narrative that depended on the unsupported re-entry/re-exit/coaxing sequence, failed to disclose that Jenkins had not interviewed Jeremiah Miller directly, failed to account for the protection order's incidental-contact and ingress/egress exceptions, failed to account for Denise's contemporaneous denial of intent, failed to account for the noncriminal loose-dog explanation, failed to account for Douglas County Resolution No. R-025-019, failed to account for Wilcox's interested and punitive posture, and failed to account for Wilcox's inflammatory danger-character assertions.

469. A corrected probable-cause narrative that included the omitted facts and removed unsupported assertions would not have established reasonably trustworthy probable cause.

470. If Davis approved the report before Denise's discharge from custody, Davis's approval caused or contributed to Denise's continued unreasonable seizure and confinement.

471. If Davis approved the report after Denise's discharge from custody, Davis's approval still caused or contributed to Denise's wrongful legal process, prosecution, legal expense, reputational injury, emotional distress, and other damages under Article II, § 7.

472. Qualified immunity is not a defense to this claim.

473. The Colorado Governmental Immunity Act, statutory immunities, statutory limitations on liability, and statutory damages limitations do not bar this claim.

474. Denise suffered damages.

CLAIM TWELVE:   C.R.S. § 13-21-131 — Colorado Constitutional Unreasonable Seizure / Home-Threshold Violation

*Alec Costerus against Defendants Jenkins and Cromwell*

475. Alec incorporates all preceding paragraphs.

476. Jenkins and Cromwell are peace officers within the meaning of C.R.S. § 13-21-131.

477. Jenkins and Cromwell acted under color of law.

478. Jenkins and Cromwell deprived Alec of rights secured by Article II, § 7 of the Colorado Constitution, including the right to be free from unreasonable seizure,

warrantless home arrest, coerced surrender from the home, and unconstitutional physical restraint.

479. Plaintiffs do not presently know the identity of any June 6, 2026 supervisory peace officer, report reviewer, probable-cause reviewer, or arrest-review officer who may have approved, ratified, processed, transmitted, or caused the use of a materially deficient probable-cause narrative concerning Alec's arrest.

480. Plaintiffs reserve the right to amend this claim to add any such peace officer if discovery establishes that the person, acting under color of law, personally approved, ratified, processed, transmitted, or caused the use of a materially deficient probable-cause narrative concerning Alec's June 6, 2026 arrest.

481. Such amendment would be based not on supervisory rank, but on the peace officer's own conduct in approving or ratifying a materially deficient narrative concerning a warrantless home-threshold seizure, lack of arrest warrant, lack of valid consent, lack of exigent circumstances, coerced surrender, and complainant-created or third-party-facilitated proximity.

482. Qualified immunity is not a defense to this claim.

483. The Colorado Governmental Immunity Act does not bar this claim.

484. Alec suffered damages.

CLAIM THIRTEEN:  Colorado State Tort — Malicious Prosecution

*Denise Costerus against Defendants Jenkins, Blake Reese Davis, and Wilcox*

485. Denise incorporates all preceding paragraphs.

486. Criminal proceedings were initiated or continued against Denise.

487. Jenkins and Wilcox caused, influenced, or contributed to those proceedings.

488. Davis caused, approved, ratified, or materially contributed to the initiation or continuation of criminal proceedings against Denise by approving the materially deficient October 10, 2025 report and probable-cause narrative.

489. The proceedings lacked probable cause because they depended on an unsupported intent narrative concerning Moose and an alleged protection-order violation.

490. The proceedings terminated in Denise's favor on December 16, 2025.

491. Defendants acted with malice, improper purpose, reckless disregard for the truth, or conscious disregard of Denise's rights.

492. Denise suffered damages.

CLAIM FOURTEEN:  Colorado State Tort — False Arrest / False Imprisonment

*Denise Costerus against Defendants Jenkins, Mancuso, and, Conditionally, Blake Reese Davis*

493. Denise incorporates all preceding paragraphs.

494. Jenkins intentionally confined Denise and deprived her of liberty.

495. Mancuso participated in, assisted, continued, or failed to prevent Denise's confinement after having reason to know the arrest lacked reasonably trustworthy probable cause.

496. To the extent Davis approved, ratified, processed, or caused the use of the deficient probable-cause narrative before or during Denise's continued confinement, booking, detention, or discharge process, Davis participated in or caused Denise's unlawful continued seizure and false imprisonment.

497. The confinement was unlawful because it lacked probable cause and was based on materially incomplete, misleading, or recklessly disregarded facts.

498. Jenkins, Mancuso, and, if the approval timing preceded or affected continued confinement, Davis acted willfully, wantonly, recklessly, maliciously, or outside lawful authority.

499. Denise suffered damages.

CLAIM FIFTEEN:  Colorado State Tort — Defamation / Defamation *Per Se*

*Plaintiffs against Defendant Wilcox*

500. Plaintiffs incorporate all preceding paragraphs.

501. Wilcox made false statements of fact or statements implying false defamatory facts about Plaintiffs to law enforcement, HOA participants, neighbors, court participants, or other third parties.

502. On or about October 9–10, 2025, Wilcox falsely or materially misleadingly stated to Jenkins, Mancuso, DCSO, and/or other law-enforcement personnel that Denise intentionally called, lured, took, withheld, or criminally interacted with Moose in violation of the protection order.

503. On or about October 9–10, 2025, Wilcox stated to law enforcement that Denise was "unhinged," that Plaintiffs "have guns," and, substantially in part, that Alec was violent or aggressive. In context, those statements conveyed or implied that Plaintiffs were unstable, dangerous, armed in a threatening manner, violent, or likely to commit violence, despite the absence of any firearm, weapon, threat, assault, or act of violence connected to the alleged Moose incident.

504. On or about June 6, 2026, Wilcox falsely or materially misleadingly stated to DCSO, Jenkins, Cromwell, dispatch, or other law-enforcement personnel that Alec knowingly approached or violated the protection order, despite Wilcox's own positioning beside the white Jeep and Alec's lack of knowledge of her presence.

505. Upon information and belief, Wilcox also made false or materially misleading statements to HOA participants, neighbors, court participants, or other third parties that Plaintiffs engaged in criminal, dangerous, harassing, or stalking conduct beyond protected reporting, lawful neighborhood conduct, incidental contact, or lawful ingress/egress.

506. The statements were false or materially misleading.

507. The statements were defamatory because they imputed criminal conduct, dishonesty, dangerousness, harassment, stalking, or protection-order violations to Plaintiffs.

508. Wilcox acted negligently, recklessly, knowingly, or with actual malice depending on the applicable standard and context.

509. The statements harmed Plaintiffs' reputations and caused economic, emotional, legal, and reputational damages.

510. To the extent Wilcox asserts privilege, Plaintiffs plead that any qualified privilege was abused by malice, excessive publication, knowing falsity, reckless disregard, or improper purpose.

511. Plaintiffs do not base this claim solely on absolutely privileged testimony or judicial statements. Plaintiffs reserve the right to narrow this claim after discovery identifies precise statements, recipients, dates, and publication contexts.

CLAIM SIXTEEN: Colorado State Tort — Negligence / Negligence *Per Se* Relating to Unrestrained Dog

*Denise Costerus against Defendant Wilcox*

512. Denise incorporates all preceding paragraphs.

513. Wilcox owed duties to control, restrain, and supervise Moose.

514. Douglas County Resolution No. R-025-019, Resolution for the Control and Licensing of Household Pets, defines "Control" to require that a dog be confined on its owner's property or, when off property, maintained on a leash, cord, or chain not more than ten feet in length and held by a person able to restrain it.

515. Douglas County Resolution No. R-025-019 defines "Running at Large" to mean off the premises of the dog owner and not under the real and immediate physical control of an owner able to control the dog.

516. Douglas County Resolution No. R-025-019 authorizes animal-control action concerning household pets found running at large and reflects the public-safety policy that owners must assume responsibility for their household pets.

517. The Resolution was designed to protect neighbors, residents, property owners, pedestrians, and others from harms caused by uncontrolled household pets.

518. Denise was within the class of persons protected.

519. The harms arising from an uncontrolled large dog running toward or onto neighboring property were the type of harms the Resolution was designed to prevent.

520. Wilcox breached her duties by allowing Moose to be loose, unrestrained, running at large, or not under real and immediate physical control.

521. Wilcox's breach caused or substantially contributed to the October 9, 2025 incident, the false or misleading criminal narrative, Denise's arrest, and Denise's damages.

CLAIM SEVENTEEN:  Colorado State Tort — Intentional Infliction of Emotional Distress / Outrageous Conduct
*Plaintiffs against Defendant Wilcox*

522. Plaintiffs incorporate all preceding paragraphs.

523. Plaintiffs plead this claim cautiously and in the alternative, recognizing Colorado's demanding outrageous-conduct standard.

524. Wilcox's conduct, taken as a course of conduct and not as isolated reporting, was extreme and outrageous.

525. As to Denise, Wilcox allegedly promoted a materially misleading loose-dog narrative, invoked her professional familiarity with Jenkins, admitted she wanted Denise punished, injected inflammatory danger-character assertions about being

"unhinged," firearms, and violence, and caused or substantially contributed to Denise's arrest and prosecution.

526. As to Alec, Wilcox allegedly acted after being warned not to use the PPO as a sword, trap, bait, or weaponized instrument, then positioned herself beside the white Jeep near Plaintiffs' home, obscured her presence from Alec, and reported apparent proximity as a violation when Alec did not know she was present.

527. Plaintiffs further allege that the Ditus, Graham, and Bach pattern facts show that Wilcox's actions were not isolated or accidental, but part of a broader course of escalating conduct involving third-party amplification, official systems, and complainant-driven consequences.

528. Wilcox acted intentionally or recklessly with knowledge that severe emotional distress was substantially certain or highly probable.

529. Plaintiffs suffered severe emotional distress, humiliation, fear, anxiety, reputational harm, household disruption, and related damages.

CLAIM EIGHTEEN:  Colorado State Tort — Abuse of Process
*Alec Costerus against Defendant Wilcox*

530. Alec incorporates all preceding paragraphs.

531. Wilcox used or invoked the protection-order and criminal-enforcement process against Alec after the magistrate expressly warned that the protection order was

not to be used "as a sword," for "baiting," for "trying to trap" Alec, or "as something to be weaponized." Ex. B, PPO Tr. 132:23–133:13.

532. The magistrate's admonition put Wilcox on express notice that the protection order could not be used to create, stage, bait, trap, or manufacture a violation.

533. Plaintiffs allege that Wilcox knowingly acted contrary to that admonition.

534. Wilcox acted with an ulterior purpose: to use the protection order and criminal-enforcement process to punish, trap, intimidate, exclude, or create criminal exposure for Alec, rather than to obtain legitimate protection.

535. Wilcox committed willful acts not proper in the regular course of protection-order enforcement by positioning herself beside a white Jeep near Plaintiffs' residence, on the driver's side away from Plaintiffs' property but adjacent to it, creating or contributing to apparent proximity, and then reporting or causing a report that Alec had "approached" or violated the protection order when Alec did not know Wilcox was present.

536. Those acts were improper because the protection order expressly permitted ingress and egress to Plaintiffs' home and incidental contact, and because a protected party may not create, stage, bait, trap, or facilitate proximity and then use that staged proximity as a criminal-enforcement trigger.

537. Plaintiffs allege that Wilcox's conduct was contempt-like and in defiance of the magistrate's express admonition. Plaintiffs do not ask this Court to hold Wilcox in contempt of the County Court protection order in this action. Plaintiffs plead the admonition and Wilcox's alleged defiance of it as evidence of Wilcox's knowledge, improper purpose, willful misuse of process, malice, and intent.

538. Wilcox's report caused or materially contributed to the law-enforcement response, warrantless home-threshold seizure, handcuffing, arrest, public humiliation, emotional distress, reputational injury, legal expense, and other damages suffered by Alec.

539. Alec suffered damages.

## XII.    DAMAGES

540. As a direct and proximate result of Defendants' conduct, Denise suffered damages including unlawful arrest, loss of liberty, custodial detention, physical injury, medical exacerbation, pain and suffering, emotional distress, humiliation, reputational harm, legal expense, defense costs, anxiety, trauma, loss of enjoyment of life, impairment of constitutional rights, and other damages to be proven at trial.

541. As a direct and proximate result of Defendants' conduct, Alec suffered damages including unlawful seizure, loss of liberty, handcuffing, emotional distress, humiliation, reputational harm, household disruption, business interruption, lost

time, legal expense, impairment of constitutional rights, and other damages to be proven at trial.

542. As a direct and proximate result of Wilcox's June 6, 2026 conduct, Alec suffered warrantless seizure, arrest, handcuffing, public humiliation, reputational injury, emotional distress, legal expense, household disruption, business interruption, and other damages.

543. Defendants' conduct was intentional, reckless, malicious, willful and wanton, oppressive, or undertaken with conscious disregard of Plaintiffs' constitutional rights.

544. Plaintiffs seek compensatory damages, nominal damages for constitutional violations, punitive damages against individual defendants where permitted by law, attorney fees where recoverable, costs, pre-judgment and post-judgment interest, declaratory relief where appropriate and not barred by pending criminal proceedings, and all other relief the Court deems just.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and award:

A.    Compensatory damages in an amount to be determined by the jury;

B.    Nominal damages for constitutional violations;

C.      Punitive damages against individual Defendants where permitted by law;

D.      Attorney fees and costs under 42 U.S.C. § 1988, C.R.S. § 13-21-131, and any other applicable law where recoverable;

E.      Pre-judgment and post-judgment interest;

F.      Declaratory relief where appropriate and not barred by pending criminal proceedings or abstention principles;

G.      Leave to amend to identify Doe Defendants and add claims after production of bodycam, CAD, dispatch, arrest, jail, medical, policy, training, report-approval, RMS audit, and internal-review evidence;

H.      Such other and further relief as the Court deems just and proper.

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

_____
Alec S.  Costerus, *pro se*
16261 Laurelhill Court
Parker, Colorado 80134
Phone:  303.549.4089
Email:   Alec@Costerus.com

_____
Denise Costerus, *pro se*
16261 Laurelhill Court
Parker, Colorado 80134
Phone:  720.765.1329
Email:   Denise@Costerus.com

**EXHIBITS**

Ex. A — Operative temporary and/or permanent protection order containing the "ingress/egress" and "incidental contact" language.

Ex. B — Relevant excerpts of the November 25, 2025 PPO hearing transcript.

Ex. C — Jenkins body-worn camera transcript from October 9–10, 2025.

Ex. D — Jenkins October 10, 2025 DCSO offense/incident report and case narrative concerning Denise, approved by Blake Reese Davis on October 10, 2025.

Ex. E — Animal Control records, including Jeremiah Miller statement and related dog-control records.

Ex. F — Criminal dismissal order or docket reflecting dismissal of charges against Denise on December 16, 2025.

Ex. G — June 6, 2026 arrest records, CAD, dispatch audio, body-worn camera, incident report, and arrest affidavit concerning Alec, to be supplemented upon production.

Ex. H — Medical, injury, restraint, jail, intake, and booking records concerning Denise and Alec, to be supplemented upon production.

 Ex. I — Relevant text messages, photographs, screenshots, and communications, including Wilcox/Jeremiah communications, to be supplemented upon authentication.

Ex. J — Records concerning the October, 24, 2024 Garrett Ditus incident, including criminal case records, dismissal or disposition records, police reports, witness statements, and communications, to be supplemented upon production.

Ex. K — Records, recordings, transcripts, or pleadings concerning related Graham and Bach incidents, offered only for limited contextual purposes unless later amended, to be supplemented as per Court's upload directions.

Ex. L — Grace Mancuso body-worn camera footage and/or transcript from October 9–10, 2025.

Ex. M — Douglas County personnel, training, discipline, counseling, promotion, supervisory, internal-affairs, remedial-action, RMS audit, report-approval, and report-routing records concerning Jenkins, Mancuso, Davis, Cromwell, and relevant supervisors, to be requested in discovery.

Ex. N — Denise Costerus cell-phone video, photographs, screenshots, or related metadata from the June 6, 2026 incident showing the white Jeep, Alex Bisgard, the unidentified adult male passenger, Wilcox's position relative to the vehicle and Plaintiffs' property, and any waving or other conduct captured while Denise recorded, to be supplemented as per Court's upload directions.

Ex. O — Douglas County Resolution No. R-025-019, Resolution for the Control and Licensing of Household Pets, including the provisions defining "Control," "Running at Large," impoundment authority, and owner responsibility.

**EXHIBIT A**

| JDF 399 | **Permanent Civil Protection Order** |
|---|---|

**A. Court**
☐ District  ☒ County  ☐ Probate  ☐ Juvenile  ☐ Municipal
Colorado County: County Court, Douglas County, Colorado
Court Address: 4000 Justice Way

Castle Rock, CO. 801097546

RECEIVED IN

NOV 2 5 2025

DOUGLAS COMBINED COURTS
*This box is for court use only.*

**B. Parties to the Case**
Petitioner: WILCOX, ELIZABETH
&
Respondent: COSTERUS, ALEC

**C. Case Details**
Number: C0182025C 000665
Division: A
Courtroom: _____

1. **Background**

   The Court issues this Order under Colorado Revised Statute (C.R.S.) section (§) 13-14-106.

   To the Restrained Person:

2. **Restrained Person**

   Name: COSTERUS, ALEC

   Date of Birth: 1/01/1963          Sex: M          Race: W

   Weight: 180          Height: 510          Hair Color: BRO          Eye Color: UNK

3. **Protected People**

   a) **Name:** WILCOX, ELIZABETH

      Date of Birth: 11/14/1962          Sex: F          Race: W

   b) **Name:** _____

      Date of Birth: _____          Sex: _____          Race: _____

   c) **Name:** _____

      Date of Birth: _____          Sex: _____          Race: _____

   d) **Name:** _____

      Date of Birth: _____          Sex: _____          Race: _____

   e) **Name:** _____

      Date of Birth: _____          Sex: _____          Race: _____

**c) Baseline Orders**

1) You *(the Restrained Person)* can't:

- Contact,
- Intimidate,
- Abuse, or
- Harass,
- Threaten,
- Molest,
- Stalk,
- Touch,
- Injure,
- Sexually Assault,

The Protected People.

2) You can't:

- Harm,
- Take,
- Molest, Encumber,
- Injure,
- Transfer,
- Dispose of, or
- Kill,
- Conceal,
- Threaten Harm to

Any of the Protected People's *(or their children's)* pets or animals.

3) You can't:

- Use,
- Attempt to Use, or
- Threaten to Use

Physical force against the Protected People that could cause bodily injury.  You can't engage in conduct that would place the Protected People in reasonable fear of bodily injury.

**d) No Contact**

You *(the Restrained Person)* can't have contact  **of any kind**  with the Protected People.

You can't attempt to contact them through another person except for your attorney.

**Exceptions:**

RSP PERMITTED INGRESS AND EGREES TO OWN PROPERTY INCID

ENTAL CONTACT PERMITTED NO CONTACT W IMMED FAMILY MEMBERS

_____

_____

_____

_____

**d) Care of Animals**

☐ Arrangements for the possession and care of an animal are as follows:

**e) No Interference**

☒ The Restrained Person can't

1) Interfere with the Protected Person at their work or school; Or

2) Engage in conduct that impairs the Protected Person's employment , educational relationships, or environment

**f) Other Matters**

☒ It is further ordered that:

RSP SHALL NOT LOITER FOR ANY REASON OUTSIDE OF THEI R RESIDENCE

**6. Service requirements** (check one)

☒ This order is the same as the Temporary Protection Order. No service required.

☐ This order is different from the Temporary Protection Order. It requires service before its provisions become effective.

**7. Signatures**

**So Ordered**

Judicial Officer Signature: _____ Dated: 11/25/2025

Judicial Officer Name: *(print)* GALLO, MEGHAN M

**Restrained Person**

By signing, I acknowledge receipt of this Order:

Restrained Person Signature: _____ Dated: 11/25/2025

☐ Restrained Person was not present in the courtroom.

A    I'm generally looking at the road.  I walk my dog. And there are other mailboxes throughout Stonegate.  Each subdivision has its own particular subset of requirements as to the mailbox, be it color or style.

MR. GOUTELL:  I don't have any further questions, Your Honor,

THE COURT:  Cross-examination?

**CROSS-EXAMINATION**

BY MR. YOUNG:

Q    Good morning, Mr. Costerus.

A    Oh, it's nice to see you.

Q    So you live on Laurelhill Street, right?

A    That's correct.

Q    It's your home too, right?

A    Yes, it is.

Q    Would you like to feel safe there?

A    Very much so.

Q    Do you feel safe there?

A    No.

Q    Why not?

A    Because we are currently under a temporary restraining order.  And on information and belief, I believe that we are being set up constantly by those who have the -- the Petitioners in this case.  Such that if we, for example, if I was to suck up my leaves on the front lawn, I am afraid

that Elizabeth would come out and start videotaping just like she has in the past against my wife saying, "This is going to be good.  I got it.  I got it."  And so she would use that as a weaponization tool to have me arrested.  That's just but one example.

Q    Okay.  Let's talk particularly about the incident with Max.  Do you recall that day?

A    Portions of it, but I -- I am aware of the situation that Ellen described.

Q    What happened?

A    So I was out walking my dogs, and a gentleman was walking towards my direction, tall, wearing dark sunglasses, mirrored, if I recall, wearing a hoodie and dark pants.  I really had no idea who it was.  And Ellen later said that he had gotten a haircut, which made him even more difficult to identify.  I have never been introduced to him, so I'm kind of speculating, but I had no idea who it was.

Q    Did you see them go into Ms. Graham's backyard?

A    No.  What I observed when I walked around -- so that I wasn't in the area of the playground area, the public area behind Elizabeth's and Ellen's house, I did see that same individual underneath the trampoline.

Q    And you were scared?

A    Well, I wasn't scared for my safety, but maybe a week prior, there was an email exchange or Nextdoor or

were emotional at different points and talked about obviously their changed behavior, but the fear that they're actually having.  So I do think that this risk of psychological or emotional harm exists.  And then when -- and all that to say that the harassment I find under the preponderance as to the prong 1.

When I turn to prong 2 and why this is necessary going forward, everything I see in the record before me suggests that, sir, you're not going to stop.  And that really, one of the only reasons we haven't had a call for service since these protection orders have been in place is quite frankly because there's a protection order in effect.

Also, when Counsel, your counsel asked you basically of whether or not you're willing to move on you said you're hopeful and that you'd like to, but I didn't get any definitive statement from you saying, you know what, I've learned my lesson.  I'm not going to do this.  Anything like that.  You seem to be putting the onus again on them and blaming them and saying that it would depend on what they did in the future, whether or not you were willing to consider your behavior.  So at that point, I do think the permanent protection order needs to exist.

I will allow, obviously, for incidental contact.  I also just want to lecture the Plaintiffs for a minute that I do not want this to be used as a sword.  I do not want this to

be the kind of protection order that means that you are baiting him into things or trying to trap him.  This is literally -- ultimately, it's just a legal document, but it is one that is meant to try to give you some peace and the ability to not suffer from the harassment while in your home and for every teeny tiny violation that he can imagine.

That being said, if down the road this ends up being, you know, a nightmare for law enforcement as well, where we now have an additional 150 calls, all to report potential violations.  So just be mindful of what, if anything, you report and the intent that the Court is doing it again, is meant as protection, not as something to be weaponized.

So I am going to go ahead and grant the permanent protection order in -- let me just grab my case numbers again -- 25 C 665 and 658.  Again, I'm going to deny it in 25 C 664.

As part of that granting, Counsel, do you waive formal -- formal reading and advisement?

MR. YOUNG:  I will, Your Honor.

THE COURT:  Okay.  We've had a waiver.

I will just caution you, sir, that any violation could be a misdemeanor and could be prosecuted either as contempt in this court or an additional criminal.

Counsel?

MR. YOUNG:  May I ask just two clarifying questions?

**EXHIBIT C**

Evidence Title: JENKINS JACOB : 2320

This transcript is unverified.

**An unverified transcript may have been generated through a combination of speech-to-text technology and
human edits. As a result, it may contain errors, so please refer to the corresponding evidence.**

[0.145] Speaker 1 - <silence>
[86.925] Speaker 2 - Hi. Hello. Do you wanna
[88.265] Speaker 1 - Come in? I've got all the papers. Those
[90.455] Speaker 2 - I've seen the protection order. So what's you're explaining? I'm, I'm confused how there's a violation. Hi.
[95.585] Speaker 3 - Come on Moose. Come on in. Moose.
[99.335] Speaker 1 - Come on.
[104.295] Speaker 3 - Come. So you read the,
[113.705] Speaker 2 - I can see the protection honor. So you're, you're saying that you got the dog back from a different neighbor? Not the person that's on the protection order. I
[122.385] Speaker 3 - Don't know if you remember me. I'm Dr. Berg Biard. Yeah,
[125.895] Speaker 2 - Yeah, yeah. I'm just, I'm confused.
[128.135] Speaker 3 - Okay. So let me just explain. So I've got this protection order against the husband and the wife over
[133.385] Speaker 2 - Here. Both of them. Right? Right.
[134.815] Speaker 3 - Okay. So I was talking to this next door neighbor right here. Okay. Outside. And Moose was, he was petting moose and moose was there. So she came outta the house. She's supposed to retreat. She's not supposed to be within a hundred yards. Uhhuh <affirmative>. So she continued to come out. She went to her mailbox and then moose started walking over. I called him back and then she called, she called his name, and then she proceeded to talk to him and took him inside her house and shut the door. So she took my dog, he went, my neighbor went over to try to get him
[174.375] Speaker 2 - This neighbor, this
[175.625] Speaker 3 - Neighbor not involved. Okay. I said, please go over and get moose. So he went over to get her, get him, sorry. It's just very upsetting. And she had her outside door closed,
[188.675] Speaker 2 - Like the storm door. The storm door was closed. Okay.
[191.145] Speaker 3 - So he went up, rang the doorbell, she came to the door and shut the inside door and walked away and wouldn't open the door to let the dog out.

[200.985] Speaker 2 - How long did this go on?
[203.035] Speaker 3 - Well, then he sat there and knocked or rang the bell until the husband finally came. Okay. And then they opened the door and he came back.
[212.795] Speaker 2 - Okay. What, I mean, what's the purpose of this other than just to irritate you?
[218.075] Speaker 3 - This has been going on for 10 years. Okay.
[220.545] Speaker 3 - And they have the, he broke the restraining order or protection order. I didn't call. The judge said, if you do it again, you know, bad

things are gonna happen. Okay. And I talked to my attorney and um, I talked to one of my buddies that's on the force mm-hmm <affirmative>. And went over it with him. And I wasn't gonna call, which is why I waited this long. And, um, he said she absolutely broke the, violated the restraining order. 'cause she's supposed, and the judge made it very clear to her that, you know, they are supposed to stay within a hundred yards away

[259.155] Speaker 2 - Away. Yeah.

[260.585] Speaker 3 - And she deliberately, she knew I was standing there. She came out and then she, what upsets me more is she took my dog. Right. She encouraged him, took him inside and shut the door so that she knew I couldn't get him. So I had to send the neighbor over to get him. And then she blocked him from getting the dog.

[278.435] Speaker 2 - Okay. How long from when they got the dog over there to when you got the dog back? How long do you think that that was?

[287.145] Speaker 3 - Um, maybe five minutes. Five

[289.245] Speaker 2 - Minutes? Okay. Um,

[290.985] Speaker 3 - And I know this seems really silly to you, but I have been, I have been,

[296.645] Speaker 2 - I don't think it's silly. Like I said, I'm just confused 'cause I, the dispatch didn't add a lot of information into the notes. So

[303.155] Speaker 3 - This is the catalog just for two years? Yeah. Of all the times that they've called,

[309.155] Speaker 2 - They've called on you. Right.

[310.595] Speaker 3 - Okay. I have 31 times. Okay. And they keep calling and they report frivolous stuff. Yeah. And we are going, we'd be, you can answer that. No, that's

[322.765] Speaker 2 - Okay. I don't think

[324.125] Speaker 3 - So. You a Jenkins household.

[325.875] Speaker 2 - Good. Good. Baby's big. Yeah, baby. Can I see a picture? Yeah. I got, I got the phone in the car. I'll show you. Lemme see

[331.685] Speaker 3 - A picture. So anyway, so what I'm saying is that, you know, I have, and this is what I talked to, I'm not gonna tell you who it was that I talked to, that I have been ignoring all of this for 10 years. And now that I have protection orders, they're not stopping. And what he was telling me is, if you let this go, it's gonna keep going and it's gonna keep escalating.

[355.785] Speaker 2 - That's what I was about to say, is that you're trying to be the bigger person. Right. But you can't be the bigger person with somebody that doesn't want to play that game. Right. Um, so like I said, I was confused because Okay. The way the dispatch made it sound was that you weren't here. Oh, the dog got out? No, they just got the dog. No, that And then your neighbor No. Got the dog back for you. No. So I was like, I'm so confused, <laugh>. I know, I know. And it's not you, it's dispatch. They, they've been busy. I know, but it's

[381.565] Speaker 3 - Like, I just, you know, I've got all these, I mean, if you could just see the stuff that, I mean, this is all the signs that they've called on me and neighbors for. And the the biggest one they keep calling on is if my friends come over and they park with the tire up on the slant. Yeah. They call and report that as a

[401.475] Speaker 2 - Parking complaint.

[402.405] Speaker 3 - Parking violation. And I'm just, I am, I can't even, I'm sorry. I'm so emotional 'cause I'm so done.

[408.915] Speaker 2 - Yeah. I, I mean, it's frustrating. And again, I will, I will parrot whatever, whoever you spoke to, but I would say call every time. I know it seems ridiculous. And I know you think that

[420.995] Speaker 3 - We I know. But it's like, when is this gonna stop?

[423.765] Speaker 2 - Eventually it's gonna have to because

[425.665] Speaker 3 - This is, this is what they're all telling me. Tonight is the night that it needs to stop.

[429.675] Speaker 2 - I would agree with that. And I'll, so what do you do? And I'll have that conversation with them. But so, so here's where we're at. Uh, you, one of thems a permanent and one of 'em is temporary. They're

[438.475] Speaker 3 - Both temporary. We're supposed to have permanent last Tuesday. But they continued it.

[441.865] Speaker 2 - They pushed. Okay. Um, 'cause one of 'em just said protection order. The other one said temporary.

[447.555] Speaker 3 - I have 'em both right here.

[449.575] Speaker 2 - And like I said, it, it's all pretty standard from what I saw. I don't think that there was any, anything glaring that stood out as anything. What

[461.115] Speaker 3 - Do you mean?

[462.015] Speaker 2 - It, it just didn't seem like there was anything that was different from like a standard protection order. No,

[466.355] Speaker 3 - It, it, it, it's, it is, it's standard protection order and he violated it. I didn't call when we were in court. My attorney said when we were going for the orders, he violated the restraining order. And the judge said, you may see this as legal, but the court sees this as harassment. I have had 10 years of harassment. Yeah. So I got these protection orders and then it doesn't stop them.

[488.785] Speaker 2 - Yeah. So with, I guess with them taking, let me back up. So the female took the dog. Denise. Denise. And the male encouraged the dog. Yep. And the male was the one that returned the, my, the, the dog to your neighbor.

[508.385] Speaker 3 - Hang on just a second.

[510.575] Speaker 2 - And where's the mailboxes? Just so I know.

[514.455] Speaker 3 - Um, I'll show you. What did he do with my phone?

[517.515] Speaker 2 - I think that might have or anything? No, I'm good. I think that might have been what dinged was your phone. Figure out

[523.315] Speaker 3 - Where it is,

[524.465] Speaker 4 - What here it is.

[535.665] Speaker 2 - And then was there any conversation to you? Was there any comments? Anything like that?

[542.785] Speaker 4 - Um,

[543.385] Speaker 3 - So this is what, so Jeremiah is my next door neighbor. Okay. He's not involved. Okay. He said, this is what he said when we, he texted me after the whole thing was over. And Mo has a collar on. It's just being underneath his hair. Yeah.

[570.505] Speaker 2 - Do you mind if I take a picture of that?

[572.145] Speaker 3 - Oh, absolutely not. Jeremiah's my neighbor.

[580.155] Speaker 4 - Okay.

[585.155] Speaker 3 - This is so ridiculous. Yeah. I can't tell you how many of my former patients have been here. This is so, and Paul Rogers was here. <laugh>,

[593.605] Speaker 2 - I think I did see that. And he's, he's

[595.085] Speaker 3 - Been here t three times.

[596.915] Speaker 2 - Okay. Um, let's see. So no, no, no contact with you, no statements, um, no comments. Nothing like that that you heard

[606.905] Speaker 3 - Other than just attracting my dog toe over

[609.535] Speaker 2 - There. Yeah. Okay. So you said you were outside. He walked out with you. Okay, so

[618.215] Speaker 3 - I have a, here's the cul-de-sac. Okay. There. That's their house. This is another house. This is another house. And this is me. We were standing here. The mailboxes are right? No, I was standing over here. The mailboxes are right here. She comes out to her mailbox here, and then she goes back inside calling moose to go with her.

[638.445] Speaker 2 - Okay.

[639.075] Speaker 3 - And just so you know, they lie through their teeth.

[642.015] Speaker 2 - I believe it has this happened before with the dog.

[646.775] Speaker 3 - He, I left the garage door open. He wandered over there. And this is why, because in the past, in the past, they encouraged him to come over to play with their dogs. Okay. So when he was out, they'd say, come over here and play with the dogs. And so they would always take the dog. So he naturally goes there. Okay. Because they would encourage him over the years. Right. To go play until this restraining order.

[671.785] Speaker 2 - Okay. Um, what do you believe that their intention was?

[678.925] Speaker 3 - Um, I believe that what she was trying to do was to get animal control back out here and try to give me a ticket.

[689.835] Speaker 2 - Okay.

[691.725] Speaker 3 - Which is make it what you want of it. But this is what I've been dealing with. Okay.

[700.335] Speaker 2 - Um, are they both there? Do you know? Yeah, they are. Okay. Um, let me run over there. Let me talk to them and then I will come back and I will.

[710.975] Speaker 3 - So you're not, other than talking to 'em, you're not gonna do anything, anything. Well,

[713.525] Speaker 2 - If it's a protection order, I have to take him into custody and they're gonna have to go to jail. Okay. So, um, I just kind of wanna see what the purpose of that was. And

[724.205] Speaker 3 - So you have Jerem and Jeremiah's, well, he may be in bed, but you know, he said he'd be happy to talk to you guys. But you've got his, that's his statement. Yeah.

[732.685] Speaker 2 - I mean that Yeah, that's, he said it to you. I got it from you, so that's fine. Um, but

[737.125] Speaker 3 - Will you do me a huge favor? Will you come back with baby pictures?

[740.465] Speaker 2 - Yes. Yes. I will show you. Um, yeah, let me, let me run over there and figure out what their, their deal is and why they chose to do that today. You're

[748.125] Speaker 3 - An FTO already?

[749.235] Speaker 2 - I've been one. Oh, sweet. Yeah, for a while. I was, I was at my last agency. Oh. I just didn't do it. Oh,

[754.445] Speaker 3 - That's right. 'cause you came up from the

[755.625] Speaker 2 - States from South. Yep. So, um, oh

[757.805] Speaker 3 - My gosh. This is like, this is like my worst nightmare is

having you guys show up and I'm just a mess. That's okay. I mean, I'm supposed to be the str This is not how you've ever seen me. It's okay.
[767.745] Speaker 2 - You've seen me vulnerable.
[769.345] Speaker 3 - No, this is different <laugh>.
[770.605] Speaker 2 - This is couldn't even walk.
[771.835] Speaker 3 - This is really different. This is me being like a mess.
[775.465] Speaker 2 - No, it's a understand that, I mean, I get it. It's frustrating, right? You've tried, again, you've tried to be the bigger person for 10 years and here we are playing this kind of ridiculous game. That's not acceptable.
[787.235] Speaker 3 - They lie. Like, can, can I just show you the one of mine that's the most favorite one that my attorney just could not believe? Um, which was, oh my gosh. Who else? Emily Wagner came out. Um, I mean every, all of my patients have been coming out and it's just, it's mortifying. This is, and it is all, you know what it's all about. It's all about his semi-truck.
[816.145] Speaker 2 - Did you call and complain about that, I'm assuming or the neighborhood?
[819.405] Speaker 3 - Um, we can't anymore. I mean, we asked him for years not to park and he still wouldn't. Then the law got changed and we still asked him, can you please not park? So then I reached out to Darren and said, Darren, is there somebody I can talk to about changing this? And Darren said, we are already in the works. Yeah. And it got changed. And he literally, I have text messages that he, this whole thing is about
[843.585] Speaker 2 - Me, the semi.
[844.935] Speaker 3 - Right. So, um,
[846.365] Speaker 2 - Because you're the bad guy, right? Yeah.
[847.885] Speaker 3 - This is the one that I thought was, so he called and said that, um, this was a work truck that was blocking the sidewalk. Okay. And reported that there's elderly in a wheelchair, but nobody in the neighborhood is in a wheelchair.
[864.795] Speaker 2 - Okay.
[865.265] Speaker 3 - So he lied about that. And then he did, he said that there were, was it 13 cars in the cul-de-sac and a noise complaint at my house? And whoever came out, whoever came out said there were three cars and there was no noise. Um, he's accused me of false reporting. Um, yeah. But one of these is, I, it was like 13 cars in Yeah. Here it is. The very first one. Large party thir with teens, 13 cars, more concerned about the temporary cars. Came around. Walked around. No noise. That was
[904.925] Speaker 2 - Me.
[905.355] Speaker 3 - That was you. Mm-hmm <affirmative>. So this is what I'm dealing with. Yeah.
[913.275] Speaker 2 - Yeah. Because I came out and I remember the, the cul-de-sac. 'cause I came out, wandered around and was like, no, nothing there.
[919.605] Speaker 3 - That's, and this is what he does.
[921.505] Speaker 2 - So
[921.875] Speaker 3 - There's just, I look at this. I have
[923.445] Speaker 4 - 31, 31
[928.275] Speaker 3 - I've sum, I've summarized all these Yeah. And I was having my roofing material delivered and he called and reported they were blocking the sidewalk.

[941.435] Speaker 2 - Yeah. So, obviously I, I'll be honest with you, there's not much we can do about the calls. Right. Um, but

[947.225] Speaker 3 - I'm just, this is what's Yeah. Got me

[949.005] Speaker 2 - To this point. Yeah. And so, um, I'm sure you've noticed, but we'll come to the area. We'll check it out. We're not gonna make contacts and bug you. Right. Especially at late hours. Um, with that being said, if it escalates or if it continues again, please call because that gives us the ability to document it. Yeah. And show Right. This pattern.

[968.885] Speaker 3 - But I haven't called

[970.665] Speaker 2 - I know. And that's what I'm asking is you have to call 'cause they're calling on you. Right. So there's ton of documentation for this residence of like, here's all these things, but it's unfounded. Unfounded. That's not true. That's not true. We didn't see that. No, no, no. But if you call and say, hey, they're just, they're, they're skirting the line of violating the protection order. And that's cool. We can document that. Right. And then we can go down that road and it's just more ammunition for you to bring to the judge. Because I'm just gonna be honest with you, if it's gone this long and it's gone this far, it's not gonna stop. Right. Until we get involved. Yeah. We get involved and they start to realize, okay, now there are consequences. Yeah. For this ridiculous behavior. Yeah. Um, and I'll be honest with you, this may help, this may not.

[1013.735] Speaker 2 - Yeah. Um, but what I can tell you is, is that as soon as there's a criminal case, in effect, the penalties get way stiffer because at this time it's a, it's a civil protection order. However, we only deal with law mm-hmm <affirmative>. And criminal law. So they'll be arrested for a misdemeanor violation of the crime, of violation of protection order. If they then choose to harass you even more, then it becomes intimidation of a victim or witness because now you're a victim of a crime. So the penalties become much stiffer the longer this goes on. And hopefully that gets through to them and hopefully they understand. But again, I can't promise you that that's gonna be, I know the eventual outcome.

[1051.025] Speaker 3 - So what I'm gonna do is, 'cause you're probably not gonna be able to come back. What is that? Are you come, is somebody coming? Is somebody with you?

[1057.205] Speaker 2 - My partner? You know, she's on the way.

[1059.015] Speaker 3 - Okay. Um, 'cause I was gonna say, I'm gonna give you, um, my cell phone number and on

[1063.945] Speaker 2 - Yours, <laugh>. Okay. You

[1065.065] Speaker 3 - Can send me baby pictures and I pro trust me, I'm not gonna

[1068.215] Speaker 2 - Call you. I know, I know,

[1073.405] Speaker 3 - I know. I changed my last name when I quit the clinic. That's

[1076.605] Speaker 2 - What Kelsey was saying.

[1077.355] Speaker 3 - Yeah. 'cause I just, I

[1079.015] Speaker 2 - Right. That's

[1079.965] Speaker 3 - Okay. He's a Denver cop. I get tired of people saying, oh, are you related to, I'm like, please don't hold it against me.

[1085.205] Speaker 2 - I get it. And

[1085.965] Speaker 3 - I didn't want his name on my headstone

[1088.165] Speaker 2 - <laugh>. Nothing wrong with that. Yeah. You get to make that choice. All right, I'm ready.

[1092.775] Speaker 3 - 3 0 3 6 3 8 6 7 0 5. And tell Kelsey to text Me too. I will. I wanna hear how she's doing.

[1101.475] Speaker 2 - Yeah, she's doing good. She actually went to investigations. So she's a detective now. Oh

[1105.845] Speaker 3 - Good. So she can call me during the day.

[1107.075] Speaker 2 - Yeah. <laugh>. Yeah. So she's, uh, she's currently in her training, so she's just kind of getting all that stuff done. But obviously with everything going on,

[1114.465] Speaker 3 - She was one of my faves. I know

[1116.135] Speaker 2 - She's the best. So, but yeah, she loves it up there. So, I mean, she's sad 'cause like her team is really good. Yeah. She was on the day shift team. Yeah. So she was sad to go, but she's happy to be there. So kind of a give and take. But,

[1127.785] Speaker 3 - But she was, I just loved the wedding. Pictures are

[1131.525] Speaker 2 - Still <laugh>. Yeah.

[1133.785] Speaker 3 - So, well, thank you so much. Okay. So, um, yeah. Do I need to sign anything? No. So this is what you did one night at 10 o'clock at night. Spent 10 minutes trying to park his truck in front of my house. So I just called and I said, can somebody just swing by and tell me if this is, if this is okay? And she came up and she said, no, it's not okay. And so he comes out and he makes her measure. Then he gets his tape measure. She was here two hours.

[1159.555] Speaker 2 - Good grief. Was that Emily?

[1162.105] Speaker 3 - No, no, Emily was, because Emily had texted me and let me know that she's now doing the, uh, hor horse, what do you call it? Mounted.

[1169.845] Speaker 2 - Mounted, mounted patrol. So

[1171.005] Speaker 3 - She was really excited and said, oh, thank you so much. And I said, oh, by the way, um, I saw you on one of the catalogs. Oh, <laugh>. And she's like, oh my gosh. That guy was a real peach. Yeah. Oh, I don't know who this was, but, um, yeah, it's the only time I called and, oh, I'll tell you who it was. It was on,

[1189.375] Speaker 2 - Looks like the October 6th.

[1191.275] Speaker 3 - Yeah. October 6th, eight, seven. I had these all in order and my attorney took them apart

[1204.915] Speaker 2 - That <laugh>

[1205.485] Speaker 3 - Because he wanted a,

[1209.705] Speaker 4 - Uh,

[1212.175] Speaker 3 - Seven three, we had to do four, four times in one week here. And that's when Paul and Stark, I wanna say Stark, um, somebody else on day shift said, you just need to get a restraining order. 10, five, no, 10. What day did I say say that?

[1230.065] Speaker 2 - The sixth. October 6th.

[1232.585] Speaker 3 - 23. No, 20. Oh, that's when Dave was here. Buyer ten seven.

[1248.845] Speaker 4 - Ver here. It's

[1255.245] Speaker 3 - Virgos.

[1256.105] Speaker 2 - Oh, okay.

[1257.025] Speaker 3 - She talked to him for two hours. Good

[1258.805] Speaker 2 - Grief.

[1259.475] Speaker 3 - Yeah. And I, he is like, why don't, can't you just give him a ticket and be done? He talked his way out of it. Anyway, I'm just, I'm sorry.

[1268.745] Speaker 2 - No, I again, I I get that it's frustrating. No, no, you're not rambling. I get that. It's frustrating. And, uh, and I'll tell you that it, it helps me establish if I'm gonna go any, any further. 'cause it, at least I have the background now, so I can, I can kind of look, um, like I said,

[1284.995] Speaker 4 - Yeah.

[1285.605] Speaker 2 - I encourage you to continue to call. I will,

[1287.485] Speaker 3 - Hopefully this will stop

[1288.445] Speaker 2 - Though. Hopefully this will, but Right. Call I'll, because we're never too busy for it. And we can always come out and at least look. Yeah. And then document it. And then we have documentation. I don't know where she's coming from,

[1302.445] Speaker 3 - I think. But you can't go over there until she's here. Right?

[1304.685] Speaker 2 - I can, I just would rather have a second. Yeah. So, yeah. Um, because

[1308.335] Speaker 3 - She's, she's just so you know, she's unhinged. Okay. <laugh>. And the thing that scares us the most, this is a little tidbit, um, we uncovered, I did some Google search and found that there was a case, um, 20 years ago when he moved to Massachusetts and applied for a concealed carry. They gave it to him and then retracted it when they found out he lied on his application about domestic violence. Oh, okay. So they withdrew, he sued the chief of police and it went all the way to the Supreme Court and he represented himself and they basically blasted. I'm saying, you lied on your application, <laugh>, you lied about this. And so he has complete disregard

[1352.545] Speaker 2 - For, for law enforcement. Yeah. Okay. Um, do they have any issues with any other neighbors? Yeah.

[1358.945] Speaker 3 - The one next door who's another single woman Okay. With an autistic kid that they've been harassing. She has a restraining order against 'em.

[1366.485] Speaker 2 - I saw that there's multiple restraining orders, like in the cul-de-sac. The

[1370.085] Speaker 3 - One that my neighbor right over here, not the one that was helping me today, but the one in between, um, she had theirs dropped. They, they mediated and they agreed to drop that restraining order. Okay. So right now I've got one against Denise and Alec. And then Ellen has one against Alec.

[1389.395] Speaker 2 - Okay. Um,

[1391.945] Speaker 3 - Oh, stop.

[1393.345] Speaker 2 - Um, stop.

[1399.065] Speaker 3 - Hi Mos. This is Mo.

[1401.905] Speaker 4 - So cute.

[1403.265] Speaker 2 - Um, okay. He loves you guys here all the time. <laugh>. So I saw when Sergeant Rogers was here. Yeah. I guess he suggested mediation.

[1413.145] Speaker 3 - He did. They refused.

[1414.675] Speaker 2 - Okay. I just wanted to see where that was at Stanton

[1417.365] Speaker 3 - Actually. 'cause you know, I know Stanton too. And so he called me after this one blew up and said, you know, I think you should do mediation. I said, great. That's what we wanna do. Yeah. So he called them and he apparently refused. Okay. So he's refused mediation, which is why we got the TPOs. Okay. Went to mediation and it fell apart when, um, they said they would not stop calling you guys and they would not stop reporting me to the HOA

[1444.435] Speaker 2 - Okay.

[1445.825] Speaker 3 - For my black mailbox that was there for four years. And he decided he didn't like it.

[1450.635] Speaker 2 - Okay.

[1451.385] Speaker 3 - So this is just so silly. I'm so sorry.

[1453.635] Speaker 2 - It's, it's <laugh>. Sorry. Like I said, there's enough of us. We have more than enough time growth has coming out. I know how short staff you are. Grave shift is coming out. This is all we've got all the time in the world. I know,

[1463.245] Speaker 3 - I know how short staffed you guys are. I mean, I hear about it all the time. It's fine. There's not enough of you.

[1468.465] Speaker 2 - That's true. But that doesn't mean that overworked

[1470.605] Speaker 3 - And

[1470.685] Speaker 2 - Underpaid. That doesn't mean that we don't get to address and pretend

[1473.885] Speaker 3 - How embarrasses is. And you can mom and say, Kelsey, you'll never guess who I saw today. <laugh>.

[1479.065] Speaker 2 - She will love it. Um, but I think that's all I need. Like I said, I was just confused 'cause the dispatch notes. Yeah. It's, were not great. Yeah. Um, so we'll go talk to 'em, see what their reasoning was. I'm gonna review that, um, protection order and then I'll just give you a call. Yeah. Once we're done. Are you gonna be up for a while?

[1499.665] Speaker 3 - Oh, hell yeah. Okay. I'm gonna probably either take Xanax or have a drink. Okay. <laugh>. I'm trying to figure out which one. I'll do both. Yeah. I know. I, one or the other <laugh>, I've had to be on Xanax because of this.

[1511.965] Speaker 2 - I, like I said, if you've been dealing with 10 for 10 years and it's just not stopping and it's just constant and it's never ending, it's gonna wear on you. So, um, like I said, I'm on

[1520.965] Speaker 3 - My last look at this. I am on this is you're like, who, who in, who are you?

[1526.165] Speaker 2 - <laugh>? Well, I came from the dark and the light. No, um, but please call. I I know, I know.

[1531.105] Speaker 3 - I'm just hoping if you take her, this will end.

[1534.765] Speaker 2 - I hope so too. But like I said, in my experience that's not been the case. And

[1538.325] Speaker 3 - The fact that they have guns really scares me. Yeah.

[1540.745] Speaker 2 - So, um, let us, let us go try to figure out what their

[1547.035] Speaker 3 - Okay.

[1547.715] Speaker 2 - What they've got going on and we'll go from there.

[1549.405] Speaker 3 - Okay. Um,

[1552.425] Speaker 2 - Yes. Yeah. I will tell Kelsey I will, I will tell her. Sorry. No, that's okay. <laugh>,

[1558.465] Speaker 3 - You can tell me. You can tell he's a very violent

[1560.945] Speaker 2 - He is. Yes. Aggressive. <laugh> aggressive. I'm gonna re-review this. Po

[2004.665] Speaker 1 - <silence>

[2041.065] Speaker 2 - Hello. Hi, how are you? Good. Hi

[2043.705] Speaker 1 - Honey. It's okay. Jeff coming. Yeah, come on in

[2047.155] Speaker 5 - If you don't mind the

[2047.855] Speaker 2 - Dogs. That's okay. Yeah, come

[2049.175] Speaker 1 - On in. You're

[2052.175] Speaker 5 - Very friendly. But

[2052.935] Speaker 2 - They, we'll follow you.

[2053.995] Speaker 1 - We were watching the movie. We're sick. Okay.

[2056.055] Speaker 2 - So we gonna get you sick. Okay. Okay. Come. So what, what's going on earlier with the dog?

[2064.875] Speaker 6 - Oh yeah. We can write that statement. Oh, I wrote it down. Yeah. So I'm gonna go get my,

[2069.675] Speaker 1 - Um,

[2070.115] Speaker 5 - Cat. Yeah, I called animal control.

[2072.925] Speaker 1 - Okay.

[2073.675] Speaker 5 - So we reported it to them. This is the third time in about three weeks the dog gets out. Um, either she's not d been different circumstances each time. Um, this time she was out there talking to a neighbor. Uh, not on a leash, no collar. Um, moose is, the dog likes us, especially my dogs and my wife. She goes to get the mail. You okay honey? Yeah. Um, and this was about 1215. Uh, the dog comes running in. He's a large dog. I dunno if you've met him, but he's about 135 pounds. So Denise opened the door to get in and he just pushed her aside, comes right in. So we called animal control to say, Hey, actually it was, I misspoke. Shortly thereafter, Jeremiah came over. Jeremiah Miller, he's in the house next to

[2129.675] Speaker 5 - Um, obviously the reporting party. And he says, I'm here to collect the dog. Great. Come on Moose. Come on you. Audi goes, she can't, well, she could come here buddy <laugh>. She better not. Um, so anyway, that was the last, that was the last thing. Now then we called animal control. I spoke to your officer. I have a card begins with an M Malman. And, uh, I'm sorry. Is it ing? It could be. I, I, it begins with an M and she's a very nice lady, so, okay. Um, I advised her what happened the first time. So the time before this one, she said that if it happens again, that it would be, um, she would be cited. I wanted a record with animal control because of She's such a bitch. I expected that you guys would eventually show up. So I wanted it reported officially. So I did that.

[2185.835] Speaker 2 - Okay.

[2186.625] Speaker 6 - It was the one that was out there.

[2188.835] Speaker 2 - What have you got there? I have.

[2190.265] Speaker 6 - So this is what happened. I wrote it right afterwards. I said went to the mailbox to get mail. Um, three times in the last few weeks, moose Elizabeth's dog saw me, came running, sorry, came running past me up to my front door. I opened the door and Moose ran inside. We wanted to say he wanted to say hi to my other dogs and play the neighbor. Jeremiah Miller came to my door to gather moose. Moose didn't want to go, but eventually did. Moose still did not have a collar on. 'cause the last two times he hasn't had a collar on. And that bothers me. Um, we reported his missing collar about a week ago. Um, the last time animal control came to pick him up. Animal control said she would be cited. Lemme

[2249.705] Speaker 5 - Get you that incident number

[2250.905] Speaker 6 - If it happened. The physical, um, we left animal control a message around 10:30 PM and then this is the, um, uh, sorry. The site that the animal control lady gave us when she called back to, um, um, say we could make a report, um, now or six months from now.

[2276.515] Speaker 2 - Okay.

[2277.985] Speaker 5 - So this, you're right. An now or me. Okay. And that's the

incident number from before.

[2284.745] Speaker 6 - It was just like, not the one

[2285.965] Speaker 5 - That you called in yet today. Correct. That's formal. Okay. Did she give you it today? No. 'cause it was just by phone. Oh, okay. Because the,

[2293.605] Speaker 2 - That's okay.

[2294.725] Speaker 5 - I just wanted to cover our asses. Okay. Just in case you guys came now. And so now I will form file a absolutely formal event.

[2303.475] Speaker 2 - Okay. So, so that she can, when Jeremiah came over, what, what was the purpose of shutting the door? The

[2309.565] Speaker 5 - Dog getting out. Okay. That's what my man was gonna do. So,

[2312.405] Speaker 2 - Okay. This main door here.

[2314.305] Speaker 6 - All, I think my dog did it. Okay. A big white dog. Okay. That shutting the door. But like, you know, he's a

[2322.405] Speaker 5 - Big boy.

[2323.585] Speaker 6 - No, I was talking about Breezy with the door. Oh. Because Breezy was standing there. I don't think the door was shut though. Did it shut

[2331.235] Speaker 5 - This door takes a while to shut.

[2334.025] Speaker 6 - Oh, I

[2334.415] Speaker 2 - Dunno. Okay. Oh, what

[2335.645] Speaker 5 - Was he?

[2336.345] Speaker 2 - Um,

[2336.685] Speaker 6 - I was, I was in the kitchen and I gave Mo a treat.

[2339.515] Speaker 2 - Okay. Um, so when you were outside, what with, with everybody out there, why did you call the dog to you?

[2347.675] Speaker 5 - Because this has been, this is like the 20th time.

[2350.685] Speaker 6 - I didn't really called my dog. I went, she said Moose. Moose come here. Yeah. And

[2355.705] Speaker 5 - She called the dog.

[2357.155] Speaker 6 - Yeah.

[2357.635] Speaker 5 - Yeah. She, I, I saw her let her dog first.

[2360.705] Speaker 6 - That's good. I, I don't remember calling moose over. And Moose would like come to me if I called them because she does. And we have a camera out there if you want take a look

[2373.285] Speaker 2 - At it. Do you have the video for that? I don't know.

[2375.785] Speaker 5 - No, we don't. 'cause it, I had to put it on a charger with the rain and stuff. The battery declined. Um, deteriorated. So it's on the charger right

[2383.325] Speaker 6 - Now. I guess you could talk to Jeremiah.

[2385.475] Speaker 2 - Yeah, I've already got his, his information. Okay. So, and you've been served with a protection order,

[2392.305] Speaker 6 - Um, from Elizabeth? Yeah. Okay. But, you know, we're nice. I think we didn't even report her again because they said last time that she would be cited and I said, let's just let it go until we go to court and see what happens and not report her and how she calls you guys. I'm just like, you know, I can't

[2414.865] Speaker 5 - Win. This is, this is absolutely,

[2416.205] Speaker 2 - I I just can't. Yeah. I mean, it, it seems that this is kind of an ongoing issue both ways, right? No, it's not

[2421.805] Speaker 6 - Like the dog, it's not

[2423.045] Speaker 5 - Deputy. It's only one way. It's one way. She has done

everything that we have done or in the past and what she is crying and whining and complaining about. We have done everything legal. We have never broken a law. And it's, she's gonna tell you about 10 years of parking. Look at the statute. You guys have been here for a decade.

[2443.275] Speaker 2 - Well, the statute's changed.

[2444.985] Speaker 5 - It has, it's changed in May of this year. Right. It hasn't been a truck here. Okay. Okay. Well

[2451.985] Speaker 2 - I'm pissed. So, but, but here's the thing. I'm gonna talk now. No, that's not how this works. I'm gonna talk now. Okay. She has 36 records of you calling frivolous complaints to our dispatch center. No. And you know how many, do you know how many, do you know how many she has in response? So that's the issue that I'm saying is that this goes both ways. You are both willing participants in this Alex. No,

[2475.115] Speaker 6 - Calm down.

[2475.825] Speaker 5 - But it doesn't Deputy here's

[2477.105] Speaker 2 - But it is, I'm telling you it is because there's complaints from your and to her and from her end to you. Right? So that is both ways you guys are calling on each other. Yes. I over ridiculous things. Is that incorrect? Oh,

[2489.915] Speaker 5 - It's petty as hell. I totally agree with

[2491.885] Speaker 2 - You. So at some point somebody has to be the adult mm-hmm <affirmative>. And look the other way.

[2497.225] Speaker 5 - And that's why we didn't call today.

[2498.915] Speaker 2 - Okay. So that's all I'm saying. And

[2500.875] Speaker 6 - Okay. And to be fair, Alec has pictures of three parking, um, things and something else that he has not called on.

[2510.595] Speaker 5 - Yeah. So,

[2511.845] Speaker 6 - 'cause I said it's just gotta stop. And that's why we didn't call, you know, or do this complaint and he didn't report the last three. And it, I I'm just wanted to stop. Right.

[2526.265] Speaker 5 - So Deputy, there there are, there are a couple things. 100% of the things that I have called you guys out, you have acted on. Whether it's been illegal parking, whether it's been anything else, your deputies have cited people that, well, Ellen's boyfriend was parked illegally. You cited him. He's almost parked on Jeremiah's front lawn.

[2548.425] Speaker 2 - So I'm gonna stop you and tell you that's incorrect. 'cause I've personally responded to some of those and taken no action.

[2553.385] Speaker 5 - No, no. But you, you've had people move their cars. I'm not saying everybody's been selling.

[2558.065] Speaker 2 - No, I I've arrived and there has not been anything to the effect of what was reported to us.

[2562.635] Speaker 5 - Well then I didn't, I don't

[2565.205] Speaker 6 - Know. Oh, I wonder if it's when Ellen's kids were out here making all that noise and

[2569.245] Speaker 5 - Stuff. Well, I, everything, when I've, when I've called, I've watched your deputies tell the people to move their cars like a hundred percent of the time. It doesn't, it doesn't matter. Yeah. It doesn't matter. So, and they're, they're also upset that I, um, and I've seen her manifesto. It's submitted as evidence. They complain about the reports to the HOA. Every time I've sent a letter to the HOA, they have sent a letter to Elizabeth or Ellen and said, Hey, in fact they were subject to fines. This has been going on for four and a half

years, since some of the events. And only now because I've been a stickler because they've been a stickler to my truck and the truck parking. Um, I'm holding them accountable. That's all it is. They were, when my truck was parked here, now I have parking offsite. Sometimes I'd bring it here to take out food, put in new food, change the laundry, the sleeping bag, vacuum, whatever. And then I bring the truck back to Flight Farm where I was rent the parking spot. They make it sound like the truck has been here day after day for 10 years. And that's not the case at all. So, and this is gonna come out in litigation. Um, I've seen their, all their evidence for their PPO. There isn't one shred of evidence to support A PPO.

[2647.635] Speaker 2 - Well that's outside of your or my decision. A judge granted that. So obviously a judge sees that there is enough. Well,

[2654.245] Speaker 5 - The judge No, no, no.

[2655.675] Speaker 6 - That was, I'm sorry.

[2656.555] Speaker 5 - That was the temporary protection order, which, you know, is very routinely given. So

[2661.185] Speaker 2 - No,

[2662.185] Speaker 5 - It is no.

[2663.255] Speaker 2 - Under the statute, those things have to meet certain criteria. Yes.

[2666.185] Speaker 5 - But if they lie about what the application on the complaint

[2669.385] Speaker 2 - Yes. Right. Which you would have an opportunity to respond to. Correct. The date that it's put into

[2673.365] Speaker 5 - Effect. That's, and that's the hearing that's coming up next week.

[2675.785] Speaker 2 - So, okay. The one that was continued Yes. By your, by your October 2nd.

[2680.225] Speaker 5 - Yes. A lawyer to the 16th. Yes. Okay. Because we got evidence that particular time. Okay. And, uh, we hadn't seen it. That was evidence that we had subpoenaed. So that's why we got continued. So we're looking forward to challenging the issuance of a, you know, that temporary becoming permanent. So now we have seen all of their evidence. There's not one, one shred of evidence that indicates stalking abuse of an adult physical threat, fri uh, or assault, um, abuse of an adult or an at risk adult or any of those things. I, I'm missing any, but I, whatever. You've probably gonna look at you. Right?

[2720.055] Speaker 6 - Why did she call you so late? Like why are you here so late?

[2723.495] Speaker 2 - So the call came in considerably earlier. However, we had other calls that we were responding to. So we just didn't have the opportunity to come until now, unfortunately. I see. If I could have come earlier, I would have. I understand. Um, okay.

[2737.235] Speaker 6 - I just thought, well why is she doing it real well? Yeah.

[2740.345] Speaker 2 - Yeah. This isn't, this isn't on any, any particular party. Like I said, it was just calls for service. Okay. Delayed us. Um, okay, so you guys have got a copy of the temporary, you understand the conditions on that? Oh yeah. Oh yeah. Okay. Yeah. So because of that, at this time I'm gonna tell you, you are under arrest for violation of a protection order. Well, hold on. So go ahead and stand up. Why?

[2763.855] Speaker 5 - No?

[2764.535] Speaker 2 - Yes. Why

[2765.455] Speaker 6 - Sir? Why?

[2766.515] Speaker 2 - I, I, how,

[2768.215] Speaker 6 - How am I? Okay. Wait. And I don't understand.

[2771.585] Speaker 2 - Okay, so, so I don't understand. So any contact that would be, there

[2775.315] Speaker 6 - Wasn't any contact. Just sec. I went to get my mail. Okay. Just let him speak for a second. Okay. I'm sorry.

[2781.895] Speaker 2 - Any contact, that would be anything outside of incidental contact, because you guys live in such close proximity is a violation of that protection order. So I have a third party witness that states that you went to your mailbox, gathered your mail, came back to your house, saw the dog, hold on, saw the dog out there returned, called the dog into your house. Then he further corroborates that he came to knock on your door. You walked from your kitchen, which you told me you were in, which corroborates his story. Come up to the front door and shut the door.

[2808.835] Speaker 6 - 'cause my dog was there. I officer, I'm not trying to cause a problem

[2814.575] Speaker 2 - At all. But that's not incidental contact. That's your intentional act to do something. The judge, the judge to annoy that other person. No,

[2821.615] Speaker 6 - No, no, no, no, no, no. I went outside. I didn't even know they were out there. Yeah. And then I turned the corner. I went, oh God, I'll just go grab my mail. Not thinking anything. Yeah, I swear. In fact. And then, um, I grabbed my mail. Um, and you know what I could have said, I, and I just don't remember 'cause I wrote it down. When I did used to see moose, I used to go, oh hi moose or whatever. But he was running towards me, I swear to God. And when I came inside, I have cancer. When, when came inside, um, he ran past trying to think into the kitchen. I went to the kitchen to go get a treat to come back out. My dog was standing right there. This one, she has a long nose. She moved the door. I don't even think it closed, I swear to you. Yeah. And, uh, the judge told me that I am allowed to be in my yard and to go get the mail. I, he did

[2885.635] Speaker 2 - Say yes. I, I don't disagree with that. However, the action of interacting with her dog and coaxing the animal to your home. No, no, no. And then refusing to release. It's the issue. Didn't,

[2897.495] Speaker 6 - I didn't refuse to le release that dog. I love that dog. Yeah.

[2901.995] Speaker 5 - How could we release it? The the dog was on its own. It wasn't on a leash and it didn't have a car.

[2906.435] Speaker 6 - No. I swear to you. Yeah.

[2909.885] Speaker 5 - Yeah. That's, this isn't

[2911.175] Speaker 6 - Fair.

[2911.955] Speaker 5 - No, this is, this is absolutely

[2913.615] Speaker 2 - Fair. Well that's, that's where we're at at this point. Okay. This

[2916.505] Speaker 6 - Judge said I could do this.

[2918.885] Speaker 2 - Yeah. And I'm not disputing that. Okay. So why did

[2922.255] Speaker 6 - I be under arrest?

[2923.795] Speaker 2 - So as I'm telling you, your actions of returning outside, after you have completed your lawful purpose, which is outlined in that protection order of gathering your mail and returning to your home, you returning, I judge

listen, you returning outside with no lawful justification. Well simply to co coax the animal. No,
 [2942.115] Speaker 5 - The judge
 [2942.515] Speaker 2 - Was back inside. I never went back And then refusing to release the animal is the issue.
 [2947.735] Speaker 5 - I did. We did.
 [2949.275] Speaker 6 - No, that's not what happened. Yeah. I didn't even go back outside.
 [2954.365] Speaker 2 - Okay, deputy, go ahead and stand up. Deputy,
 [2956.635] Speaker 5 - Can I say something?
 [2957.675] Speaker 6 - Can I please just get some water?
 [2960.275] Speaker 2 - Not right now.
 [2961.025] Speaker 5 - She's, she's sick. She's really sick. I just got over it.
 [2965.725] Speaker 6 - Unfortunately it, the law is
 [2968.295] Speaker 5 - Away for that. Can I, can I get a glass of water? Come? Not this time.
 [2972.955] Speaker 6 - I'm so sick.
 [2973.715] Speaker 2 - Not this. I understand that. You're gonna have to stand up. I don't want to have to pick you up.
 [2979.595] Speaker 5 - Can I get her some other
 [2980.575] Speaker 2 - Garbage face away from me? Place your hands behind your back. She'll
 [2984.695] Speaker 6 - Be fine. This, they change. They change them anyway. So she'll be fine by her. She just wants to get a permitt. That's all it is. She's just a bitch.
 [2994.915] Speaker 5 - You, oh God.
 [2996.925] Speaker 6 - Okay. Okay. How long do
 [2999.175] Speaker 2 - I have to stay? Just stay still because I don't want these to get any tighter on you. Okay? Yeah. So what'll happen from this point forward, what'll happen from this point forward is we'll get you down there. We'll get you processed and you'll see a judge in the morning. Okay?
 [3013.485] Speaker 6 - Like this,
 [3015.075] Speaker 2 - Not like this. Like she said, they're gonna change you out into a jail uniform. Okay? So we're gonna step out here. Okay?
 [3030.585] Speaker 1 - Can you please have some water?
 [3032.925] Speaker 2 - I, I can't have you ingest anything 'cause I don't know what it is. Okay? We're gonna walk over to my patrol car over here.
 [3039.025] Speaker 1 - Oh,
 [3039.305] Speaker 7 - You are really not nice.
 [3040.495] Speaker 2 - Watch your, uh, I apologize that you feel that way.
 [3043.715] Speaker 7 - What? This was bullshit. And you're bullshit.
 [3047.275] Speaker 2 - Okay.
 [3055.235] Speaker 1 - Damn
 [3055.915] Speaker 7 - This fucking bitch. That's not even what happened. And your officers go over there for like hours and just sit there and help her because she says she called in favors. It's not nice.
 [3076.235] Speaker 2 - Well, I don't know about that. This, that's not this's kind come
 [3079.425] Speaker 7 - Out.
 [3080.395] Speaker 2 - What do you mean it was

[3081.705] Speaker 7 - Coming out?
[3082.705] Speaker 2 - Sir, your hand? Yeah, you're fine.
[3086.355] Speaker 7 - Okay. What do you want me to do?
[3087.725] Speaker 2 - I want you to slide in the best you can.
[3090.025] Speaker 7 - Can can I lay
[3090.845] Speaker 2 - Down? I don't want you to lay down 'cause that's gonna, I'm gonna
[3094.165] Speaker 7 - Fall.
[3095.105] Speaker 2 - That's not gonna go well for I faint. It's a small, I faint now I'm faint.
[3099.625] Speaker 7 - Yes, I'm
[3102.115] Speaker 1 - Sick.
[3104.545] Speaker 2 - Um,
[3105.915] Speaker 1 - Yeah. One
[3111.225] Speaker 7 - Up here where it's not we.
[3113.275] Speaker 2 - Okay. Would you mind I'm gonna throw my light on. Yeah.
[3116.315] Speaker 1 - Okay. I'm just gonna
[3117.105] Speaker 7 - Put you down. Gonna step out.
[3119.495] Speaker 1 - We're
[3119.845] Speaker 7 - Gonna move to the back so I'm not being turned by water. Okay. 'cause you want her to see. No, that's why I'm moving you to the back. Bullshit.
[3127.865] Speaker 2 - Oh ma'am. We pat everybody down.
[3143.685] Speaker 7 - I have a spinal cord similar later in my back. You might feel that. Okay. Is that something that's not, you're not able to remove? No, it's in any of the skin. Okay.
[3153.585] Speaker 2 - Are you taking any medications? Yes. What are you taking?
[3156.985] Speaker 7 - Um, I don't know. Just take it from my pill box. I'm not talking to where is it at? I'm not talking to you guys anymore. Okay. I just don't wanna pull it if it's on your back. I'm not trying to hurt you. I did not call that dog.
[3186.075] Speaker 1 - Fucking,
[3188.105] Speaker 7 - You're kind of a jerk. Watch your head.
[3201.765] Speaker 2 - I am gonna have you lean back a little bit so I can get the seatbelt on you okay? Yeah.
[3207.265] Speaker 7 - I'm gonna pass out.
[3209.105] Speaker 2 - Why are you gonna pass out? Because
[3210.765] Speaker 7 - I say I told you I have cancer. You asshole.
[3214.075] Speaker 2 - Okay. But you, you haven't given me any kind of explanation as to why you feel that way right now. Because you can yell and holler at me, but that doesn't solve anything. I'm trying to ask you questions so I can get you properly. I
[3230.755] Speaker 7 - Told you I'm not talking
[3231.735] Speaker 2 - To you. Okay? Uh, no I got a phone number. Okay.
[3400.505] Speaker 8 - <silence>
[3407.125] Speaker 9 - She does this shit on purpose. I know
[3409.345] Speaker 2 - She does. 2 41 boy.
[3411.625] Speaker 8 - I
[3413.925] Speaker 10 - 2 41 boy
[3416.085] Speaker 2 - En route to the jail. One female born

[3422.715] Speaker 10 - 44.
[3426.685] Speaker 9 - If I die, I hope my husband sues your ass. Trying to me.
[3434.175] Speaker 2 - Well you said you didn't want to talk to us and I was trying to ask you about your medical condition. So if you want to tell me about it, I already told you. Okay? But that doesn't give me any detail.
[3443.305] Speaker 9 - I hope your thing is
[3444.445] Speaker 2 - On it is that's why I'm trying to ask you what's going on so that I can, I told you
[3451.025] Speaker 9 - I have cancer.
[3452.055] Speaker 2 - Okay? That doesn't give me any explanations as to why you're gonna pass out. Because
[3456.025] Speaker 9 - I do. I don't have any water. I get very dehydrated and I take this medication.
[3462.135] Speaker 2 - Okay? What medication?
[3465.065] Speaker 9 - Honestly, I'm taking blood.
[3466.555] Speaker 10 - We're boy, we're gonna be a dedering parking want and the patient.
[3471.415] Speaker 2 - Okay? Well they're gonna ask you when you get to the jail so that they can try to care for you. I can't stop
[3476.795] Speaker 9 - Right now. My mouth is just you
[3478.945] Speaker 8 - Throwing.
[3479.455] Speaker 2 - Well I apologize but I can't get you any water in the patrol car. <laugh>.
[3496.435] Speaker 8 - Ma'am, you
[3497.685] Speaker 9 - Do anything. She's not with me afraid. I'm stuck with you. What are you gonna do? Shoot me.
[3505.725] Speaker 2 - Why would I shoot you?
[3506.895] Speaker 9 - Because you are that way.
[3508.775] Speaker 2 - Okay? You've made a judgment call about me and we've known each other for how long ma'am?
[3513.815] Speaker 9 - Well look what you did to me and because you, you don't even know what happened and I never went outside twice.
[3520.535] Speaker 2 - Okay?
[3523.665] Speaker 9 - I told
[3524.685] Speaker 8 - You
[3525.695] Speaker 9 - Even
[3527.355] Speaker 10 - 3 22 break. 3 7 1 4 7 9 2 42
[3548.405] Speaker 9 - It turned off so
[3549.385] Speaker 2 - Light, I cannot
[3553.925] Speaker 9 - Are you taking
[3554.765] Speaker 2 - Me to the Douglas County Jail?
[3578.025] Speaker 8 - So I take care of an animal. This is the way I get treated. That's great. Do you know how many times we have seen that dog?
[3590.785] Speaker 10 - One The
[3593.105] Speaker 8 - Dog? He just like accidents.
[3597.365] Speaker 10 - I two one. Oh.
[3626.835] Speaker 8 - Have you had any alcohol or drugs tonight? No. What to know?
[3751.085] Speaker 9 - Someone treats you like it's something
[3754.905] Speaker 8 - And

[3773.825] Speaker 9 - Now pinch is really methodical too. The way she does shit. You know, this is just because we reported Rogers to internal affairs. Boy, I can't wait till my story comes out of it. And what is your name?
[3799.865] Speaker 2 - I'm Deputy Jenkins. It'll be on all your paperwork.
[3804.245] Speaker 9 - I can't hear you.
[3805.595] Speaker 2 - Okay,
[3806.715] Speaker 9 - What are you, who are
[3807.805] Speaker 2 - You? I will tell you when we get down there so we can talk to each other. Tell me now. Okay
[3813.705] Speaker 9 - Deputy who you are refusing to tell
[3818.365] Speaker 2 - Me, I've told you multiple times tonight. I cannot hear you say that. Okay? And that's why I'm not gonna do this. Okay then
[3824.445] Speaker 9 - I want your badge
[3825.225] Speaker 2 - Number, okay?
[3826.935] Speaker 9 - Right now.
[3828.115] Speaker 2 - Okay?
[3836.225] Speaker 9 - Wow.
[3838.805] Speaker 8 - I
[3840.345] Speaker 9 - Put that the report and just go steer him by and came over. Who? I lied actually to collect the dog and we release the dog. That's why you kill you after arrest me. That's so wrong boy. To fuck with you. My hospital. You just been really new at this. You can't do this to me
[4054.915] Speaker 8 - Because
[4055.505] Speaker 9 - The judge said that I could be out my yard. You're doing something really wrong. Really wrong. You're going to get in trouble.
[4131.975] Speaker 10 - We're going into the Lamar Runners parking lot. I'm the black four runner boy. Mary Order Lincoln Adam copy 2 41. Voice to jail.
[4155.025] Speaker 8 - 2 41 code 4 22 6.
[4181.905] Speaker 10 - Do you have 3 31? Boy can you start towards three? Oh Charles three. Three Oh Charles, do you have any additional identifiers? You ready for police? Go ahead. David. Queen Height at Young 95 And is she alone? She's got her date I eight. Restraining order from a male named Dylan Meyer Know if he needed information other than not, she can be clear and valid on an adult regular. Thank you ma'am. 22.
[4290.865] Speaker 9 - Why we keep opening our door to you guys?
[4300.375] Speaker 10 - 300 truck. 9 2 59 3 Adam Trooper 5 25 with the 2 4 1 northbound North colored SUV played out Colorado Frank eight zero Union. Four seven unit out of lanes or stated they may not be 21 Boy says Google break. 300 Adam seven
[4343.865] Speaker 9 - And I demand you take a picture of my neck.
[4346.345] Speaker 10 - So 2300. See how
[4348.045] Speaker 9 - Tight you put this on
[4350.545] Speaker 2 - The video. Camera's been rolling watching you push your neck into it.
[4354.705] Speaker 8 - You're
[4355.125] Speaker 9 - Not pushing my neck into it. I can't get out of it.
[4365.025] Speaker 8 - See
[4365.325] Speaker 9 - I can't get out
[4366.085] Speaker 10 - Of it. 2300 it's
[4367.945] Speaker 9 - In my neck.

[4368.545] Speaker 10 - Six 60 xray Trevor,

[4370.195] Speaker 8 - Because

[4370.685] Speaker 9 - Of you.

[4371.665] Speaker 10 - Six 60 Xray. King River University, Edward Pal, zebra boy. Nine four. You can show me <laugh>. 2259. Three three Charlie 300. Okay, I might have misunderstood it. The first of Young Young Ocean Union at North George. Young Union. Yeah. Just YU. Okay, you're probably showing clear the records. Okay, pretty good.

[4435.025] Speaker 9 - We can

[4437.095] Speaker 8 - Shift it.

[4455.285] Speaker 10 - Dispatch SAR seven 10 on main SAR seven 10. Was patrol gonna have uh, an officer meet, search and rescue at the elementary school. 23 2 2300 boy, Adam, Edward nor one four. Do we have a unit en route to the elementary school to meet with her? I am.

[4503.145] Speaker 8 - No, I know I

[4508.655] Speaker 10 - Seven 10. Copy. I got people starting to show up at school then 23 2 2 41.

[4527.385] Speaker 2 - Boy

[4531.425] Speaker 10 - Go

[4533.105] Speaker 2 - On scene. Jail. Can you run a criminal history for Stateway?

[4540.915] Speaker 8 - Plaintiff's

[4541.605] Speaker 10 - Initial Jeep Trooper

[4544.585] Speaker 2 - 2 4 1 boy continuing. Can you run a criminal history for the Denise party on the call? Send it to my email. Please

[4552.235] Speaker 8 - Give

[4552.525] Speaker 10 - Me water

[4553.185] Speaker 8 - Inside.

[4554.955] Speaker 2 - They can get you water once you're processed.

[4576.885] Speaker 8 - Hi coming in

[4577.565] Speaker 2 - County one female.

[4579.015] Speaker 8 - Welcome.

[4579.635] Speaker 2 - Thank you.

[4587.245] Speaker 8 - You do have manners just now.

[4705.955] Speaker 1 - Okay? I want your name.

[4708.675] Speaker 2 - Okay, you're going to get an additional charge for escape. I'm not escaping. I have it taking off the handcuffs. That's what you were doing back here? Yeah, but I kept them back here. No, that's not how that works. You're placed in hand restraints for a specific reason. Okay? Go ahead and place your hand. What is it? Shaken to what? Go ahead and place your hand behind your back. What's your first name? I don't need to tell you that.

[4737.385] Speaker 1 - 2 3 0 2 3 2 0.

[4739.495] Speaker 2 - Again it'll be on all your booking paperwork. Stop turning. So I was trying to be kind with you and leaving them loose. You're being kind. So now I'm gonna put 'em on a lot tighter 'cause you're slipping cuffs. That's unacceptable. You are an unkind person. Okay, stand right here at the back of the tail light. Do not move. Okay. 2 41, boy. Okay, walk towards the door with the black label above it. Just for cad. Can you log up my subject? Uh, slipped or cuffs in the back of the car? I've got a cuff now. Slipped

[4794.385] Speaker 11 - One? Not both.

[4796.315] Speaker 1 - Okay,

[4799.115] Speaker 2 - Stop. Look to your right here. Your assignment says warning. I need you to read that. Tell me if you have any of those items. I can't read it.

[4807.405] Speaker 1 - I don't wear my glasses.

[4808.275] Speaker 2 - Okay. Any introduction of any contraband such as drugs, money, weapons, keys, matches, and drug paraphernalia past this point will result in an additional felony charge. Do you have any of those items with no. Or on your person? Or in your person? My

[4820.565] Speaker 1 - God, no. Okay,

[4822.155] Speaker 2 - Step in here.

[4823.285] Speaker 1 - I can't write this second. Sorry. Just gimme a second. Okay. Alright,

[4833.465] Speaker 2 - Go ahead and step in here. Once you get in here, turn to your left. Walk towards the blue mat.

[4838.435] Speaker 1 - Blue

[4838.725] Speaker 2 - Mat? Yep. Okay. Step in here. This door will shut on its way. So go ahead and go to the wall over here.

[4852.685] Speaker 1 - I didn't see you.

[4853.625] Speaker 2 - The wall over here.

[4855.145] Speaker 1 - The window down? Yes. It's not a

[4857.165] Speaker 2 - Wall. Okay, have a seat. I am assuming you've seen the nurse already.

[4885.585] Speaker 1 - What's

[4886.005] Speaker 2 - That? I'm assuming you've seen the nurse already? Yeah. Okay.

[4889.185] Speaker 1 - Um, it's.

**EXHIBIT D**

# DOUGLAS COUNTY SHERIFF
★ Honor. Service. Valor ★
Darren M. Weekly

4000 Justice Way
Castle Rock. CO 80109
(303) 660-7505

## OFFENSE / INCIDENT REPORT

**CASE NO.**
2025-00089791

**CONNECTING CASE NUMBER(S)**
2025-
2025-

| | | | |
|---|---|---|---|
| **DATE REPORTED** 10/09/2025 | **TIME** 20:42 | **INCIDENT TYPE** OTHER OFFENSES | **CASE DISPO** CLEARED B | **EXCEPTIONAL CLEARANCE** |

**EVENT**

| | | | |
|---|---|---|---|
| **OCCURRED FROM** 10/09/2025 | **TIME** 20:42 | **LOCATION OF OCCURRENCE** 16211 LAURELHILL CT PARKER, CO | |
| **OCCURRED TO** 10/09/2025 | **TIME** 22:40 | **AT INTERSECTION** | **ROUTE TO** INV PERSONS |
| **CASE STATUS** CLOSED | **CASE STATUS DATE** 10/10/2025 | **REPORTING DISTRICT** DCSO-04 | **SIGNIFICANT EVENT** |

**OFFENSES**

| NO. | AT/CO | COUNT | CRS | |
|-----|-------|-------|-----|---|
| 1 | C | 1 | 18-6-803.5 (1)(a)   M2 | VIOLATION OF A PROTECTION ORDER - CIVIL |
| 2 | C | 1 | 18-4-506  M2 | 2ND DEGREE CRIMINAL TAMPERING |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |

**Victim was provided with written Victims Rights Information  X Yes  _ No  _ N/A**

### Assisting Agency Information

| ORI | Role | Comments (Case Number, etc.) |
|-----|------|------------------------------|
| | | |

| | | |
|---|---|---|
| **REPORTING OFFICER** JENKINS, JACOB | **DATE SUBMITTED** 10/10/2025 | **APPROVING SUPERVISOR** DAVIS, BLAKE REESE 10/10/2025 |

NWS CASE REPORT

Case Report 2025-00089791 Page 1 OF 5

| PRIMARY OFFENSE / INCIDENT TYPE | DOUGLAS COUNTY SHERIFF'S OFFICE | CASE NO. |
|---|---|---|
| **OTHER OFFENSES** | WITNESS LIST SUBJECTS | **2025-00089791** |

| REPORTING OFFICER | DATE |
|---|---|
| **JENKINS, JACOB** | **10/09/2025** |

| INVOLVEMENT | NAME | | DOB | AGE |
|---|---|---|---|---|
| **VICTIM** | **WILCOX, ELIZABETH ELEANOR** | | **11/14/1962** | **62** |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| **WH** | **F** | **55 -** | **120 -** | **RED** | **BLU** | **920054117** | **CO** |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| **16211 LAURELHILL CT PARKER, CO 80134** | **(303)638-6705** |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| **EMPLOYER** | **SELF EMPLOYED** | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
**VICTIM**

| INVOLVEMENT | NAME | | DOB | AGE |
|---|---|---|---|---|
| **VICTIM** | **STATE OF COLORADO,** | | | |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| | | **-** | **-** | | | | **CO** |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| **CO** | |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| | | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
**VICTIM**

| INVOLVEMENT | NAME | | DOB | AGE |
|---|---|---|---|---|
| **SUSPECT** | **COSTERUS, DENISE M** | | **02/15/1961** | **64** |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| **WH** | **F** | **56 -** | **160 -** | **BRO** | **HAZ** | **040050455** | **CO** |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| **16261 LAURELHILL CT PARKER, CO 80134** | **(720)765-1329** |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| **EMPLOYER** | **RETIRED** | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
**SUSPECT**

| INVOLVEMENT | NAME | | DOB | AGE |
|---|---|---|---|---|
| **SUBJECT** | **COSTERUS, ALEC S** | | **04/26/1962** | **63** |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| **WH** | **M** | **60 -** | **170 -** | **BRO** | **BLU** | **920475561** | **CO** |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| **16261 LAURELHILL CT PARKER, CO 80134** | **(303)841-5400** |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| **EMPLOYER** | **UNKNOWN** | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
**SUBJECT**

| INVOLVEMENT | NAME | | DOB | AGE |
|---|---|---|---|---|
| **LE OFFICER** | **JENKINS, JACOB** | | | |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| **WH** | **M** | **-** | **-** | | | | **CO** |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| **4000 JUSTICE WAY CASTLE ROCK, CO 80109-** | **(303)663-7500** |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| | | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
**LE OFFICER 2320**

C0182025M002624                                        DISCOVERY PAGE 8

| PRIMARY OFFENSE / INCIDENT TYPE | DOUGLAS COUNTY SHERIFF'S OFFICE | CASE NO. |
|---|---|---|
| OTHER OFFENSES | | 2025-00089791 |
| REPORTING OFFICER<br>JENKINS, JACOB | | DATE |

**VICTIM OFFENDER RELATIONSHIP**

**COSTERUS, DENISE M  02/15/1961 NEIGHBOR**

**VICTIM OFFENDER RELATIONSHIP**

**COSTERUS, DENISE M  02/15/1961 NEIGHBOR**

**VICTIM OFFENDER RELATIONSHIP**

**VICTIM OFFENDER RELATIONSHIP**

**VICTIM OFFENDER RELATIONSHIP**

**VICTIM OFFENDER RELATIONSHIP**

**VICTIM OFFENDER RELATIONSHIP**

C0182025M002624                                    DISCOVERY PAGE 9



| | 4000 Justice Way | CASE NO. |
| :---: | :---: | :---: |
| **DOUGLAS COUNTY** **SHERIFF** ★ Honor, Service, Valor ★ Darren M. Weekly | Castle Rock, CO 80109 (303) 660-7505 | **2025-00089791** |
| | | PRIMARY OFFENSE / INCIDENT TYPE |
| | **CASE NARRATIVE** | **OTHER OFFENSES** |

| REPORTING OFFICER | DATE SUBMITTED | APPROVING SUPERVISOR |
| :--- | :--- | :--- |
| **JENKINS, JACOB** | **10/10/2025** | **DAVIS, BLAKE REESE 10/10/2025** |

**NARRATIVE**

On 10/09/2025 at approximately 2141 hours, I, Deputy Jenkins was on patrol in the County of Douglas, State of Colorado when I was dispatched to 16211 Laurel Hill Ct for an active restraining order violation.

I arrived on scene and spoke to the reporting party identified as Elizabeth Wilcox DOB (11/14/1942) who stated that her neighbor took her dog and refused to return him for approximately 5 minutes. Elizabeth explained that her neighbor, Denise Costerus DOB (02/15/1961), is restrained from contact in a temporary protection order. I was able to locate the protection order in DKT # C0182025C 000664, expiring 02/15/2026. The protection order has the standard provisions as well as,  MISC: KEEP A DISTANCE OF AT LEAST 100 YARDS FROM THE PROTECTED PARTIES  NO CONTACT EXCEPT RSP PERMITTED INGRESS AND EGREES TO OWN PROPERTY INCID ENTAL CONTACT PERMITTED NO CONTACT W IMMED FAMILY MEMBERSTY EXCLUDED 100 YARDS FROM: HOME 16211 LAURELHILL CT PARKER CO 80134 IT IS FURTHER ORDERED RSP SHALL NOT LOITERFOR ANY REASON OUTSIDE OF THEI R RESIDENCE. Elizabeth was outside checking her mail and speaking with another neighbor she identified as "Jeremiah". Elizabeth stated that her dog "Moose" was outside with her at this time. Elizabeth stated that Denise exited her home and checked the mail, after which she returned to her home shortly before exiting again and calling "Moose" numerous times to Elizabeth's dog. Denise was approximately 30 yards from Elizabeth at this time. Moose went to Denise and she walked him into her house. Elizabeth, in an attempt to not be a party in violating the court order, asked Jeremiah to recover the dog on her behalf. Jeremiah went to Denise's home and attempted to recover the dog however Denise walked from the kitchen and shut the front door to her home, ignoring Jeremiah and refused to release the dog. Jeremiah continued to attempt contact by knocking and ringing the doorbell while verbally explaining that he was trying to recover the dog, before the animal was released approximately 5 minutes later. Elizabeth showed me a text message from Jeremiah which confirmed her statement. Jeremiah states that Denise saw him and he asked for the dog but was ignored and had the door "shut in his face". Jeremiah also states that it was "weird" for Denise to call the dog and let him into her house. Elizabeth stated that the dog used to go over to Denise's for "play dates" with her dogs but that has not happened in some time due to the ongoing disputes. Elizabeth showed me a substantial amount of documentation for previous calls for service where the Sheriff's Office responded in relation to numerous parking complaints, animal complaints, noise complaints, and neighbor disputes. Elizabeth claimed that she has endured this behavior from Denise and her husband Alec for approximately 10 years. Elizabeth was encouraged to contact law enforcement to document the continuing issues.

I made contact with Denise at her home located at 16261 Laurelhill Ct. Denise let me inside the home and when I asked about what happened with Moose Denise claimed to have written a note to document the event. Denise returned and showed me the note after reading it to me. In the note, Denise claims that she was checking her mail and Moose ran to her front door. Denise claims to open the door to her home so Moose can say "hi" to her dog and play. Denise then claims that Jeremiah arrived to get Moose who "didn't want to go" but eventually does. Denise noted that Moose was not wearing a collar and she contacted animal control. I was unable to locate any CAD information in relation to this event for animal control. I took a photo of this document to be uploaded to Evidence.com. I asked Denise why she called the dog to her home and she initially claimed that she did not, later stating that she "may" have called Moose but "couldn't remember". I then asked why Denise shut the door on Jeremiah and she claimed that it may have been her dog that made the door shut. Denise did state that she came from the kitchen to the front door but maintained that she did not shut the door. Denise stated the reason she let Moose inside the house was to "take care" of him as she was concerned that he was out and not wearing a collar. Elizabeth previously stated that Moose wears a collar however due to his thick coat it is difficult to



| | | CASE NO. |
|---|---|---|
| | 4000 Justice Way<br>Castle Rock. CO 80109<br>(303) 660-7505 | **2025-00089791** |

## CASE NARRATIVE CONTINUATION

see. During this conversation Denise and her husband both would deviate from the event and attempt to discuss prior events, claiming that the fault for this event was with Elizabeth. Denise and her husband both stated that Elizabeth was a "bitch" and that the protection order was filed and granted on false information. Denise confirmed she was provided a physical copy of the protection order. Denise was taken into custody and placed din a patrol vehicle. A criminal history was ran and Denise does not have any previous convictions for crime of violation of protection order. Denise was transported to the Douglas County Jail where she was placed without incident. Denise was issued summons EB0318264.

My body camera was recording at the time of this incident and may contain details and/or statements that were not reflected in my report.

Attachments
BWC Deputy J. Jenkins
Photos
VINE sheet

C0182025M002624                                    DISCOVERY PAGE 11

# STATE OF COLORADO
# TWENTY-THIRD JUDICIAL DISTRICT
# COUNTY OF DOUGLAS

| | | |
|---|---|---|
| AGENCY CR | # | **2025-00089791** |
| JAIL ID: | # | |
| DOCKET: # | | |

DETERMINATION OF PROBABLE CAUSE TO DETAIN

(COMPLETED BY ARRESTING AUTHORITY)

**COSTERUS, DENISE M**                    **2/15/1961**

SUSPECT (LAST, FIRST, MIDDLE)                    DOB                    SSN

**16261 LAURELHILL CT**                    **PARKER**        **CO**  **80134**

SUSPECT ADDRESS                    CITY        ST        ZIP        SUSPECT PHONE #

**WHITE**        **F**        **160**        **5 6**        **BRO**        **HAZ**

RACE        SEX        WEIGHT        HEIGHT        HAIR        EYES

**DOUGLAS COUNTY SHERIFF'S OFFICE**        **(303) 660-7505**        **10/09/2025        22:37**

ARRESTING AGENCY                    PHONE        DATE OF ARREST TIME

ALL OF THE ABOVE INFORMATION MUST BE COMPLETED BY ARRESTING OFFICER IF KNOWN.

THE ABOVE PERSON IS ORDERED TO REPORT TO COURT AS DIRECTED BY THE APPROPRIATE LAW ENFORCEMENT AUTHORITIES PER THE FOLLOWING INFORMATION:

Date _____ **10/10/2025** _____ Time _____ **08:30** _____ am / pm

Court Location: **4000 JUSTICE WAY   CASTLE ROCK, CO 80109**

(COMPLETED BY JUDGE)

## PROBABLE CAUSE DETERMINATION

On this date, the court has reviewed the relevant information to the arrest of the above individual and has determined:

_____        Probable cause to believe that this person has committed a crime **does exist** and there is a reason to detain this person pending posting bond or further court proceedings.

_____        Probable cause to believe that this person has committed a crime has not been shown and the person is ordered released pending further court proceedings and must appear before the court as directed above.

BY THE COURT: _____

                    Judge                                        Division

                    _____

                    Date                                        Time

Original:  **COURT**
Copy:      **AGENCY RECORD'S DIVISION**

1

AGENCY CR#  **2025-00089791**

C0182025M002624

# STATE OF COLORADO
## TWENTY-THIRD JUDICIAL DISTRICT
## COUNTY OF DOUGLAS

CR# _2025-00089791_

## STATEMENT IN SUPPORT OF WARRANTLESS ARREST

| COSTERUS, DENISE M | 2/15/1961 |
|---|---|
| SUSPECT (LAST, FIRST, MIDDLE) | DOB |

CHARGE (S)

| STATUTE / ORDINANCE | DESCRIPTION | COUNTS |
|---|---|---|
| 18-4-506  M2 | 2ND DEGREE CRIMINAL TAMPERING | 1 |
| 18-6-803.5 (1)(a)   M2 | VIOLATION OF A PROTECTION ORDER - CIVIL | 1 |

I, **JENKINS, JACOB**_____, a peace officer with the _DOUGLAS COUNTY SHERIFF'S OFFICE_, states that there exists probable cause for the warrantless arrest of the above named suspect for the charges stated above. The officer further states that the facts below are based on personal knowledge and/or interviews with witnesses and fellow peace officers and/or review of official law enforcement reports.

2

C0182025M002624

**STATE OF COLORADO**
**TWENTY-THIRD JUDICIAL DISTRICT**
**COUNTY OF DOUGLAS**

CR# **2025-00089791**

STATEMENT IN SUPPORT OF WARRANTLESS ARREST

**COSTERUS, DENISE M**                                                    **2/15/1961**
SUSPECT (LAST, FIRST, MIDDLE)                                               DOB

The crime (s) alleged occurred on      **10/09/2025**   ,            .
                                          Date              Year
at,  **16211 LAURELHILL CT PARKER, CO 80134**            ,
      **PARKER**
City of _____, County of **Douglas**, State of Colorado.

Executed on the _____ day of _____ _____ at _____ am / pm.
                    Day            Month           Year         Time

I declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief.

**JENKINS, JACOB**                     **/S/**      Arresting Agency Supv. **10/09/2025**
Arresting Officer Signature                                                  Date

3. The facts in support of the probable cause for the warrantless arrest of the above named suspect are as follows:

(Enter Narrative Here)

**On 10/09/2025 at approximately 2141 hours, I, Deputy Jenkins was on patrol in the County of Douglas, State of Colorado when I was dispatched to 16211 Laurel Hill Ct for an active restraining order violation.**

**I arrived on scene and spoke to the reporting party identified as Elizabeth Wilcox DOB (11/14/1942) who stated that her neighbor took her dog and refused to return him for approximately 5 minutes. Elizabeth explained that her neighbor is Denise Costerus DOB (02/15/1961) is restrained from contact in a temporary protection order. I was able to locate the protection order in DKT # C0182025C 000664, expiring 02/15/2026. The protection order has the standard provisions as well as,  MISC: KEEP A DISTANCE OF AT LEAST 100 YARDS FROM THE PROTECTED PARTIES  NO CONTACT EXCEPT RSP PERMITTED INGRESS AND EGREES TO OWN PROPERTY INCID ENTAL CONTACT PERMITTED NO CONTACT W IMMED FAMILY MEMBERSTY EXCLUDED 100 YARDS FROM: HOME 16211 LAURELHILL CT PARKER CO 80134 IT IS FURTHER ORDERED RSP SHALL NOT LOITERFOR ANY REASON OUTSIDE OF THEI R RESIDENCE. Elizabeth stated that Denise exited her home and checked the mail, after which she returned to her home shortly before exiting again and calling "Moose" to Elizabeth's dog. Moose went to Denise and she walked him into her house. Elizabeth in an attempt to not be a party in violating the court order asked a neighbor to recover the dog. The neighbor went to Denise's home and attempted to recover the dog however Denise shut the door to her home and refused to release the dog. The neighbor continued to attempt contact before the animal was released approximately 5 minutes later. Denise confirmed she was provided a physical copy of the protection order. A criminal history was ran and Denise does not have any previous convictions for crime of violation of protection order. Denise was taken into custody and transported to the Douglas County Jail where she was placed without incident.**

3

C0182025M002624                                              DISCOVERY PAGE 14

| | CASE NO. |
|---|---|
| **DOUGLAS COUNTY SHERIFF** ★ *Honor. Service. Valor* ★ Darren M. Weekly | 2025-00089791 |
| 4000 Justice Way Castle Rock. CO 80109 (303) 660-7505 | |

**PROBABLE CAUSE NARRATIVE CONTINUATION**

PRIMARY OFFENSE / INCIDENT TYPE

| REPORTING OFFICER | DATE SUBMITTED | APPROVING SUPERVISOR |
|---|---|---|
| JENKINS      JACOB | 10/09/2025 | GREGOREK, MICHAEL MATTHEW 10/10/2025 |

**N A R R A T I V E   C O N T I N U A T I O N**

My body camera was recording at the time of this incident and may contain details and/or statements that were not reflected in my report.

Arrest Report 202500089791 Page 4 OF 4

**UNIFORM SUMMONS AND COMPLAINT / PENALTY ASSESSMENT**    EB0318264
**Douglas County Sheriff's Office**

Offense Date/Time: 10/09/2025/20:42     Incident Number   2025-00089791
Issue Date/Time: 10/09/2025/20:42

THE PEOPLE OF THE STATE OF COLORADO vs:

STATE OF COLORADO

| First Name | Middle Intl | Last Name | DOB | Age |
|---|---|---|---|---|
| DENISE | M | COSTERUS | 02/15/1961 | 64 |

Address
16261 LAURELHILL CT

| City | State/Zip | Phone |
|---|---|---|
| PARKER | CO/80134 | |

| Drivers License # | State | DL Type |
|---|---|---|
| 040050455 | CO | CLASS R |

| Race | Sex | Hgt | Wgt | Hair | Eyes |
|---|---|---|---|---|---|
| W | F | 506 | 160 | BRO | HZL |

| V.I.N. | Vehicle License # | State |
|---|---|---|
| | VEH TAG | CO |

| Veh Year | Make | Model | Style | Veh Color |
|---|---|---|---|---|

Registered Owner

| First Name | Middle Name | Last Name |
|---|---|---|

| Address | City | State/Zip |
|---|---|---|
| | | CO/ |

**IF NOT PAID, YOU ARE HEREBY DIRECTED TO APPEAR AS INDICATED**

ROBERT A CHRISTENSEN JUSTICE CENTER     10/10/2025 AT 8:30 AM
4000 JUSTICE WAY, CASTLE ROCK, CO 80109

| Charge | Result | Section | Com Code | Fine | VA | TBI | FF | Points |
|---|---|---|---|---|---|---|---|---|
| No 1 | CITATION | 18-6-803.5 (1)(c) | MRS | SUM | SUM | SUM | SUM | SUM |

Description
VIOLATION OF PROTECTION ORDER - CIV - FIREARM/AMMO/DOCS
Offense Notes

| Charge | Result | Section | Com Code | Fine | VA | TBI | FF | Points |
|---|---|---|---|---|---|---|---|---|
| No 2 | CITATION | 18-4-506 | | SUM | SUM | SUM | SUM | SUM |

Description
2ND DEGREE CRIMINAL TAMPERING
Offense Notes

| Total VA | Total TBI | Total FF | DNA Surcharge | Total to be paid by Mail | Total Points |
|---|---|---|---|---|---|
| SUM | SUM | SUM | SUM | SUM | SUM |

APPROXIMATE LOCATION OF VIOLATION - Located in Douglas County, Colorado    Direction of Travel
16211 LAURELHILL CT / / OAKMOOR PL

PAYABLE SUMMONS OR PENALTY ASSESSMENT      ✔    CRIMINAL

| Speed Determined By | Speed Written | Speed Limit | Actual Speed |
|---|---|---|---|
| | MPH | MPH | MPH |

☐ Accident   ☐ Injury   ☐ Cnst Zone   ☐ Schl Zone   ☐ AGG   Flea

The Undersigned have probable cause to believe that the defendant committed the offense(s) against the peace and dignity of the people of the State of Colorado, Douglas County and certify that this Summons and Complaint was signed and served upon the defendant at the location and on the date referenced above

Results of Signature    IN CUSTODY

OFFICER   J. JENKINS 2320      VIOLATOR _____
                                                Violator Signature

State of Colorado, County of Douglas
Certified to be a full, true, and correct
copy of the original.
By_____ 2343

**THIS IS A LEGAL DOCUMENT - READ ENTIRE DOCUMENT**

**SPECIAL REQUIREMENTS FOR MINORS:** (Defendants under 18 years of age) If this citation is a summons, you are required to appear in court, and your parent or legal guardian must appear with you. The minor defendant must notify his or her parent or legal guardian within 72 hours of the issuance of the summons. If this citation is a penalty assessment and you are mailing in the fine, the minor defendant and his or her parent or legal guardian must each sign the citation, and the signature of the parent or legal guardian must be notarized. If you do not mail the fine within 20 days as noted on the citation, the minor defendant and their parent or legal guardian must appear in court on the date indicated. Mailing in this citation without all of the necessary signatures will not constitute proper payment and will require a court appearance by the minor defendant and his or her parent or legal guardian. If your court date falls on a holiday or weekend, you must appear on the next court business day.

Parent or Guardian Signature _____

**Notary Section:**

Subscribed and sworn to before me this _____ day of (month) _____ (year) _____

Notary Signature _____ , Notary Public for the State of Colorado

# STATE OF COLORADO
# TWENTY-THIRD JUDICIAL DISTRICT
# COUNTY OF DOUGLAS

AGENCY CR # **2025-00089791**
JAIL ID: #
DOCKET: # **15005411**

DETERMINATION OF PROBABLE CAUSE TO DETAIN

(COMPLETED BY ARRESTING AUTHORITY)

---

**COSTERUS, DENISE M**                    **02/15/1961**                    ▮▮▮▮▮

SUSPECT (LAST, FIRST, MIDDLE)                    DOB                    SSN

**16261 LAURELHILL CT**                    **PARKER**        **CO  80134**

SUSPECT ADDRESS                    CITY        ST    ZIP    SUSPECT PHONE #

**WHITE**        **F**            **160**            **5 6**        **BRO**        **HAZ**

RACE        SEX            WEIGHT            HEIGHT        HAIR        EYES

**DOUGLAS COUNTY SHERIFF'S OFFICE**        **(303) 660-7505**        **10/09/2025        22:37**

ARRESTING AGENCY                    PHONE            DATE OF ARREST TIME

ALL OF THE ABOVE INFORMATION MUST BE COMPLETED BY ARRESTING OFFICER IF KNOWN.

THE ABOVE PERSON IS ORDERED TO REPORT TO COURT AS DIRECTED BY THE APPROPRIATE LAW ENFORCEMENT AUTHORITIES PER THE FOLLOWING INFORMATION:

Date _____ **10/10/2025** _____ Time _____ **08:30** _____ am / pm

Court Location: **4000 JUSTICE WAY   CASTLE ROCK, CO 80109**

(COMPLETED BY JUDGE)

## PROBABLE CAUSE DETERMINATION

On this date, the court has reviewed the relevant information to the arrest of the above individual and has determined:

_____        Probable cause to believe that this person has committed a crime **does exist** and there is a reason to detain this person pending posting bond or further court proceedings.

_____        Probable cause to believe that this person has committed a crime has not been shown and the person is ordered released pending further court proceedings and must appear before the court as directed above.

BY THE COURT: _____        _____

                    Judge                                Division

                    _____        _____

                    Date                                Time

Original: **COURT**
Copy:    **AGENCY RECORD'S DIVISION**

1

AGENCY CR# **2025-00089791**

**STATE OF COLORADO**
**TWENTY-THIRD JUDICIAL DISTRICT**
**COUNTY OF DOUGLAS**                                    CR# _2025-00089791_
STATEMENT IN SUPPORT OF WARRANTLESS ARREST

| **COSTERUS, DENISE M** | **02/15/1961** |
|---|---|
| SUSPECT (LAST, FIRST, MIDDLE) | DOB |

CHARGE (S)

| STATUTE / ORDINANCE | DESCRIPTION | COUNTS |
|---|---|---|
| **18-4-506  M2** | **2ND DEGREE CRIMINAL TAMPERING** | **1** |
| **18-6-803.5 (1)(a)   M2** | **VIOLATION OF A PROTECTION ORDER - CIVIL** | **1** |

I, **JENKINS, JACOB**_____, a peace officer with the DOUGLAS COUNTY SHERIFF'S OFFICE , states that there exists probable cause for the warrantless arrest of the above named suspect for the charges stated above. The officer further states that the facts below are based on personal knowledge and/or interviews with witnesses and fellow peace officers and/or review of official law enforcement reports.

2

C0182025M002624                                                        DISCOVERY PAGE 20

**STATE OF COLORADO**
**TWENTY-THIRD JUDICIAL DISTRICT**
**COUNTY OF DOUGLAS**                                      CR# __2025-00089791__
**STATEMENT IN SUPPORT OF WARRANTLESS ARREST**

__COSTERUS, DENISE M__                                                      __02/15/1961__
SUSPECT (LAST, FIRST, MIDDLE)                                                  DOB

The crime (s) alleged occurred on _____**10/09/2025**_____, _____.
                                              Date                  Year

at, __16211 LAURELHILL CT PARKER, CO 80134_____,

          **PARKER**
City of _____, County of **Douglas**,State of Colorado.

Executed on the _10th_ day of _October_ _2025_ at _12 24_ (am)/ pm.
                  Day        Month        Year          Time

I declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief.

**JENKINS, JACOB** _[signature]_ /S/
Arresting Officer Signature          Arresting Agency Supv. __10/09/2025__
                                                              Date

3. The facts in support of the probable cause for the warrantless arrest of the above named suspect are as follows:

(Enter Narrative Here)

On 10/09/2025 at approximately 2141 hours, I, Deputy Jenkins was on patrol in the County of Douglas, State of Colorado when I was dispatched to 16211 Laurel Hill Ct for an active restraining order violation.

I arrived on scene and spoke to the reporting party identified as Elizabeth Wilcox DOB (11/14/1942) who stated that her neighbor took her dog and refused to return him for approximately 5 minutes. Elizabeth explained that her neighbor is Denise Costerus DOB (02/15/1961) is restrained from contact in a temporary protection order. I was able to locate the protection order in DKT # C0182025C 000664, expiring 02/15/2026. The protection order has the standard provisions as well as, MISC: KEEP A DISTANCE OF AT LEAST 100 YARDS FROM THE PROTECTED PARTIES NO CONTACT EXCEPT RSP PERMITTED INGRESS AND EGREES TO OWN PROPERTY INCID ENTAL CONTACT PERMITTED NO CONTACT W IMMED FAMILY MEMBERSTY EXCLUDED 100 YARDS FROM: HOME 16211 LAURELHILL CT PARKER CO 80134 IT IS FURTHER ORDERED RSP SHALL NOT LOITERFOR ANY REASON OUTSIDE OF THEI R RESIDENCE. Elizabeth stated that Denise exited her home and checked the mail, after which she returned to her home shortly before exiting again and calling "Moose" to Elizabeth's dog. Moose went to Denise and she walked him into her house. Elizabeth in an attempt to not be a party in violating the court order asked a neighbor to recover the dog. The neighbor went to Denise's home and attempted to recover the dog however Denise shut the door to her home and refused to release the dog. The neighbor continued to attempt contact before the animal was released approximately 5 minutes later. Denise confirmed she was provided a physical copy of the protection order. A criminal history was ran and Denise does not have any previous convictions for crime of violation of protection order. Denise was taken into custody and transported to the Douglas County Jail where she was placed without incident.

My body camera was recording at the time of this incident and may contain details and/or statements that were not reflected in my report.

3

**UNIFORM SUMMONS AND COMPLAINT / PENALTY ASSESSMENT** EB0318264

**Douglas County Sheriff's Office**

**Offense Date/Time:** 10/09/2025/20:42
**Issue Date/Time:** 10/09/2025/20:42

Incident Number: **2025-00089791** —

**THE PEOPLE OF THE STATE OF COLORADO vs:**

**STATE OF COLORADO**

**Officer's Notes:**

| First Name | Middle Intl. | Last Name | DOB | Age |
|---|---|---|---|---|
| **DENISE** | **M** | **COSTERUS** | **02/15/1961** | **64** |

Address
**16261 LAURELHILL CT**

| City | State/Zip | Phone |
|---|---|---|
| **PARKER** | **CO/80134** | |

| Drivers License # | State | DL Type |
|---|---|---|
| **040050455** | **CO** | **CLASS R** |

| Race | Sex | Hgt | Wgt | Hair | Eyes |
|---|---|---|---|---|---|
| **W** | **F** | **506** | **160** | **BRO** | **HZL** |

| V.I.N. | Vehicle License # | State |
|---|---|---|
| | **VEH TAG** | **CO** |

| Veh Year | Make | Model | Style | Veh Color |
|---|---|---|---|---|
| | | | | |

Registered Owner

| First Name | Middle Name | Last Name |
|---|---|---|
| | | |

| Address | City | State/Zip |
|---|---|---|
| | | **CO/** |

### IF NOT PAID, YOU ARE HEREBY DIRECTED TO APPEAR AS INDICATED

**ROBERT A CHRISTENSEN JUSTICE CENTER**
**4000 JUSTICE WAY, CASTLE ROCK, CO 80109**

**10/10/2025 AT 8:30 AM**

| Charge | Result | Section | Com. Code | Fine | VA | TBI | FF | Points |
|---|---|---|---|---|---|---|---|---|
| No. 1 | **CITATION** | **18-6-803.5 (1)(c)** | CVRS | **SUM** | **SUM** | **SUM** | **SUM** | **SUM** |

Description
**VIOLATION OF PROTECTION ORDER - CIV - FIREARM/AMMO/DOCS**
Offense Notes:

| Charge | Result | Section | Com. Code | Fine | VA | TBI | FF | Points |
|---|---|---|---|---|---|---|---|---|
| No. 2 | **CITATION** | **18-4-506** | | **SUM** | **SUM** | **SUM** | **SUM** | **SUM** |

Description
**2ND DEGREE CRIMINAL TAMPERING**
Offense Notes:

| Total VA | Total TBI | Total FF | DNA Surcharge | Total to be paid by Mail | Total Points |
|---|---|---|---|---|---|
| **SUM** | **SUM** | **SUM** | **SUM** | **SUM** | **SUM** |

APPROXIMATE LOCATION OF VIOLATION: Located in Douglas County, Colorado      Direction of Travel

**16211 LAURELHILL CT /  / OAKMOOR PL**

**PAYABLE SUMMONS OR PENALTY ASSESSMENT**          **CRIMINAL**

| Speed Determined By | Speed Written | Speed Limit | Actual Speed |
|---|---|---|---|
| | **MPH** | **MPH** | **MPH** |

☐ Accident   ☐ Injury   ☐ Cnst Zone   ☐ Schl Zone   ☐ AGG   Plea:

The Undersigned have probable cause to believe that the defendant committed the offense(s) against the peace and dignity of the people of the State of Colorado, Douglas County and certify that this Summons and Complaint was signed and served upon the defendant at the location and on the date referenced above.

Results of Signature:   **IN CUSTODY**

OFFICER   **J. Jenkins 2320**          VIOLATOR _____
                                              *Violator Signature*

---

**Offense Date:** 10/09/2025        **Offense Time:** 20:42
**Type of Stop:** CRIMINAL

**Distance:**

**District:**
**Towed:** No

**Insp. Exp.:**                    **Reg. Exp.:**
**Case #:** 2025-00089791          **Workers Present:** No
**VIN:**                           **# of Occ:**
**Attitude:**                      **Condition:**
**Traffic:**                       **Weather:**
**Other Offense:** 0
**Actual Wt:**                     **CDL:** No
**Car #:** 2017                    **CMV:** No
**DL Exp:**                        **DOT#:**
**Eth:** N
**Hzmt:** No
**Law Enforcement Recommends Diversion Screen:** No
**Light Condition:** DAYLIGHT      **Venue:** PARKER
**Significant Event:**             **Permitted Wt:**
**Reporting Dist:** DCSO-04
**School:**
**Void Reason:**
**Determined By:**                 **Radar Mov/Stat:** Hand Held
**Lsr #:**
**MPH Fork 1:**                    **MPH Fork 2:**
**Fork 1 Serial #:**               **Fork 2 Serial #:**

**Business Info**

**Address Type:**                  **Bus Phone:**
**Address:**
**City:**            **State:** CO        **Zip:**

EXHIBIT E

# OFFENSE / INCIDENT REPORT

**DOUGLAS COUNTY SHERIFF**
★ Honor. Service. Valor ★
Darren M. Weekly

4000 Justice Way
Castle Rock. CO 80109
(303) 660-7505

**CASE NO.**
2025-00091315

**CONNECTING CASE NUMBER(S)**
2025-
2025-

| | | | | | |
|---|---|---|---|---|---|
| **DATE REPORTED** 10/14/2025 | **TIME** 13:51 | **INCIDENT TYPE** ANIMAL CONTROL | **CASE DISPO** NON CRIMI | **EXCEPTIONAL CLEARANCE** | |

**EVENT**

| | | | |
|---|---|---|---|
| **OCCURRED FROM** 10/09/2025 | **TIME** 12:15 | **LOCATION OF OCCURRENCE** 16261 LAURELHILL CT PARKER, CO | |
| **OCCURRED TO** 10/09/2025 | **TIME** 12:15 | **AT INTERSECTION** | **ROUTE TO** ANIMAL CONTROL |

| **CASE STATUS** CLOSED | **CASE STATUS DATE** 10/14/2025 | **REPORTING DISTRICT** DCSO-04 | **SIGNIFICANT EVENT** |
|---|---|---|---|

**OFFENSES**

| NO. | AT/CO | COUNT | CRS |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |

Victim was provided with written Victims Rights Information _ Yes _ No X_ N/A

**Assisting Agency Information**

| ORI | Role | Comments (Case Number, etc.) |
|---|---|---|
| | | |

| **REPORTING OFFICER** MOHAMED, OMAR | **DATE SUBMITTED** 10/16/2025 | **APPROVING SUPERVISOR** MUNNS, BRYANNA MONIQUE 10/17/2025 |
|---|---|---|

NWS CASE REPORT

Case Report 2025-00091315 Page 1 OF 5

| PRIMARY OFFENSE / INCIDENT TYPE | DOUGLAS COUNTY SHERIFF'S OFFICE | CASE NO. |
|---|---|---|
| ANIMAL CONTROL | WITNESS LIST SUBJECTS | 2025-00091315 |

| REPORTING OFFICER | DATE |
|---|---|
| MOHAMED, OMAR | 10/14/2025 |

| INVOLVEMENT | NAME | DOB | AGE |
|---|---|---|---|
| LE OFFICER | MOHAMED, OMAR MOBARAK FADIL | | |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | | |
|---|---|---|---|---|---|---|---|---|
| BL | M | - | - | | | | | |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| 4000 JUSTICE WAY CASTLE ROCK, CO 80109 | (303)660-7500 |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| | | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
LE OFFICER

| INVOLVEMENT | NAME | DOB | AGE |
|---|---|---|---|
| RP | COSTERUS, ALEC S | 04/26/1962 | 63 |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| WH | M | 60 - | 170 - | BRO | BLU | 920475561 | CO |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| 16261 LAURELHILL CT PARKER, CO 80134 | (303)549-4089 |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| | | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
RP

| INVOLVEMENT | NAME | DOB | AGE |
|---|---|---|---|
| WITNESS | COSTERUS, DENISE M | 02/15/1961 | 64 |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| WH | F | 56 - | 160 - | BRO | HAZ | 040050455 | CO |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| 16261 LAURELHILL CT PARKER, CO 80134 | (720)765-1329 |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| | | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
WITNESS

| INVOLVEMENT | NAME | DOB | AGE |
|---|---|---|---|
| WITNESS | MILLER, JEREMIAH MERIADOC | 09/03/1955 | 70 |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| WH | M | 58 - | 160 - | BRO | HAZ | 15-245-0513 | CO |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| 16229 LAURELHILL CT PARKER, CO 80134- | (720)340-6790 |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| | | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
WITNESS

| INVOLVEMENT | NAME | DOB | AGE |
|---|---|---|---|
| SUBJECT | WILCOX, ELIZABETH ELEANOR | 11/14/1962 | 62 |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYES | DRIVERS LIC. NO. / STATE | |
|---|---|---|---|---|---|---|---|
| WH | F | 55 - | 120 - | RED | BLU | 920054117 | CO |

| RESIDENCE ADDRESS | PRIMARY PHONE |
|---|---|
| 16211 LAURELHILL CT PARKER, CO 80134 | (303)638-6705 |

| E-MAIL ADDRESS | OTHER PHONE |
|---|---|
| | |

| EMPLOYER / SCHOOL TYPE | EMPLOYER / SCHOOL NAME | OCCUPATION |
|---|---|---|
| | | |

| EMPLOYER / SCHOOL ADDRESS | BUS. PHONE |
|---|---|
| | |

WITNESS CAN TESTIFY TO:
SUBJECT/ DOG OWNER



| | 4000 Justice Way<br>Castle Rock. CO 80109<br>(303) 660-7505<br><br>**CASE NARRATIVE** | **CASE NO.**<br>**2025-00091315**<br><br>PRIMARY OFFENSE / INCIDENT TYPE<br><br>**ANIMAL CONTROL** |
|---|---|---|

| REPORTING OFFICER<br>MOHAMED, OMAR | DATE SUBMITTED<br>10/16/2025 | APPROVING SUPERVISOR<br>MUNNS, BRYANNA MONIQUE 10/17/2025 |
|---|---|---|

**NARRATIVE**

On October 10, 2025 at approximately 1300 hours, Douglas County Animal Services received an online complaint from Alec Costerus (PHN:(303) 549-4089) and Denise Costerus (PHN:(720) 765-1329) regarding a dog at large issue. Where they contained the dog "Moose" at their residence. DCAS has record of containing a dog matching the description provided for "Moose" in July and September of 2025.

The signed complaint reads:

"On 10/09/2025, my wife Denise, went to the mailbox.
The neighbor's unleashed and uncollared dog, Moose, ran away from its owner, Elizabeth Wilcox who was in front of her home speaking with a neighbor, Jeremiah Miller.
The dog ran toward Denise and past her while she was walking back to the house.
Because Elizabeth obtained a Temporary Civil Protection Order, we are prohibited from having any contact with her.
The last time that this escaped dog happened (Sept. 25, 2025), we contacted Animal Control. Officer instructed us to restrain the dog and contact Animal Control. Moreover, if Denise is to successfully return into her home, we cannot stop such a large dog (Denise was ill).
On this instant date, Mr. Miller came to the front door to whom we relinquished the dog. Entire time of dog possession was less than 5 minutes.
Based on this incident of Elizabeth's repeated negligent animal care, Elizabeth reported Denise to be violating the terms of the RO. DCSO arrested Denise later 10/9/2025 at 22:40. She has perversely and improperly weaponized the instrumentalities of justice to further achieve her pervasive vigilantism to intentionally inflict emotional distress on a) a senior; and b) a person with a severe medical condition.
I think it is appropriate that DCSO investigate Elizabeth for improper animal control (leash), failure to have a collar with identifying information and rabies vaccination, and other violations as deemed appropriate."

On October 11, 2025 at approximately 1000 hours, I, officer O. Mohamed ACO88 with Douglas County Animal Services received phone contact from Alec and Denise Costerus (PHN:303-549-4089) regarding a signed statement they submitted.

I asked them about the address where "Moose" resides, and they provided 16211 Laurelhill Ct. Their signed statement indicated a different address, but they affirmed that they were filing complaint regarding the dog from 16211.

A. and D. Costerus advised me that the complaint is related to D. Costerus being arrested on 10/09/2025. I located record of a Restraining order violation in New World under CR#: 2025-89791. I advised both of them that I would not be the expert related to that type of investigation, advising that I could only address the Dog at Large issue, they understood.

A. and D. Costerus stated that "Moose" has long been welcome at their residence for dog play dates and a number of times over the years has come to their residence when leaving its own property unattended. We discussed recent incidents where DCAS responded in the area for a dog "Moose". They stated that it has become a matter for complaint as a result of the disputes between them and their neighbor, "Moose's" owner, Elizabeth. I advised them that with the previous history at the address I would investigate the incident for a summons, but would need to establish probable cause to issue a summons. They understood, and advised me to contact Jeremiah Miller who they stated was a witness to the

Case Report 2025-00091315 Page 3 OF 5



**DOUGLAS COUNTY**
**SHERIFF**
★ Honor, Service, Valor ★
Darren M. Weekly

4000 Justice Way
Castle Rock. CO 80109
(303) 660-7505

CASE NO.

**2025-00091315**

## CASE NARRATIVE CONTINUATION

N A R R A T I V E   C O N T I N U A T I O N

incident and a neighbor. They provided me his contact information as PHN:720-340-6790 and residing at 16229 Laurelhill Ct.. We ended phone contact.

On October 14, 2025 at approximately 1000 Hours, I, Officer O. Mohamed ACO88 with Douglas County Animal Services contacted Jeremiah Miller (PHN:720-340-6790) and advised him that I would like to gather a signed statement regarding a dog at large from 10/09/2025, he confirmed he was a witness and agreed to meet with me to provide statement.

I arrived at 16229 Laurelhill Ct in Parker, CO at approximately 1107 hours, I met with J. Miller. Who showed me that he and his neighbor Elizabeth were at their respective mailboxes and pointed out specifically that the front door of his neighbor Denise was out of sight from where they stand. He invited me inside of his residence.

J. Miller stated that he has a medical condition that prevents him from writing well and that he has an assistant who helps with those type of tasks, but they were on a work call currently. I advised him I could document his statements in writing and gather his signature if he felt comfortable, he stated he was fine with that. He stated that he already submitted statement to Deputies and Elizabeth's Attorney related to the incident. I asked him if he was comfortable testifying in a court setting and he stated he would prefer not to because it exacerbates his medical condition to be in stressful situations. I wrote the statement with J. Miller and he read it and signed it, and he proofread it as we went along, it reads:

"I went outside to retrieve the mail after seeing the mail was delivered. At the same time , Elizabeth, my neighbor met me at the mailbox and we started small talk. Within that timeframe Denise came to get her mail. I waved at her to say hello, she looked at me and did not wave back. At this point, Moose was behind Elizabeth, and he saw that I waved at Denise and Moose ran toward Denise. And I thought I heard Denise call out to Moose. Moose went around toward Denise's front door, as Elizabeth and I called for Moose to come back. I followed after Moose to retrieve him for Elizabeth. When I arrived at the storm door, I saw that moose was already inside the house. I knocked on the storm door, Denise appeared and I said I am just here for the dog and she reached and closed the main door. I knocked again and Alec came to the door and he said to come in. Moose came down the stairs and I grabbed him by the nape of his neck. Later Elizabeth clarified he is wearing a collar, it is buried in his fur. I returned Moose home directly after grabbing him inside of the home."

J. Miller stated with me that it appeared that Denise was coaxing "Moose" at the time of incident, but can't be certain when he heard her actually call out to "Moose". He stated that the part of the incident that was 'weird' was that Denise shut the door on him. I advised him that I would contact him as necessary, we thanked one another and I cleared without incident.

I made contact with Alec Costerus (DOB:04/26/1962) at his front door 16261 Laurelhill Ct. He stated that he and Denise Costerus had been sick since before the incident and D. Costerus was preparing to go to the doctor at this moment and could not meet with me.

A. Costerus described his understanding of the incident, stating that he was in the house when "Moose" came in, describing it as a ruckus. He stated that "Moose" pushed pass D. Costerus coming into the storm door and she can not fend him off as "Moose" is ~140lbs. He described that D. Costerus called out to "Moose" to get him away from their front door and that she had to return inside quickly in attempt to

C0182025M002624                                                                 DISCOVERY PAGE 58



**CASE NO.**

**2025-00091315**

4000 Justice Way
Castle Rock. CO 80109
(303) 660-7505

## CASE NARRATIVE CONTINUATION

N
A
R
R
A
T
I
V
E

C
O
N
T
I
N
U
A
T
I
O
N

honor her restraining order. I advised him that I would contact him and D. Costerus after I completed my investigation.

I returned to my truck to better understand DCAS contact related to "Moose" being at large. Looking at records we had only directly contacted "Moose's" owner once before.

I made contact with Elizabeth Wilcox (DOB:11/14/1962)(PHN:303-638-6705) at her front door 16211 Laurelhill Ct. She invited me into her residence to complete our contact. I observed "Moose" a large black and tan Leonberger type dog who was alert and active. I photographed "Moose" with consent and observed that his collar was easily hidden in his fur.

I advised E. Wilcox that I would be issuing her a warning related to the incident, and she understood acknowledging that "Moose" left her property. We discussed "Moose" being coaxed to the her neighbor. She stated that she was unsure of the timing D. Costerus called out to "Moose" during the incident, but stated she heard her call out and return inside her home with "Moose". She stated that she did not follow after "Moose" but called out to him.

I advised E. Wilcox that a similar incident would result in citation, and that she should tether "Moose" when in the front yard going forward if he can be coaxed away, she understood. She provided her driver's license and followed me to my truck for me to issue her a warning.

I issued E. Wilcox warning EW0244481 for 1 count of Dog at Large R-025-019 1.08(1)(b), she signed the warning and accepted her copy. I advised her that the nature of the case has allowed me to issue a warning at this time, as "Moose" is acknowledged to be 'friendly' by the complainant, and this is our first attempt to document the issue with the Sheriff's office, but by letter of the law the moment he breaches her property line outside of immediate physical control it is a violation, she understood. E. Wilcox confirmed that "Moose" was up to date on his rabies vaccination through Meridian Animal Hospital. I cleared without incident.

I made contact at  16230 Laurelhill with a male party I provided my officer card to, requesting video from their cameras they stated they would return contact if anything was found.

I made phone contact with D. Costerus and A. Costerus and advised them I issued a warning related to their complaint and provided them the case report number. They stated they were in disagreement as they expected I would issue a citation. I advised them of my experience with Dog at Large and that it is my common practice to issue a warning for incident I have only a statement for, and within the statute of limitations I could escalate to a summons with supervisor approval. I advised them that the warning effectively documents my contact related to Dog at Large and should mitigate the issue, they understood. We ended the phone contact.

Case Report 2025-00091315 Page 5 OF 5

## Right Document — Uniform Summons and Complaint

| UNIFORM SUMMONS AND COMPLAINT / PENALTY ASSESSMENT | EW0244481 |
|---|---|
| Douglas County Sheriff's Office | |

Offense Date/Time: 10/09/2025/13:30
Issue Date/Time: 10/14/2025/13:50

Incident Number: 2025-00091315

THE PEOPLE OF THE STATE OF COLORADO
COUNTY OF DOUGLAS vs:

**ANIMAL CONTROL**

| First Name | Middle Intl | Last Name | DOB | Age |
|---|---|---|---|---|
| ELIZABETH | E | WILCOX | 11/14/1962 | 62 |

Address: **16211 LAURELHILL CT**

| City | State/Zip | Phone MAIN |
|---|---|---|
| PARKER | CO/80134 | 3036386705 |

| Drivers License # | State | DL Type |
|---|---|---|
| 920054117 | CO | |

| Race | Sex | Hgt | Wgt | Hair | Eyes |
|---|---|---|---|---|---|
| W | F | 505 | 120 | RED | BLU |

VIN | Vehicle License # | State: CO

VEH TAG: CO

| Veh Year | Make | Model | Style | Veh Color |
|---|---|---|---|---|

Registered Owner
First Name | Middle Name | Last Name

Address | City | State/Zip CO/

| Charge | Result | Section | Com Code | Fine | VA | TBI | FF | Points |
|---|---|---|---|---|---|---|---|---|
| No. 1 | WARNING | R-025-019 1.08 (1) | GPO | $0 | $0 | 0 | 0 | 0 |

Description: DOG AT LARGE FIRST OFFENSE
Offense Notes

| Total VA | Total TBI | Total FF | Total to be paid by Mail | Total Points |
|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 |

APPROXIMATE LOCATION OF VIOLATION: Located in Douglas County, Colorado
Direction of Travel
16229 LAURELHILL CT / /

PAYABLE SUMMONS OR PENALTY ASSESSMENT | CRIMINAL

| Speed Determined By | Speed Written | Speed Limit | Actual Speed |
|---|---|---|---|
| | MPH | MPH | MPH |

☐ Accident   ☐ Injury   ☐ Cnst Zone   ☐ Schl Zone   ☐ AGG   Pled

The Undersigned have probable cause to believe that the defendant committed the offense(s) against the peace and dignity of the people of the State of Colorado, Douglas County and certify that this Summons and Complaint was signed and served upon the defendant at the location and on the date referenced above.

Results of Signature: **PERSONALLY SERVED**

OFFICER  O. MOHAMED ACO88    VIOLATOR
Violator Signature

Sheriff Darren M. Weekly Encourages

Safe Driving in Douglas County

You were given a warning today:  ELIZABETH WILCOX

by Deputy:  O. MOHAMED     OSN  ACO88

For the following violation(s):

| Charge | Description |
|---|---|
| No. 1 | DOG AT LARGE FIRST OFFENSE |

## Left Document (back of form)

THIS IS A WARNING ONLY for an infraction of the traffic laws committed. No Penalty will be assessed and no further action on your part is necessary other than to comply with the traffic laws in the future. This DOES NOT become a part of your driving record.

This warning is given to you in an effort to secure your cooperation in better observance of the traffic laws, thus helping to prevent traffic accidents. The Douglas County Sheriff's Office believes that good citizens will comply with traffic laws when reminded of their provisions and of the importance of strict compliance with them.

Douglas County Ordinance R-025-019 1.01 Licensing: Every owner within the County shall obtain and maintain a current rabies certificate and tag issued by a licensed veterinarian for each dog and cat that he or she owns after the dog or cat is four months of age. Each dog or cat must possess a current certificate and tag by the time the dog or cat is five months of age. The tag shall be the County license and no other license is required.

Douglas County Ordinance R-025-019 1.07 Noisy Household Pets: No household pet individually, or in combination with another household pet(s), shall disturb the peace of another by making any noise audible from an adjacent or nearby property for a twenty (20) minute period that is relatively continuous and uninterrupted.

Colorado State Statute 24-4-604 Animal Biting Person to be Quarantined: [Excerpts] The owner of a dog, cat, or other pet animal that has attacked or bitten a person must confine the animal at the expense of the owner upon his premises or at a pound or other place designated for a period of 10 days.

Douglas County Ordinance R-025-019 1.08(1)(b) Dog at Large: [Excerpts] A household pet owner commits a class 2 petty offense if the owner's dog runs at large in the county, except in public parks where dogs are permitted to run at large within designated areas. Running at large means off the premises of the dog owner and not under the real and immediate physical control maintained on a leash, cord, or chain no more than ten (10) feet in length held by an owner able to control the dog.

Douglas County Ordinance R-025-019 1.05 At Risk Animal: It is unlawful for any person to allow their household pet to engage in At Risk behavior while in the County. At Risk means any household pet, except a dog that is assisting a law enforcement officer that is engaged in law enforcement duties, that (a) without provocation, approaches any person or domestic animal in a menacing or terrorizing manner or in an apparent attitude of attack, whether such person or domestic animal is in motion or standing still, and whether such person is on foot or on or in a vehicle or device which allows person to be in motion, (b) without provocation causes minor injury to a person or a domestic animal, or (c) is cited for running at large on three or more occasions within a 12 month period of time.

Douglas County Ordinance R-025-019 1.06 Potentially Dangerous Animal: It is unlawful to keep or maintain any potentially dangerous household pet within the County without compliance with appropriate permit, as explained in section 1.06 Potentially Dangerous Animal means any animal that (a) causes bodily injury to a person or domestic animal at any place within the County, (b) Attacks any person who is lawfully on the owner's or keeper's property, or (c) continues to display behavior that caused the animal to be adjudicated as an "At Risk" animal.

Douglas County Ordinance R-025-019 1.09 Dangerous Household Pet: It is unlawful to own, keep, or maintain any dangerous animal within the County. Dangerous animal means any animal, except a dog assisting a law enforcement officer engaged in law enforcement duties, that (a) causes serious bodily injury to a person or the death of a domestic animal, (b) has previously been adjudicated as a Potentially Dangerous Animal under section 1.06 and the owner or keeper has failed to comply with maintain the required Potentially Dangerous Animal permit, (c) engages in or has been trained for animal fighting.

Colorado State Statute 18-9-204.5 Unlawful Ownership of a Dangerous Dog: [Excerpts] Dangerous dog means any dog that has inflicted bodily or serious bodily injury upon or has caused the death of a person or domestic animal, has demonstrated tendencies that would cause a reasonable person to believe that the dog may inflict injury upon or cause the death of any person or domestic animal or has engaged in or been trained for animal fighting.

Animal Neglect/Cruelty:
Douglas County Ordinance R-025-019 1.08(1) (g) (i) (ii): (g) Sanitary living condition for a pets, (i) no person shall neglect or mistreat a household pet at any location within the County, (i) No person shall abandon any household pet.

Colorado State Statute 18-9-202 Cruelty to Animals: [Excerpts] If he or she knowingly, recklessly, or with torments, deprives of...

# Douglas County Animal Services

### 4556 Castleton Court, Castle Rock, CO 80104
### Phone—(303) 660-7529   Fax—(303) 484-4172

A25-20081
2025-91315

## COMPLAINANT INFORMATION

| Complainant's Name | DOB | Age | Race | Sex | DL or SSN# |
|---|---|---|---|---|---|
| Jeremiah Miller | 09/03/1955 | | W | M | |

| Complainant's Address | City | State | Zip Code |
|---|---|---|---|
| 16229 Laurelhill Ct. | Parker | CO | 80134 |

| Home Phone | Work Phone | Cellular Phone |
|---|---|---|
| | | 720 340 6790 |

## WITNESS INFORMATION

| Witness Name | DOB | Age | Race | Sex | DL or SSN# |
|---|---|---|---|---|---|
| | | | | | |

| Witness Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Home Phone | Work Phone | Cellular Phone |
|---|---|---|
| | | |

## VIOLATION INFORMATION

| Date of Violation | Start Time of Violation | Stop Time of Violation |
|---|---|---|
| 10/09/2025 | Early Afternoon  AM PM | AM PM |

## ANIMAL INFORMATION

| Address of Animal Owner | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Breed Type of Animal | Size | Hair Length | Color (s) | Markings |
|---|---|---|---|---|
| | Small  Med  Large | Short  Med  Long | | |

## STATEMENT

I went outside to retrieve the mail. after seeing the mail was delivered. At the same time, Elizabeth, my neighbor met me at the mailbox and we started small talk. Within that timeframe Denise came to get her mail. I waved at her to say hello, she looked at me and did not wave back. At this point, Moose was behind Elizabeth, and he saw that I waved at Denise and Moose started ran toward Denise. And I thought I heard Denise call out to ran moose. Moose, went around toward Denise's front door, as Elizabeth and I called for Moose to come back. I followed after Moose to retrieve him for Elizabeth.

***Prior to signing this document read the attached instructions page! Attach additional pages when required***

## SIGNATURES

| Complainant Signature | Date |
|---|---|
| | 10/14/2025 |

| Corroborating Witness Signature | Date |
|---|---|
| | |

*White copy: HSPPR*

*Yellow copy: Complainant*

# Douglas County Animal Services

### 4556 Castleton Court, Castle Rock, CO  80104
### Phone—(303) 660-7529   Fax—(303) 484-4172

A25-20081
2025-91315

## COMPLAINANT INFORMATION

| Complainant's Name | DOB | Age | Race | Sex | DL or SSN# |
|---|---|---|---|---|---|
| | | | | | |

| Complainant's Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Home Phone | Work Phone | Cellular Phone |
|---|---|---|
| | | |

## WITNESS INFORMATION

| Witness Name | DOB | Age | Race | Sex | DL or SSN# |
|---|---|---|---|---|---|
| | | | | | |

| Witness Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Home Phone | Work Phone | Cellular Phone |
|---|---|---|
| | | |

## VIOLATION INFORMATION

| Date of Violation | Start Time of Violation | Stop Time of Violation |
|---|---|---|
| | AM  PM | AM  PM |

## ANIMAL INFORMATION

| Address of Animal Owner | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Breed Type of Animal | Size | Hair Length | Color (s) | Markings |
|---|---|---|---|---|
| | Small  Med (Large) | Short  Med (Long) | Brown ? Black | |

## STATEMENT

When I arrived at the storm door, I saw that Moose was already inside the house. I knocked on the storm front door, Denise appeared and I said. I am just here for the dog and she reached and closed the main door. I knocked again and Alec came to the door and he said to come in. Moose came down the stairs and I grabbed him by nape of his neck. Later Elizabeth clarified he is wearing a collar, it is buried in his fur. I returned Moose home directly after grabbing him inside of the home.

***Prior to signing this document read the attached instructions page! Attach additional pages when required***

## SIGNATURES

| Complainant Signature | Date |
|---|---|
| *[signature]* | 10/14/2025 |

| Corroborating Witness Signature | Date |
|---|---|
| *[signature]* | |

*White copy:  HSPPR*                                    *Yellow copy:  Complainant*

# STATEMENT FORM

This Statement Form is a legal and binding document. By providing a signature on this document the complainant is acknowledging that the facts contained within are true and correct to best of his/her knowledge. A signature also indicates that the complainant is willing to testify in a court of law concerning the matter.

The personal information requested on this document will be used to identify and subpoena the complainant should the issue be set for trial.   Prior to signing this document, the complainant should understand that the information provided on the statement will become a matter of public record and can be released in compliance with Colorado Revised Statues.  If this statement is concerning Barking Dogs, as per Douglas County Ordinance R999-177 1.05 (1) (h) your name and address will be provided to the defendant at the time of service.

Before any legal action can be taken, the statement needs to include the following:

> **Name, date of birth, age, race, sex, social security or driver license number, complete address, and a valid telephone number** of the complainant.

> **Date and approximate time of violation (s)**. If the statement is for a Barking Dog, it must include the time that the dog started barking and a time the dog stopped barking.

> **Address of animal owner**.  It is best to provide and exact address. If an exact address is not possible then identify the location of the violation as a hundred block and street name.

> **Description of the animal.**  In most cases a general description is best. Example: a medium black Labrador type of dog or one large white dog.

> **Statement Section.**  The complainant should describe the who, what, where, and when of the alleged violation. The Animal Welfare Officer who investigates the matter will use the statement to establish probable cause that a violation occurred. If any required information is omitted, the Officer cannot establish probable cause and therefore no action can be taken.  Background information is sometimes useful to help solve the problem, but this type of information should be kept to a minimum.

> **Corroborating Witness** from an address other than the complainants.

Once the statement is completed return it to Douglas County Animal Services via one of the following methods:

**Fax**   (303) 484-4172
**Fax**   AnimalC@dcsheriff.net
**Mail**   4556 Castleton Ct. Castle Rock CO 80104
During normal business hours, which vary by season, you may deliver the statement in person at the above address. Please call to make arrangements prior to delivery in person.  In emergency situations or where special circumstances occur please contact DCAS to make other arrangements.

Once DCAS receives a statement it will be reviewed to ensure it contains all of the required information.  An Animal Welfare Officer will then conduct an investigation to establish probable cause and determine the most appropriate action to be taken.  This can include a Written Warning, Penalty Assessment, or a Summons and Complaint to court.  It is the Investigating Officer's discretion that will determine which corrective measure will be used to address the problem.  This decision will be based on Douglas County Ordinances, the frequency of the problem, the severity of the violation, prior violations, and a myriad of other factors.  Although the complainant's suggestions are always welcome, the Investigating Officer will make the final decision on how best to attempt to resolve the matter.

We will strive to address your concerns as soon as possible.  Our response time may very due to emergency calls for service, work load, weather conditions, manpower, and a variety of other factors. If an accurate and complete statement is received, we will make every attempt to address the matter on the day after the complaint is received. If the complainant would like contact please indicate such on the statement and an Officer will attempt contact with the complainant once corrective measures have been taken.

**EXHIBIT F**

| | |
|---|---|
| COUNTY COURT<br>DOUGLAS COUNTY, COLORADO<br>Court Address: Douglas Combined Courts<br>4000 Justice Way, Castle Rock, CO 80109 | |
| THE PEOPLE OF THE STATE OF COLORADO, Plaintiff<br><br>vs.<br>**DENISE M COSTERUS**, Defendant | |
| | COURT USE ONLY |
| District Attorney:<br>GEORGE BRAUCHLER,<br>23rd Judicial District Attorney<br>4000 Justice Way, Suite 2525 A, Castle Rock, CO 80109<br>Phone: 720-733-4500<br>Atty. Reg. #: 25910 | Case Number:<br>**C0182025M002624**<br>Division/Courtroom:<br>**G** |

## MOTION TO DISMISS CASE

GEORGE BRAUCHLER, District Attorney for the Twenty-Third Judicial District State of Colorado, respectfully moves the Court pursuant to Crim.P. Rule 48(a) to dismiss the case and to quash any warrants which presently exist against the Defendant in the above captioned case, and as grounds therefore states as follows:

1. Further prosecution of the above captioned case is no longer necessary in that the People feel that the ends of justice would not be further served by continued prosecution of the Defendant because the Defendant took a Making Better Choices class.

GEORGE BRAUCHLER, District Attorney

By      **/s/Anders Ericson**
            Anders Ericson
            Deputy District Attorney
            Registration # 59228

| | |
|---|---|
| COUNTY COURT<br>DOUGLAS COUNTY, COLORADO<br>Douglas Combined Courts<br>4000 Justice Way<br>Castle Rock, CO 80109 | DATE FILED<br>January 8, 2026 4:13 PM<br>CASE NUMBER: 2025M2624 |
| THE PEOPLE OF THE STATE OF COLORADO, Plaintiff<br>vs.<br>**DENISE M COSTERUS**, Defendant | ▲COURT USE ONLY▲ |
| | Case Number:<br>**C0182025M002624**<br>Division/Courtroom:<br>**G** |

## ORDER TO DISMISS CASE

THIS MOTION TO DISMISS having been considered by the Court:

The Court ORDERS that the above-entitled case is dismissed.

Date_____January 8, 2026_____      _____

                                                                       JUDGE/MAGISTRATE

9:57

JM

Jeremiah >

Definitely weird... she called him over and then opened the glass storm door to let him inside. When I got to the front door and rang the door bell, Denise came up and shut the main door in my face (despite my pleading with her that I'm here for the dog). After a bit, Alec opened the door and invited me inside. After greeting each other, Moose then came over and he followed me outside. Alec noticed that Moose didn't have a collar on so you may want to make sure he is collared in the future when he comes outside.

iMessage

EXHIBIT I

INTEGRATED COLORADO ONLINE NETWORK (ICON)

Status:       CLSD              County Court, Douglas County      **EXHIBIT J**
Case #: 2024 M  002662      Div/Room: FAC    Type: Harassment
        The People of the State of Colorado vs. DITUS, GARRETT EDWARD

                                                      DV STATUS:
Case File Date: 10/25/2024    Case Close Date:  1/31/2025   Appealed: N
                              Confidential Intermediary.............:


                      Bar #    Name
       Judicial Off...: 044431   MARK STEVEN SOLOMON
       Alt Jud Officer: 000000
                      Description                Stat Date        Time    Appear Rr
       Trial..........:                                           0:00
       Next Schd Event:                                           0:00
       Last Schd Event: Pre-Trial Conference      VACT  2/10/2025  8:00 A
       Last Event.....: Case Closed-Case Dismissed  n/a  1/31/2025


       Attorney(s)....: Y  +


       Agency: Douglas County Sheriff Dept    Agency Case #: 2024-00098477
       Ticket/Summons Number(s):      EB0286732    Arrest#: 24006615


       Warrant.........:      Warrant Date:           Expired Date:
       Party on Warrant:
       Change of Venue.:      Agency:


       Bond(s)..................: N


       Sentence Date............:
       Detention Location.......:
       Supervising Agency.......:
       Probation Officer........:


                          ----- PARTIES -----
PARTY  ROL STS    NAME                    ATTORNEY                ROL
DEF  1            DITUS, GARRETT EDWARD    CRAWFORD, HOLLIS ANN    PRV
               Date of Birth...........: 6/15/1993
               Sex.....................: Male
               Race....................: Caucasian
               Height..................: 509
               Weight..................: 150
               Hair Color..............: Blonde
               Eye Color...............: Green
               Home Address............: 16278 LAURELHILL CT
                                        : PARKER, CO  80134
PPL  1               THE PEOPLE OF THE STATE OF C
  CNT STS STATUTE NUMBER        CHARGE DESCRIPTION              CLASS
   1 (D) 18-9-111(1)(a)         HARASSMENT-STRIKE/SHOVE/KICK    M1
     Offense Date: From: 10/24/2024 To:          Time:         BAC: .000
     Arrest Date.......:            Time:         Ticket #:     EB0286732
     Disposition.......: Dism by DA                 Date:  1/31/2025
FILE DATE    EVENT DESCRIPTION
10/25/2024  Notice of Appearance         Event ID: 000002   E-Filed: N
            DEF/   DITUS, GARRETT EDWARD

| FILE DATE | SCHEDULED EVENT DESCRIPTION | SCHD DATE | TIME | ROOM | APPEAR |
|-----------|----------------------------|-----------|------|------|--------|
| 1/31/2025 | Pre-Trial Conference | 2/10/2025 | 08:00 AM | FAC | |

Officer: ALISHA TAIBO COOMBE

Length:  1.00 Hour(s)

Status.: VACT-Vacated

End of Case: 2024 M  002662

**EXHIBIT L**

Evidence Title: MANCUSO GRACE : 2255

This transcript is unverified.

**An unverified transcript may have been generated through a combination of speech-to-text technology and
human edits. As a result, it may contain errors, so please refer to the corresponding evidence.**

[0.135] Speaker 1 - <silence>
[73.555] Speaker 2 - Hi. Hi. Most, this is Max.
[76.315] Speaker 3 - Oh, he's so cute. Hi. Um, okay.
[78.915] Speaker 2 - He loves you guys. <laugh>
[80.275] Speaker 3 - All the time. We love him. So I saw when Sergeant Rogers was here. Yeah. I guess he suggested mediation.
[87.995] Speaker 2 - He did. They refused.
[89.445] Speaker 3 - Okay. I just wanted to Stan see where that was going.
[91.255] Speaker 2 - Stan Stanton actually. 'cause you know I Stanton too. And so he called me after this one blew up and said, you know, I think you should do mediation. I said, great. That's what we wanna do. Yeah. So he called them and he apparently refused. So he's refused mediation, which is why we got the TPOs went to mediation and it fell apart when, um, they said they would not stop calling you guys and they would not stop reporting me to the HRA
[119.245] Speaker 3 - Okay.
[120.635] Speaker 2 - For my black mailbox. So that was there for four years and he decided he didn't like it.
[125.405] Speaker 3 - Okay.
[126.155] Speaker 2 - So this is just so silly. You're so sorry. It's,
[128.565] Speaker 3 - It's, no, I'm sorry. I guess there's enough of us. We have more than enough time.
[133.125] Speaker 2 - Well, I know how short staffed you
[134.695] Speaker 3 - Are. Grade shift is coming out. This is all
[136.405] Speaker 2 - Yeah. But I know, I know how short staffed you guys are. I mean, I hear about it all the time. It's fine. There's not enough of you. That's true.
[144.085] Speaker 3 - Doesn't
[144.575] Speaker 2 - Mean you're overworked and underpaid. That
[146.135] Speaker 3 - Doesn't mean that all Don't get too address. Understand
[148.735] Speaker 2 - How embarrasses is a homicide. Kelsey, you'll never guess who I saw today.
[153.695] Speaker 3 - <laugh>. She will love it. Um, but I think that's all I need. Okay. Like I said, I was just confused 'cause the dispatch
[160.775] Speaker 2 - Notes Yeah. It's
[161.295] Speaker 3 - An it did. Were not great. Yeah. Um, so we'll go talk to 'em, see what their reasoning was. I'm gonna review that, um, protection order and then I'll just give you a call once we're done. Are you gonna be up for a while?
[174.475] Speaker 2 - Oh, hell yeah. Okay. I'm gonna probably either take Xanax or have a drink. Okay. I'm trying to figure out which one. Don't do both. Yeah, I know. Yeah. One or the other <laugh> to be on Xanax because of this.

[186.845] Speaker 3 - I, like I said, if you've been dealing with Li 10 for 10 years and it's just not stopping and it's just constant, it's never ending. It's gonna wear me. So, uh, like I said,

[195.465] Speaker 2 - I'm on my last look at this. I am on this is, you're like, who, who in, who are you?

[200.965] Speaker 3 - <laugh>? Well, I came from a dark light. No, um, but please call. I, I know,

[205.525] Speaker 2 - I know. I'm just hoping if you take her, this will end.

[209.685] Speaker 3 - I hope so too. But like I said, in my experience, it's not been the

[212.525] Speaker 2 - Case. And the fact that they have guns really scares me. Yeah.

[215.665] Speaker 3 - So, um, let us, let us go try to figure out what they're

[221.915] Speaker 2 - Okay.

[222.675] Speaker 3 - What they've got going on and we'll do

[224.285] Speaker 2 - That. Okay. Um,

[227.345] Speaker 3 - Yes. Yes.

[228.195] Speaker 2 - I'll tell

[228.765] Speaker 3 - Kelsey to call. I will, I will tell him. Tell want me.

[230.655] Speaker 2 - Sorry. No, it's okay. It's just a rug. You can tell. He's, you can tell he's a very violent He is. He's so cute. <laugh> aggressive. Thank you. Thank you. Conference review

[245.835] Speaker 3 - This po

[247.275] Speaker 2 - Okay.

[367.505] Speaker 4 - <silence>

[370.235] Speaker 5 - Hello?

[371.565] Speaker 4 - Hi, Gabriel? Yes. Hi. I'm so sorry. Um, I'm not able to take your call right this moment. I will call you as soon as I can. Um, I just wanna let you know everything's fine. I just do have some questions for you. Okay.

[384.935] Speaker 5 - Okay.

[385.485] Speaker 4 - So I'll call you back as soon as I can.

[388.815] Speaker 5 - Okay. I'll wait for your call. Do you want me to work or do you want a statement of time? You'll call

[394.585] Speaker 4 - Me? Yep. You can keep working. Um, if it doesn't happen tonight that we call, we'll talk tomorrow. Okay?

[400.895] Speaker 5 - Okay. But I will wait for your call.

[403.295] Speaker 4 - Okay. Perfect. Thank you. Thank you. Alright, bye. Conference. Is this on

[479.485] Speaker 1 - Or off? Conference? <silence>

[716.015] Speaker 6 - Hello? Hi, how are you? Good. Okay. Them coming in? Yeah. Come on in.

[721.985] Speaker 7 - If you don't mind the dogs.

[722.985] Speaker 6 - That's okay. <laugh>. No, they're very friendly, but they have a lot here. We watching a movie, we're sick, so I don't wanna get you sick. Okay, that's fine. So what, what's going on early on with the dog? Oh yeah, we've gotta write that statement. Oh, I wrote it down. So I'm gonna go get my, um,

[745.035] Speaker 7 - Yeah, I called Dan with patrol.

[747.475] Speaker 6 - Okay. So

[748.865] Speaker 7 - We reported to them, this is the third time in about three weeks the dog gets out. Um, either she's not d it's been different circumstances

each time. Um, this time she was out there talking to a neighbor, uh, not on a leash, no collar. Um, moose is, the dog likes us, especially my dogs and my wife. She goes to get the mail. You okay, honey? Yes. Um, and this was about 1215. Uh, the dog comes running in. He's a large dog. I dunno if you met him, but he's about 135 pounds. So Denise opened the door to get in and he just pushed her aside, comes right in. So we called animal control to say, Hey, actually it was, I misspoke. Shortly thereafter, Jeremiah came over. Jeremiah Miller, he's in the house next to um, obviously the reporting party. And he says, I'm here to collect the dog. Great. Come on Moose. Come on. And howdy goes, she can't, well, she could come here but <laugh>, she better not. Um, so anyway, that was the last, that was the last event. Now then we called animal control. I spoke to your officer. I have a card begins with an m, uh,

[828.725] Speaker 6 - Erman. And, uh, I'm sorry. Is it Erman?

[831.025] Speaker 7 - It could be. I, I, okay. It begins with an M and it's very nicely. So, okay. Um, I advised her what happened the first time. So the time before this one, she said that if it happens again, that it would be, um, she would be cited. I wanted a record with animal control because of She's such a bitch. I expected that you guys would eventually show up. So I wanted it reported officially. So I did that.

[860.675] Speaker 8 - Okay. I was the one that was out there.

[863.875] Speaker 7 - What have you got there?

[864.945] Speaker 8 - Uh, so this is what happened. I wrote it right afterwards. I said went to the mailbox to get mail. Um, three times in the last few weeks, noose Elizabeth Stocks saw me, came running, sorry, came running past me up to my front door. I opened the door and Moose ran inside. We wanted to say he wanted to say hi to my other dogs and play the neighbor. Jeremiah Miller came to my door to gather moose. Moose didn't want to go, but eventually did. Moose still did not have a caller on. 'cause the last two times he hasn't had a caller on. And that bothers me. Um, we reported his missing caller about a week ago. Um, the last time animal control came to pick him up. Animal control said she would be cited. Lemme

[924.465] Speaker 7 - Get you that incident number

[925.665] Speaker 8 - If it happened again. Um, we left Animal Control a message around 10:30 PM and then this is the, um, uh, sorry. This site that the animal control lady gave us when she called back to, um, um, say we could make a report, um, now or six months from now.

[951.395] Speaker 3 - Okay.

[952.785] Speaker 7 - So this you're right now, or me. Okay. And that's the incident number from before.

[959.585] Speaker 8 - It was

[959.845] Speaker 9 - Just not the one that you called in yet today.

[961.675] Speaker 7 - Correct. That's the,

[964.065] Speaker 9 - Did she give you it

[964.925] Speaker 7 - Today? No. 'cause it was just by phone. Oh, okay. Because the dog went over. I just wanted to cover our asses. Okay. Just in case you guys came now. Okay. And so now I will form file a absolutely formal event. Okay. And so, so that she can be sent, when

[981.445] Speaker 3 - Jeremiah came over, what

[982.385] Speaker 9 - Ci what was

[983.125] Speaker 3 - The purpose of

[983.685] Speaker 7 - Shutting the door? The dog getting yelled. Okay. That's what

my own man was gonna do. So, okay.

[988.075] Speaker 9 - Well, we, we can't cite them for that,

[989.555] Speaker 7 - That she can, but if you can put that in report dog.

[992.195] Speaker 8 - Okay. White dog. Not shutting the door, but like, you

[996.565] Speaker 7 - Know, he's a big boy.

[998.145] Speaker 8 - No, I was talking about Breezy with the door because Breezy was standing there. I don't think the door shut though. Did it shut

[1006.195] Speaker 7 - This door takes a while to shut?

[1009.085] Speaker 8 - I

[1009.295] Speaker 3 - Dunno.

[1009.645] Speaker 7 - Okay. Oh, lemme see.

[1011.185] Speaker 8 - Um, I, I was in the kitchen and I gave moose a

[1013.765] Speaker 3 - Treat. Okay.

[1015.035] Speaker 7 - Yeah. She's here.

[1016.145] Speaker 3 - So when you were outside with, with everybody out there, why did you call the dog to you?

[1022.635] Speaker 7 - Because this has been, this is like the 20th time

[1025.645] Speaker 8 - I really called my dog. I went, she said Moose. Moose come here. Yeah. She called the

[1031.165] Speaker 7 - Dog. Yeah. Yeah. She

[1033.595] Speaker 9 - Here. I just let her, let her talk first.

[1035.585] Speaker 8 - I'm good. I, I don't remember calling moose over and Moose wouldn't like come to me if I call them because she does. And we have a camera out there if you wanna take a look

[1048.165] Speaker 3 - At it. Do you have a video for

[1049.805] Speaker 7 - That? I don't, no, we don't. 'cause it, I had to put it on the charger with the rain and stuff. The battery decline, um, to curated. So it's on the charger right now.

[1058.525] Speaker 8 - I guess you could talk to Jeremiah.

[1060.515] Speaker 3 - Yeah, I've already got his, his information. Okay. So, and you've been served with a protection order,

[1067.145] Speaker 8 - Um, from Elizabeth? Yeah. Okay. But, you know, we're nice. I think we didn't even report her again because they said last time that she would be cited and they said, let's just let it go until we go to court and see what happens and not report her. And now she calls you guys. I'm just like, you know, I can't,

[1089.795] Speaker 7 - This is, this is absolutely,

[1091.085] Speaker 3 - I, I just can't. Yeah, I mean, it, it seems that this is kind of an ongoing issue both ways.

[1095.825] Speaker 7 - No, it's only

[1096.545] Speaker 8 - Not with the dog. It's

[1097.925] Speaker 7 - Not deputy. It's only one way. It's one way. She has done everything that we have done or in the past and what she is crying and whining and complaining about. We have done everything legal. We have never broken a law. And it's, she's gonna tell you about 10 years of parking. Look at the statute. You guys have been here for a decade.

[1118.195] Speaker 3 - Well, the statute's changed. It has,

[1120.555] Speaker 7 - It's changed. It may of this year. Right? It hasn't been a truck here, honey. Okay, well I'm pissed and

[1128.665] Speaker 3 - No, I'm gonna talk now. No, that's not how this works. I'm

gonna talk now. Okay. She has 36 records of you calling frivolous complaints to our dispatch center. No, no.
 [1139.025] Speaker 8 - You
 [1139.245] Speaker 7 - Know,
 [1140.465] Speaker 3 - Do you know how many a she has in response? Stop. So that's the issue that I'm saying is that this goes both ways. You are both willing participate.
 [1149.505] Speaker 7 - No, calm down. But it doesn't, deputy, here's
 [1152.005] Speaker 3 - The thing. But it is, I'm telling you it is because there's complaints from your end to her. Yes. And from her end to you. Right? So that is both ways you guys are calling on each other. Yes. I over ridiculous things. Is that incorrect? Oh,
 [1164.795] Speaker 7 - It's petty as hell. I totally agree with you.
 [1167.065] Speaker 3 - So at some point somebody has to be the adult mm-hmm <affirmative>. And look the other way.
 [1172.065] Speaker 7 - And that's why we didn't call today.
 [1173.755] Speaker 3 - Okay. So that's all I'm saying. And Okay.
 [1175.945] Speaker 8 - And to be fair, Alec has pictures of three parking, um, things and something else. Oh. But he has not
 [1185.005] Speaker 7 - Called on. Yeah. So,
 [1186.685] Speaker 8 - 'cause I said it's just gotta stop. And that's why we didn't call, you know, or do this complaint and he didn't report the last three. And I, I'm just wanted to stop.
 [1200.615] Speaker 7 - Right. So Deputy, there there are, there are a couple things. 100% of the things that I have called you guys out, you have acted on. Whether it's been illegal parking, whether it's been anything else, your deputies have cited people that, well, Ellen's boyfriend was parked illegally. You cited him. He was almost parked on Jeremiah's front lawn.
 [1223.305] Speaker 3 - So I'm gonna stop you and tell you that's incorrect. Okay. 'cause I've personally responded to some of those. Okay. I'm taking no action.
 [1228.225] Speaker 7 - No, no. But you, you've had people move their cars. I'm not saying everybody's been cited. No,
 [1233.085] Speaker 3 - I I've arrived and there has not been anything to the effect of what was reported to us.
 [1237.675] Speaker 7 - Well then I didn't, I
 [1239.885] Speaker 8 - Don't know. Oh, I wonder if it's when Ellen's kids were out here making all that
 [1243.605] Speaker 7 - Noise. Well, I, not everything When I, when I called, I've watched your deputies tell the people to move their cars like a hundred percent of the time. It doesn't, it doesn't matter. Yeah. It doesn't matter. So in their, they're also upset that I've, um, and I've seen her manifest on it. It's submitted as evidence. They complain about the reports to the HOA. Every time I've sent a letter to the HOA, they have sent a letter to Elizabeth or Ellen and said, Hey, in fact they were subject to fights. This has been going on for four and a half years in some of the events. And only now because I've been a stickler because they've been a sticker to my truck and the truck parking. Um, I'm holding them accountable. That's all it is. They were, when my truck was parked here, now I had parking offsite. Sometimes I'd bring it here to take out food, put in new food, change the laundry, the sleeping bag, vacuum, whatever. And then I'd bring the truck back to Flat Farm where I was drinking the parking spot. They make it sound like the truck

has been here day after day for 10 years. And that's not the case at all. So, and this is gonna come out in litigation. Um, I've seen their, all their evidence for their PPO, there isn't one shred of evidence to support A PPL.

[1322.475] Speaker 3 - Well, that's outside of your or my decision. Yeah. I the judge granted that, so obviously a judge sees that there is enough.

[1328.835] Speaker 7 - Well, the judge says and all, no, no, no. That was, I'm sorry. That was the temporary protection order. Yeah. Which, you know, is very routine given. So no, it is. No. So

[1337.975] Speaker 3 - Under the statute, those things have to meet certain criteria. Yes.

[1341.065] Speaker 7 - But if they lie about what the application on the complaint Yeah,

[1344.445] Speaker 3 - That's right. Which you would have an opportunity to respond to. Correct the date that it's put

[1348.085] Speaker 7 - Into. And that's the hearing that's coming up next week. So,

[1350.885] Speaker 3 - Okay. The one that was continued Yes. By your to

[1353.925] Speaker 7 - October 2nd. Yes. The lawyer to the 16th. Yes. Okay. Because we got evidence that particular time and, uh, we hadn't seen it. That was evidence that we had subpoenaed. So that's why it got continued. So we're looking forward to challenging the issuance of a, you know, that temporary becoming permanent. So now we have seen all of their evidence. There's not one, one shred of evidence that indicates stalking abuse of an adult physical threat, Riz, uh, or assault, um, abuse of an adult or an at risk adult or any of those things. I, I'm missing name, but I whatever. You probably know what it is. Sounds right. Why

[1395.015] Speaker 8 - She called you so late. Like why are you here so late?

[1398.455] Speaker 3 - So the call came in considerably earlier. Okay. However, we had other calls Oh my. That we were responding to. Okay. So we just didn't have the opportunity to come until now, unfortunately. I see. If I could have come earlier, I would've I understand. Um, okay. I just thought,

[1412.665] Speaker 8 - Well why is she doing it now?

[1414.425] Speaker 7 - Yeah,

[1415.265] Speaker 3 - Yeah. This isn't, this isn't on any, any particular party. Like I said, it was just calls for service. Okay. Right. Delayed us. Um, okay, so you guys have got a copy of the temporary, you understand the conditions on that? Oh yeah. Oh yeah. Okay. Yeah. So because of that, at this time, I'm gonna tell you, you are under arrest for violation of a protection order. Whoa, whoa, whoa. So go ahead and stand up. Why? No. What, why sir? I'm okay. You're okay. How my, okay. Wait. We, we,

[1444.985] Speaker 8 - And I don't understand.

[1446.475] Speaker 3 - Okay. So, so I don't understand. So any contact that would be, there wasn't

[1450.405] Speaker 8 - Any, there wasn't contact.

[1452.235] Speaker 3 - Just let him speak for a sec

[1453.305] Speaker 8 - To get my mail. Okay. Just let him speak for a sec. Okay. I'm

[1456.325] Speaker 3 - Sorry. Okay. Any contact that would be anything outside of incidental contact, because you guys live in such close proximity is a violation of that protection order. So I have a third party witness that states that you went to your mailbox, gathered your mail, came back to your house, saw the dog, hold on,

saw the dog out there returned, called the dog into your house. Then he further corroborates that he came to knock on your door. You walked from your kitchen, which you told me you were in, which corroborates his story. Come up to the front door and shut the door

[1483.195] Speaker 8 - Because my dog was there. I officer, I am not trying to cause a problem

[1489.475] Speaker 3 - At all. But that's not incidental contact. That's your intentional act to do something. The judge, the judge to annoy that other person. No, I, no,

[1496.295] Speaker 8 - No, no, no. I went outside. I didn't even know they were out there. Yeah. And then I turned the corner. I went, oh God, I'll just go grab my mail. Yeah. Not thinking anything. Yeah, I swear. In fact. And then, um, I grabbed my mail. Um, and you know what I could have said, I, and I just don't remember 'cause I wrote it down. When I did used to see moose, I used to go, oh hi moose or whatever. But he was running towards me, I swear to God. And when I came inside, I had cancer. When, when came inside, um, he ran past trying to think into the kitchen. I went to the kitchen to go get a treat to come back out. My dog was standing right there. This one, she has a long nose. She moved the door. I don't even think it closed, I swear to you. No. And, uh, the judge told me that I am allowed to be in my yard and to go get the mail. I he did

[1560.515] Speaker 3 - Say that. Yes. I don't, I don't disagree with that. However, the action of interacting with her dog and coaxing the animal to your home. I didn't No, no, no, no. And refusing to release it. I, that's the issue.

[1572.295] Speaker 8 - I didn't refuse to lease release that dog. I love that dog. Yeah.

[1576.535] Speaker 7 - Well, how could we release it? The, the dog was on his own. It wasn't on a leash and it didn't have a car.

[1581.275] Speaker 3 - No.

[1581.975] Speaker 8 - I swear to you. Yeah.

[1584.725] Speaker 7 - Yeah. That's

[1585.665] Speaker 8 - Isn't fair.

[1586.755] Speaker 7 - No, this is, this is absolutely

[1588.335] Speaker 3 - Ridiculous. That's, that's where we're at at this point. Okay. But the

[1591.335] Speaker 8 - Judge said I could do this.

[1593.885] Speaker 3 - Yeah. And I'm not disputing that. Okay.

[1596.525] Speaker 8 - So why would I be under arrest?

[1598.685] Speaker 3 - So as I'm telling you, your actions of returning outside, after you have completed your lawful purpose, which is outlined in that protection order of gathering your mail and returning to your home, you returning, listen, you returning outside with no lawful justification. Simply the coast. No, the judge was back inside. I never went back. And then refusing to release the animal is the issue. Deputy, deputy, no,

[1624.505] Speaker 8 - That's not what happened. Yeah. I didn't even go back outside.

[1629.075] Speaker 3 - Yeah. Okay. Deputy, go ahead and stand up. Deputy, can I say something?

[1632.825] Speaker 8 - Can I please just get some water?

[1635.025] Speaker 3 - Not right now. She's, she's sick. She's really sick. I just got over it.

[1640.595] Speaker 9 - Unfortunately, it's, the law doesn't wait for that.
[1643.705] Speaker 3 - Can I, can I get glass of water
[1646.425] Speaker 9 - Bottle? Um, not this time. Not at this time.
[1649.205] Speaker 3 - I understand that. You're gonna have to stand up. I don't want to have to pick you up. Can I get her some other garments face away from me.
[1657.625] Speaker 4 - Oh, raise your
[1658.205] Speaker 3 - Hands behind your bag.
[1659.105] Speaker 9 - She'll be fine in this. They change 'em anyways. I'm sorry. They change 'em anyways, so she'll be fine in that.
[1664.225] Speaker 8 - She just wants to get a permit. That's all it is. She's just a bitch.
[1669.465] Speaker 9 - 2 42 1 1
[1670.405] Speaker 3 - Custody. Come Michael.
[1671.795] Speaker 8 - Okay. Alright. How long do I have to
[1674.205] Speaker 3 - Stay? Just stay still. Sorry. Because I don't want these to get any tighter on. Okay. Yeah. So what'll happen from this point forward, what will happen from this point forward is we'll get you down there. We'll get you processed. Thank
[1685.525] Speaker 9 - You for staying over here
[1686.285] Speaker 3 - And see a judge in the morning. You guys gotta take judge like this, not like this. Like she said, they're gonna change you out into a jail form. Okay. So we're gonna step out here. Okay?
[1705.435] Speaker 1 - Can you please have some water?
[1708.415] Speaker 10 - I can't have you ingest anything 'cause I don't know what it is. Okay. I'm gonna walk over to my patrol
[1712.715] Speaker 3 - Car over here.
[1713.835] Speaker 1 - Oh, you're really not nice.
[1715.325] Speaker 4 - Just watch your step.
[1718.885] Speaker 1 - What? And you're bullshit. Okay.
[1729.675] Speaker 4 - Um, I'll have you just hang out up here. We're going literally right there. I mean, you can't really say goodbye to her at this point.
[1735.755] Speaker 11 - Can I give you a bottle of water so she can have some
[1738.495] Speaker 4 - Jail? I unfortunately can't. We're she, they're going straight to the jail, so she, it's literally like 10 minutes. We can get her some water there. Like he said, we have no idea what you're giving her. I know. That's so we don't know. I,
[1751.195] Speaker 11 - I'd like, I mean, she's, she's getting through the cancer.

[1753.855] Speaker 4 - I hear you. I I, unfortunately the answer is no. It doesn't matter how many times you ask me. I'm sorry, <laugh>. That's, um, I'm gonna assist with him really quick and I'll come talk to you, okay? Okay. Just hang out here for me,
[1772.375] Speaker 1 - I think. No.
[1773.655] Speaker 4 - Do you want me to? Yes,
[1775.115] Speaker 1 - I can sit.
[1777.055] Speaker 4 - Do you need me to pat her down?
[1779.415] Speaker 1 - Um,
[1783.215] Speaker 12 - We'll just do that quick.
[1785.495] Speaker 4 - Maybe back here where it's not wet.
[1788.855] Speaker 6 - Would you mind? I'm gonna,

[1790.755] Speaker 4 - Yeah. Okay. I'm just gonna pass you down real quick. We're gonna step out and we're gonna move to the back so we're not getting sprayed by water. Okay.
[1796.725] Speaker 12 - Because you want her to see,
[1798.835] Speaker 4 - Okay. No, that's why I'm moving you to the back.
[1802.005] Speaker 12 - Bullshit.
[1803.265] Speaker 4 - So right here,
[1805.285] Speaker 12 - Whatever.
[1806.035] Speaker 4 - Okay. Separate your feet for me please. Do you have anything on you that's gonna stick
[1809.885] Speaker 12 - Your both me? No. Anything that I should be aware? Nothing. Nothing? Nothing. Okay.
[1812.985] Speaker 4 - So I'm gonna just go through everything. Okay?
[1818.485] Speaker 12 - I have a spinal cord stimulator in my back. You might feel that.
[1822.235] Speaker 4 - Okay. Is that something that's not, you're not able to remove?
[1825.585] Speaker 12 - No, it's underneath the
[1826.725] Speaker 4 - Skin. Okay.
[1828.545] Speaker 6 - Are you taking any medications?
[1830.065] Speaker 12 - Yes. Um, I don't know. I just take it from my pillbox in my pocket.
[1837.125] Speaker 4 - Where is is it at?
[1838.785] Speaker 12 - I'm not talking to anybody there.
[1840.795] Speaker 4 - Okay. I just don't wanna pull it. If it's on your back. I'm not trying to hurt you.
[1855.635] Speaker 12 - Call that dog.
[1858.075] Speaker 1 - Okay.
[1860.675] Speaker 12 - Damn. Fucking
[1861.575] Speaker 1 - Bitch. You're
[1863.325] Speaker 12 - A kind jerk. Watch your head down.
[1876.355] Speaker 6 - Okay? I am gonna have you lean back a little bit so I can get the seatbelt on you. Okay?
[1882.115] Speaker 12 - I'm gonna pass out.
[1883.995] Speaker 6 - Why are you gonna pass out?
[1884.975] Speaker 12 - Because I say I told you I have cancer. You asshole. Okay.

[1889.095] Speaker 6 - But you, you haven't given me any kind of explanation as to why you feel that way, right? Because you can yell and holler at me, but that doesn't solve anything. Try and ask you questions so I can get you properly.
[1905.455] Speaker 12 - I told you I'm not talking to
[1906.735] Speaker 6 - You. Okay.
[1913.915] Speaker 4 - Do you need me to follow up with her over there at all? Uh, no.
[1916.975] Speaker 6 - I got
[1917.255] Speaker 4 - It. Okay. I'm just gonna chat with him real quick and then go
[1931.195] Speaker 6 - Uh, yeah, just uh, for gathering the mail. So if you could call, that would be great.
[1938.985] Speaker 4 - Okay. I just wanna let you know they're going to the jail

in Douglas County. So that's in casts Rock, right? You know where that is? The justice center. Okay. Um, she won't have a bond tonight. She'll be able to see a judge tomorrow, um, kind of in the afternoon. So that's where we're at right now. You won't be able to bond her out tonight. Does that make sense?

[1954.745] Speaker 6 - Yeah. Okay.

[1956.215] Speaker 4 - Any questions before we go?

[1957.655] Speaker 6 - Um,

[1960.565] Speaker 11 - I guess, do I go to the FAC type of thing? Where does he have her phone?

[1967.265] Speaker 4 - Um, it'll be virtual so I'm not sure if you'll be able to join that. Okay. So it's a virtual one in while they're in custody.

[1973.475] Speaker 11 - Alright. Gotcha.

[1975.945] Speaker 4 - You can check on the court docket on our website though, and kind of update of if she's in custody or not, but she should be able to call you. Okay? Okay. Thank you.

**EXHIBIT N**



Ref #20250135550, Date: 9/1/2025-10:49 AM, Pages: 6 of 18 ,
Electronically Recorded Douglas County, CO. Sheri Davis, Clerk and Recorder

Case No. 1:26-cv-02893   Document 1   filed 06/23/26   USDC Colorado   pg 167 of 172

Docusign Envelope ID: 7EA30252-9DD9-461A-9EAC-0C7A009D0CE5

## Resolution No. R-025-019


### THE BOARD OF COUNTY COMMISIONERS

### OF THE COUNTY OF DOUGLAS, COLORADO

### RESOLUTION FOR THE CONTROL AND LICENSING OF HOUSEHOLD PETS


*WHEREAS*, the Board of County Commissioners ("Board") is authorized to adopt a resolution for the control and licensing for dogs, cats, and pet animals pursuant to section 30-15-101 et seq., C.R.S. and;

*WHEREAS*, it is the policy of the Board that the keeping of a household pet in Douglas County is a potential hazard and annoyance to the citizens of the County and that a household pet owner must, therefore, assume full responsibility and strict liability for the actions of any household pet that is owned, kept, controlled, or harbored by the household pet owner or that is in the custody of the household pet; and

**WHEREAS**, the Board wishes to repeal Resolution No. R-019-029, and adopt a revised resolution for the Control and Licensing of Household Pets: now, therefore,

**BE IT RESOLVED BY THE BOARD OF COUNTY COMMISIONERS OF DOUGLAS COUNTY, COLORADO, AS FOLLOWS:**


### 1.0   DEFINITIONS


As used in this resolution unless the context otherwise requires:

(1)   **Abandon** means the leaving of household pet without adequate provisions for the animal's proper care by its owner, the person responsible for the animal's care or custody, or any other person having possession of such animal.

(2)   **Animal Control Officer** means any person empowered by Douglas County to enforce the provisions of this resolution, including personnel of the Douglas County Sheriff's Office; Douglas County Health Department; peace officers as defined in sections 18-3-201(2) and 30-15-101, C.R.S.; and employees of any Contractor.

(3)   **Attack** means violation or aggressive physical contact with a person or household pet, or violent or aggressive behavior that confines the movement of a person

Ref # 20250135550, Pages 2 of 46

Docusign Envelope ID: 7EA30252-9DD9-461A-9EAC-0C7A009D0CE5

(4)    **At Risk** means any household pet, except a dog that is assisting a law enforcement that is engaged in law enforcement duties, that:

    (a)    Without provocation, approaches any person or domestic animal in a menacing or terrorizing manner or in an apparent attitude of attack, whether such person or domestic animal is in motion or standing still, and whether such person is on foot or on or in a vehicle or device which allows such person to be in motion.

    (b)    Without provocation causes minor injury to a person or a domestic animal

    (c)    Is cited for running at large on three or more occasions within a 12-month period of time.

(5)    **Bodily Injury** means any physical injury that results in severe bruising, muscle tears, or skin laceration requiring professional medical treatment or any physical injury that requires corrective or cosmetic surgery.

(6)    **Contractor** means any person, corporation, company, or legal entity authorized by the County by contract to enforce the provisions of this resolution.

(7)    **Control** shall mean that the dog is confined on its owner's property or when off property it is maintained on a leash, cord, or chain not more than 10 (10) feet in length and is held by a person of sufficient age, size, and physical ability to restrain the animal.

(8)    **County** means the unincorporated portion of Douglas County.

(9)    **Dangerous Animal** means any animal, except a dog assisting a law enforcement officer engaged in law enforcement duties, that:

    (a)    Causes serious bodily injury to any person or the death of a domestic animal

    (b)    Has been previously adjudged as a potentially dangerous animal under section 1.06 of this resolution and the owner or keeper has failed to obtain and maintain the required potentially dangerous animal permit, or the animal has engaged in subsequent behavior that poses a threat to public safety or for which any of the potentially dangerous animal permit conditions set forth for the keeping of potentially dangerous animals have been violated (unless the animal owner or keeper has been relieved of the obligation to maintain such permit as set forth in Subsection 1.06(4)(h)(iii) of this resolution).

    (c)    Engages in or has been trained for animal fighting as described and prohibited in Section 18-9-204.5, C.R.S.

Docusign Envelope ID: 7EA30252-9DD9-461A-9EAC-0C7A009D0CE5

(24)    **Potentially Dangerous Animal** means any animal, except a dog assisting a law enforcement officer engaged in law enforcement duties, that may be a threat to public safety as may be demonstrated by any of the following behaviors:

>    (a)    Causes bodily injury to any person or domestic animal at any place within the County.
>
>    (b)    Attacks any person who is lawfully on the owner's or keeper's property.
>
>    (c)    Continues to display behavior that caused the animal to be adjudicated as an "At Risk" animal.

(25)    **Proper Enclosure** means a structure which:

>    (a)    Has secure sides and a secure top or secure sides which are of sufficient height to prevent the animal from escaping over the sides.
>
>    (b)    Has sides that are constructed at the bottom so as to prevent the animal's escape by digging under the sides.
>
>    (c)    Has sides that are constructed at the top so as to prevent the animal's escape by climbing or jumping over.
>
>    (d)    Provides appropriate protection from the elements for the animal.

(26)    **Running at Large** means off the premises of the dog owner and not under the real and immediate physical control of an owner able to control the dog.

(27)    **Shelter** means an adequate structure that is in good repair, provides protection from the weather, provides shade from the direct rays of the sun, and provides appropriate ventilation.

(28)    **Serious Bodily Injury** means bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree.

### 1.01    LICENSING

Every owner within the County shall obtain and maintain a current rabies certificate and tag issued by a licensed veterinarian for each dog and cat that he or she owns after the dog or cat is four months of age. Each dog or cat must possess a current certificate and tag by the time the dog or cat is five months of age, or within one month of being brought into the County if the dog or cat is over four months of age. The tag shall be the County license and no other license is required. This section 1.01 shall not apply to dogs or cats that are residents of a licensed kennel or veterinary facility.

Docusign Envelope ID: 7EA30252-9DD9-461A-9EAC-0C7A009D0CE5

## 1.02    GUARD DOGS

A guard dog may be placed or kept in an area for the protection of property only under the following conditions:

(1)    The guard dog shall by confined to an enclosed area adequate to ensure that it will not escape or shall be under the complete control of a person at all times; and

(2)    Warning signs shall be conspicuously posted indicating that a guard dog is present on the property and such signs shall plainly show a telephone number at which some person responsible for controlling the dog can be reached at all times.

## 1.03    IMPOUNDMENT OF HOUSEHOLD PETS

An animal control officer may take into custody and impound any household pet that is found running at large or any household pet that has allegedly bitten a person or animal, caused bodily injury to a person or animal, or any animal that is not being provided with normal standards of care consistent with the species, age, or physical condition of the household pet. Unless otherwise authorized by this resolution, the household pet may be taken into custody and impounded for no more than ten (10) days.

Nothing in this Section shall be construed to prevent an animal control officer or any other law enforcement officer from taking whatever action is reasonably necessary to protect his/her person or members of the public from being injured by any household pet.

The owner or keeper of any impounded animal shall be responsible for the payment of all charges and fees, including those for impoundment, boarding and daily care, euthanasia, disposal, veterinary care, and all other services needed. Fees and charges for impounded animals shall be set by the Contractor in accordance with the fees and charges incurred by the County.

(1)    The owner or keeper of any animal impounded in conjunction with a violation of 1.06, 1.08(1)(i), (j), or 1.09 may prevent disposition of the animal by filing a payment for impoundment, care and provision costs set by the Contractor in an amount determined to be sufficient to provide said care for at least thirty (30) days with the Douglas County Clerk's Office.

(2)    The owner or keeper must file the payment:

(a)    Within ten (10) days after the animal is impounded; or

(b)    Within ten (10) days after the date of impoundment, the owner or custodian may request a hearing for the courts to determine whether there was sufficient probable cause for impoundment and whether the costs associated with impoundment are fair, reasonable, and necessary.

Docusign Envelope ID: 7EA30252-9DD9-461A-9EAC-0C7A009D0CE5

## 1.08    VIOLATIONS AND PENALTIES

Petty Offense

(1)    A household pet owner commits a Petty Offense if:

(a)    The owner's dog or cat is unlicensed as provided in Section 1.01 of this resolution;

(b)    The owner's dog runs at large in the County, except in public parks where dogs are permitted to run at large within designated areas;

(c)    The dog owner possesses one or more guard dogs and fails to comply with the conditions of Section 1.02 of this resolution;

(d)    The owner's household pet engages in At Risk behavior as described in Section 1.05 of this resolution;

(e)    The owner's household pet violates Section 1.06 of this resolution (Potentially Dangerous Animal). Any person charged with violation Section 1.06 of this resolution may be issued a summons and complaint requiring a mandatory court appearance.

1.    An affirmative defense to the violation of Section 1.06 may be:

a.    That, at the time of the attack by the household pet which causes injury to or the death of a domestic animal, the domestic animal was at large, was an estray, and entered upon the property of the owner and the attack began, but did not necessarily end upon such property;

b.    That, at the time of the attack by the household pet which causes injury or death of a domestic animal, said animal was biting, scratching, or otherwise attacking the household pet or its owner.

c.    That, at the time of the attack by the household pet which causes bodily injury to or the death of a person, the victim of the attack was committing or attempting to commit a criminal offense, other than a petty offense, against the household pet's owner, and the attack did not occur on the owner's property.

d.    That, at the time of the attack by the household pet which causes bodily injury or the death of a person, the victim of the attack was committing or attempting to commit a criminal offense, other than a petty offense, against a person on the owner's property or the property itself and

Docusign Envelope ID: 7EA30252-9DD9-461A-9EAC-0C7A009D0CE5

## 1.11   DISPOSITION OF FINES AND FORFEITURES

All fines and forfeitures for the violation of this resolution shall be paid into the treasury of the County.


## 1.12   LIABILITY FOR ACCIDENT OR SUBSEQUENT DISEASE FROM IMPOUNDMENT

The Board of County Commissioners, any of its employees or assistants, or any other person authorized to enforce the provisions of this household pet control and licensing resolution shall not be liable for injury or disease that may occur to any household pet in connection with the administration of this resolution.

## 1.13   SEVERABILITY

In the event that any section, clause, sentence, or part of this resolution is adjudged by any court or competent jurisdiction to be unconstitutional or invalid, that judgement shall not affect, impar, or invalidate the resolution as a whole o any part of the resolution other than the part adjudged to be invalid.

## 1.14   REPEAL OF PRIOR RESOLUTIONS

Resolution R19-029 pertaining to the control and licensing of dogs and household pets is hereby repealed.

## 1.15   EFFECTIVE DATE

This resolution shall become effective immediately upon adoption.


**PASSED AND ADOPTED**, this 25th day of March 2025, in Castle Rock, Douglas County, Colorado.


**THE BOARD OF COUNTY COMMISSIONERS**
**OF THE COUNTY OF DOUGLAS, COLORADO**

BY: _____
**ABE LAYDON, Chair**

ATTEST: _____
**HAYLEY HALL,** Clerk to the Board